Dominique **FORD–SHOLEBO**, individually and as administrator of the estate of Habib Solebo, Plaintiff,

v.

The **UNITED STATES** of
America, Defendant.

No. 09 C 2287.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 3, 2013.

Cindy Gale Fluxgold, Lorenzo Vallado-lid, Michael James Baron, Scott G. Gold-stein, Goldstein, Fluxgold & Baron, P.C., Chicago, IL, for Plaintiff.

Jonathan C. Haile, United States Attorney's Office, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

RUBEN CASTILLO, Chief Judge.

Plaintiff Dominique Ford–Sholebo, individually and as administrator of the estate of her deceased husband, Habib Solebo ("Solebo"), brings this wrongful death action against the United States pursuant to the Federal Tort Claims Act (the "Act" or "FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq.* (R. 101, Fifth Am. Compl. at 2–8.) Solebo, Plaintiff's decedent, died on May 1, 2007, while incarcerated at the Metropolitan Correctional Center (the "MCC") pending criminal trial proceedings. Plaintiff alleges that the United States, by and through the MCC and MCC physicians, staff, supervisors, employees, agents, and apparent agents, negligently failed to provide Solebo with proper and adequate medical attention, thereby proximately causing Solebo's death. (*Id.* at 2–8.) Plaintiff seeks a total of $1,650,000.00 in wrongful death damages for loss of consortium, loss of society, companionship, money, benefits, goods, services, grief, sorrow, and mental suffering. (R. 93, Proposed Pretrial Order, Ex. G: Statement of Damages at 1.)

In February 2012, this Court voluntarily accepted the transfer of this lawsuit to its docket during the unfortunate illness of its friend and judicial colleague, the Honorable William J. Hibbler, who prematurely passed away on March 19, 2012, at the age of 65. Thereafter, it was brought to this Court's attention that it had also presided over Solebo's criminal proceedings and the less than successful criminal prosecution of Solebo's co-defendant in those proceedings. Nevertheless, this Court is confident that it approached these trial proceedings from a neutral standpoint; not favoring one side or the other. Unfortunately, the bottom line is that this Court must conclude that the repeated negligence of officials at the MCC caused Solebo's premature death.

After bifurcating the proceedings, this Court conducted a five-day bench trial on

liability beginning in late February 2012. (R. 102, Min. Entry; R. 103, Min. Entry; R. 104, Min. Entry; R. 105, Min. Entry; R. 106, Min. Entry.) On March 15, 2012, this Court ruled that Plaintiff established by a preponderance of the evidence that the United States negligently violated the appropriate standard of care for treating Solebo's seizure disorder and that its negligence proximately caused his death in a reasonably foreseeable manner during his ongoing treatment for seizure disorder. (R. 109, Order on Liability at 1; R. 108, Min. Entry.) On May 16, 2012, this Court issued an order on comparative fault, finding that the United States bore 67% of the responsibility for Solebo's death and that Solebo's contributory fault was 33%. (R. 117, Order on Comparative Fault at 1.) On June 4, 2012, this Court held the damages phase of the trial. (R. 118, Min. Entry.) That same day, the case was referred to the Honorable Morton Denlow for one final settlement conference, which proved to be unsuccessful, and on July 16, 2012, the case was referred back to this Court for a ruling. (R. 125, Min. Entry.)

In this memorandum opinion and order, this Court explains its findings of fact and conclusions of law. Pursuant to Federal Rule of Civil Procedure 52, this Court hereby enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they

shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

This Court concludes that Plaintiff established through both direct and circumstantial evidence, as well as reasonable inferences drawn therefrom, the following facts by a preponderance of the evidence:

### I. General Background

1. Habib Solebo was born on June 10, 1983. (Pl.'s Ex. A at 84; June 4, 2012 Tr. 9, June 4, 2012.)[1] He and Plaintiff were married on October 4, 2005. (June 4, 2012 Tr. 2.) On October 8, 2006, while Solebo was incarcerated at the MCC, their daughter, Jadesola Sholebo was born. (June 4, 2012 Tr. 5–6.)

2. Solebo was arrested on January 25, 2006. (Stip. Ex., *United States v. Mustapher*, No. 06 CR 61–2, Excerpt of Trial Tr. 61–62 (Jan. 24, 2007, J. Castillo); Stip. Ex., Arrest and Interview of Habib Solebo Jan. 25, 2006.) The next day, he was taken to the Kankakee County Detention Center/Jerome Combs Detention Center ("Kankakee"). (*See* Jt. Ex. 3 at 1–3.) On August 28, 2006, Solebo was transferred to the MCC in Chicago, Illinois. (Def.'s Ex. 22 at 1.) Following his arrest, he was indicted for conspiracy to distribute and to possess with intent to distribute 100 grams or more of a substance containing heroin

---

1. The parties' exhibits that were admitted and received into evidence at trial are cited as "Pl.'s Ex. ___," "Def.'s Ex. ___," or "Jt. Ex. ___." Witness depositions that were admitted and received into evidence are cited as "[last name of deponent] ___, [date of deposition]," in the first instance, and thereafter as "[last name of deponent] ___." Per an agreement with Plaintiff's counsel, the Government also submitted exhibits and a stipulation in advance of the damages phase of the trial on June 1, 2012; such exhibits are cited as "Stip. Ex. ___," and the stipulation is cited as "Damages Hr'g Stip. ¶ ___." Finally, as the trial transcript for the damages phase of the trial is only available in rough form, this Court cites that transcript by the date of the proceeding, as "June 4, 2012 Tr. ___."

in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 (Count I), and distribution of a substance containing .33 grams of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count II), and possession with the intent to distribute and distribution of 99.4 grams of a substance containing heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count III). (Def.'s Ex. 8, Indictment at 1–3, *United States v. Solebo and Mustapher*, No. 06 CR 61 (N.D.Ill. Feb. 23, 2006).) [2]

3. Solebo was found dead in his cell at the MCC in the early morning of May 1, 2007. (R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶¶ 1–2.) At the time of his death, he was 23 years old. (Pl.'s Ex. A at 58.) He is survived by his wife and his minor daughter, (R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶ 3), who was six months old at the time of his death, (June 4, 2012 Tr. 17).

## II. Solebo's time at the Kankakee County Detention Center: January 2006 to August 2006

4. On January 26, 2006, Solebo was incarcerated at Kankakee. (*See* Jt. Ex. 3 at 1–2.) At this time, Solebo reported that he did not have an individual or family history of seizures and that he was not taking any medications. (*Id.*) A report of Solebo's past medical history indicated that Solebo had a history of smoking and that he did not have a history of seizures. (*Id.* at 3.)

5. On February 17, 2006, Solebo experienced his first episode of loss of consciousness and was admitted to the emergency room at Provena St. Mary's Hospital ("Provena"). (*Id.* at 24, 41–43.)

Although Solebo's chief complaint was described as a fall, the medical note from the emergency room visit provides, "? [seizure] prior to fall?" (*Id.* at 45.) A February 23, 2006 progress note from Solebo's Kankakee medical records describing this episode states: "In ER on 2/17. Was laying in bed sleeping. Next thing he knew he was being brought to hospital. The roommate says he was shaking. No incontinence. No personal or [family] history of [seizures]. Stated head injury ... [with] blowout [fracture]." (*Id.* at 24; *see also* Trial Tr. 578–79.)

6. While at Provena, Solebo underwent a Computed Tomography scan ("CT scan"). (Jt. Ex. 3 at 39.) The CT scan impression stated, in part: "No hemorrhage, mass effect or contusion in the brain. Blow out fracture of the left lamina papyracea of indeterminate age. Minimally displaced fracture of the nasal bones." (*Id.* at 39.) This was not a normal CT scan in that there were some findings. (Trial Tr. 365.)

7. On February 23, 2006, Dr. Jeffrey Long of the Medical Group of Kankakee County ("Kankakee Medical") saw Solebo after he returned to Kankakee. (Jt. Ex. 3 at 24.) Dr. Long's assessment at this time was "loss of consciousness [with] shaking activity." (*Id.*; Trial Tr. 271.) Dr. Long's recommendations and treatment plan provided that if Solebo had "further [seizures] empiric RX [with] Dilantin or phenobarbital" should be commenced. (Jt. Ex. 3 at 24; *see also* Trial Tr. 271–72, 578.) Dr. Long also ordered that Solebo undergo an electroencephalogram ("EEG") test for possible seizures. (Jt. Ex. 3 at 24, 36; Trial Tr. 364.)

**2.** A copy of the indictment was admitted and received into evidence on June 4, 2012. (June 4, 2012 Tr. 38.) Although counsel for the Government stated that the indictment was Defendant's Exhibit 11, the indictment is actually labeled Defendant's Exhibit 8. (*See* June 4, 2012 Tr. 38.)

**928**

8. On February 24, 2006, Solebo underwent an EEG at Provena. (Jt. Ex. 3 at 38.) The EEG results state: "[t]his is a case of a patient with possible seizures." (*Id.*) The EEG was "within normal limits," and no epileptiform activity was detected. (*Id.*)

9. On April 17, 2006, Dr. Abigail Martinez of Provena prescribed Solebo 100 milligrams of Dilantin to be taken twice a day. (Jt. Ex. 3 at 14, 40.) Dilantin, also known as Phenytoin, (Trial Tr. 409), is an anti-seizure medication that lowers the risk of having seizures, (Trial Tr. 497, 504; Trial Tr. 758), and is customarily administered in the form of pills, (Trial Tr. 223).

10. Three days later, on April 20, 2006, Physician Assistant K. Patterson of Kankakee Medical saw Solebo to follow up on an emergency room visit and discontinued his Dilantin. (Jt. Ex. 3 at 14, 20, 31.) A progress note for this visit provided: "Habib states woke up in am with correctional officers standing over him, they had called ambulance. He has no other recollection of event and I have no history from [correctional officers]. I have no ER paperwork. Came back [with prescription] for Dilantin. Habib refuses [medications], states he does [not] have seizures. Does not want to be housed in this building, wants to return to old jail." (*Id.* at 20; *see also* Trial Tr. 582.) The progress note also stated that Solebo did not have a history of seizures. (Jt. Ex. 3 at 20.) The assessment at this time was "Questionable episode [loss of consciousness]/seizure. Normal EEG." (Jt. Ex. 3 at 20; *see also* Trial Tr. 582.)

11. On May 24, 2006, Solebo experienced an episode that he described as a seizure with violent shaking of his whole body. (Jt. Ex. 3 at 15, 18, 56–57.) During this episode, Solebo fell out of his bunk. (*Id.* at 57.) The very day of this episode, Solebo submitted a request to a Kankakee

nurse and requested that his Dilantin be resumed. (*Id.* at 18, 58.) In his request, Solebo wrote, "I was previously on Dilantin medication and was taken off prescription and believe I may have suffered a seizure because of discontinuation of Dilantin. I want to be put back on the medication Dilantin." (*Id.* at 58.)

12. On May 25, 2006, Physician Assistant Patterson saw Solebo for his episode the day prior. (*Id.* at 18.) The progress note for this visit stated that Solebo "woke up on [the] floor, near incontinent of urine," and that his "cellmate told him he was shaking on the floor." (*Id.* at 18.) The assessment at this time was "Questionable seizures." (*Id.* at 18.) During this visit, Physician Assistant Patterson resumed Solebo's Dilantin. (*Id.* at 14, 18, 32.) Solebo continued to take 100 milligrams of Dilantin twice a day until August 28, 2006. (*Id.* at 33–35.)

13. On August 22, 2006, Physician Assistant Patterson noted that Solebo "refuse[d] follow-up today for seizure management." (*Id.* at 27, 29.) That same day, this Court entered an order, as the presiding trial judge in Solebo's pending criminal case, requiring Solebo to undergo a forensic evaluation to assess his competency to stand trial. (*See* Def.'s Ex, 22 at 1; *see also* Trial Tr. 158, 160.)

### III. The Metropolitan Correctional Center

14. On August 29, 2006, Solebo was transferred to the MCC. (Jt. Ex. 3 at 35; *see also* Def.'s Ex. 22 at 1.) In the early morning of May 1, 2007, Solebo was found dead in his cell. (R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶ 2.) This Court refers to the time period during which Solebo was at the MCC as "the relevant time period."

## A. MCC personnel

### 1. The MCC warden

15. At the time of Solebo's transfer to the MCC, there was no official warden at the MCC; instead, Associate Wardens Janet Purdue and James Henry were acting as interim wardens. (Trial Tr. 694–95.) Eric Wilson became the warden of the MCC on April 1, 2007, and was the warden of the MCC at the time of Solebo's death. (Trial Tr. 694.) As warden, Wilson was the person who was ultimately in charge of running the MCC. (Trial Tr. 695.)

16. Warden Wilson testified at trial. (Trial Tr. 694–720.) He testified that he was responsible for ensuring that inmates received medical care and treatment that was necessary for their medical conditions. (Trial Tr. 695.) He was responsible for overseeing that medications were administered to inmates in accordance with the MCC's rules and regulations and that the MCC's rules were generally followed. (Trial Tr. 696.) Warden Wilson was also responsible for ensuring that the MCC personnel followed the Bureau of Prisons ("BOP") program statements, procedural statements, and technical reference manuals. (Trial Tr. 696; *see also* Trial Tr. 702–03.)

17. Warden Wilson also testified that he had to ensure that there was an adequate medical staff at the MCC to care for the inmates. (Trial Tr. 699–700.) He testified that he had a thorough knowledge of BOP regulations in effect to protect the lives of the MCC's inmates. (Trial Tr. 698.) Warden Wilson also testified that if he knew an inmate was acting in a way that could cause the inmate's own death, he had a duty to protect the inmate from killing himself. (Trial Tr. 698.)

### 2. The MCC Physicians

18. During the relevant time period, only two physicians practiced at the MCC: Dr. Arthur Hoffman and Dr. Bonnie Nowakowski (the "Physicians" or the "MCC Physicians"). (Trial Tr. 481–82.) Dr. Hoffman and Dr. Nowakowski each testified at trial. (Trial Tr. 387–474, 479–560.) Dr. Hoffman was evasive and combative during questioning, and his testimony was generally not credible.

19. Dr. Hoffman was the MCC's Clinical Director from November 2005 until about November 2007. (Trial Tr. 390–91; 481). Dr. Nowakowski was a staff physician who worked under the supervision of Dr. Hoffman. (Trial Tr. 481, 487.) The Physicians' regular hours were 7:45 a.m. to 4:15 p.m., Monday through Friday. (Pl.'s Ex. Y at 1; Trial Tr. 482.) Beginning in approximately the second half of March 2007, Dr. Hoffman went on leave and did not return to his role as Clinical Director at the MCC at any point in time prior to Solebo's death. (Trial Tr. 402–03.) In Dr. Hoffman's absence, Dr. Nowakowski was the Acting Clinical Director, (Trial Tr. 144, 482–83), and was the only physician on the MCC's premises from mid-March through the Fall of 2007, (Trial Tr. 487–88.)

20. Dr. Hoffman, as the Clinical Director, oversaw the clinical care provided at the MCC and was responsible for all health care delivered at the MCC. (Pl.'s Ex. C at 3.) Dr. Hoffman also supervised MCC health care providers, such as physician assistants. (Trial Tr. 392, 396; Pl.'s Ex. C at 5.) Specifically, Dr. Hoffman testified that it was his job, as Clinical Director, to ensure that the Physicians and physician assistants provided medical care and treatment to the inmates at the MCC in a proper manner. (Trial Tr. 393–95.) The Clinical Director also had a duty and responsibility to be directly involved in the evaluation and treatment of patients with

medically complex problems. (Trial Tr. 397; Pl.'s Ex. C at 3.)

21. As a staff physician, Dr. Nowakowski's duties included providing patient care, either directly through patient visits or by supervising physician assistants. (Trial Tr. 481.) Dr. Hoffman and Dr. Nowakowski shared the responsibility of treating the MCC's inmates, including Solebo. (Trial Tr. 545.)

22. Dr. Nowakowski testified that when she was out, she provided the physician assistants with a contact number at which they could call her if there was an urgent medical problem. (Trial Tr. 491–92.) When the Physicians were not physically present at the MCC, a BOP regional medical director or a physician from a different BOP institution was designated to be available to provide clinical guidance to a physician assistant or nurse telephonically. (Trial Tr. 168.)

### 3. The MCC physician assistants

23. In 2007, the MCC physician assistants, also known as mid-level practitioners, included Albert Iskandar, (Trial Tr. 28), Maria Velasquez, (Trial Tr. 66), Victoria Carrera, (Trial Tr. 99), and Roberto Aruiza, (Aruiza Dep. 7, Mar. 10, 2010). Iskandar, Velasquez, and Carrera each testified at trial. (Trial Tr. 28–140.) Aruiza's deposition was admitted into evidence. (*See* Trial Tr. 721, 788.) Each MCC physician assistant was a physician in another country who was not licensed to practice medicine in the United States. (Trial Tr. 100, 395–96.) The Physicians supervised the physician assistants. (Sample Dep. 24, Jan. 25, 2011.) Dr. Hoffman testified that he regularly had contact with the physician assistants and discussed medical care and treatment with them. (Trial Tr. 396.)

24. During the relevant time period, physician assistants were on tile premises at the MCC from 7:30 a.m. until 11:00 p.m. (Trial Tr. 33, 484.) Medical personnel were not physically present between 11:00 p.m. and 6:00 a.m., (Trial Tr. 33), and all emergencies during those hours would be called out to 911, (Trial Tr. 483–84). Physician assistants who worked the night shift in 2007 overlapped with the Physicians' day shift. (Trial Tr. 131.) Thus, if physician assistants who worked the night shift at the MCC had a concern about an inmate missing his medication, they could tell the Physicians about this during the overlapping time. (Trial Tr. 131.)

25. The physician assistants' duties included, in part, administering medication on the pill line. (Trial Tr. 29; Aruiza Dep. 28.) Physician assistants were responsible for working with the Physicians, (Trial Tr. 100), and assisting the Physicians with managing chronic health problems, such as seizure disorders, (Aruiza Dep. 14–15). Physician assistants were also responsible for making decisions, in conjunction with the Physicians, concerning the patients' medical care and special needs. (Aruiza Dep. 15–16.) Because the physician assistants had daily contact with the inmates, they were in essence the Physicians' eyes and ears on the ground regarding the medications inmates were and were not receiving. (Trial Tr. 36–37, 89–90.)

### 4. Health Services Administration

26. At all times relevant to this action, Ken Sample was the Health Services Administrator ("HSA") at the MCC. (Sample Dep. 20, 23.) He managed the MCC's Health Services Unit. (Trial Tr. 768.) Although Sample did not testify at trial, his deposition was admitted into evidence. (*See* Trial Tr. 721, 788.) In his capacity as HSA, Sample managed and directed the MCC Laboratory, the MCC Pharmacy, and the Medical Records departments. (Sample Dep. 24, 32; Trial Tr. 436.) In managing the MCC Laboratory, for example, Sample relied on a BOP Program

Statement on Laboratory Services ("Lab Services Statement") that was in effect during the relevant time period to perform his job as the HSA. (Sample Dep. 84.) As the HSA, Sample was responsible for formulating and implementing administrative policies and programs essential to medical and dental operations. (Sample Dep. 31.) In addition, he was responsible for coordinating and controlling MCC programs and resources to achieve a balance between patient care and the inmate population. (Sample Dep. 31–32.)

27. Sample also evaluated MCC employees, with the exception of the Physicians. (Sample Dep. 24.) Although Sample was the physician assistants' administrative supervisor, they were under the medical and clinical supervision of the Physicians. (Sample Dep. 24, 29.) Therefore, when evaluating the physician assistants on those areas that involved the clinic, Sample sought input from the Physicians and others. (Sample Dep. 29–30.)

28. From January 2007 through May 2007, Deborah Lamping was the Assistant HSA and was supervised by Sample. (Trial Tr. 141–43.) Lamping testified at trial. (Trial Tr. 141–175.) In her role as the Assistant HSA, Lamping had direct contact with the inmates. (Trial Tr. 144.) Nevertheless, she never had any conversations with Solebo about his medical care and treatment. (Trial Tr. 144–45.)

### a. Medical Records

29. Sample was in charge of the Medical Records department. (Sample Dep. 24.) In that capacity, Sample provided overall management reporting, and the two medical records clerks reported to him. (Sample Dep. 41.) Sample required the medical records clerks to stay current with their filing, their audits, and any other required tasks that were outlined in their program statement. (Sample Dep.

41.) In short, Sample was responsible for ensuring that the medical records clerks followed their job descriptions as defined in their program statement. (Sample Dep. 42.)

30. Medical records were maintained in an inbox ("Medical Records Inbox"). (Sample Dep. 42.) Sample did not have any input or control over the types of documents that were contained in the Medical Records Inbox, and a program statement directed where each one of those documents was placed. (Sample Dep. 42.)

### b. MCC Laboratory

31. The MCC Laboratory was in a separate office from the Medical Records department. (S. Wilson Dep. 34, Sept. 27, 2010.) From 2006 through March 2007, the only nurse at the MCC was Duane Wagner. (Trial Tr. 501, 767–68.) He worked from Monday through Friday and oversaw the MCC Laboratory. (Trial Tr. 768–69.) Wagner was called to testify at trial. (Trial Tr. 767–88.) The MCC Laboratory also employed a phlebotomist, Sandra Wilson, through a staffing agency. (S. Wilson Dep. 9, 14.) The phlebotomist worked a morning shift from Monday through Friday. (S. Wilson Dep. 10, 14, 19.) Although the phlebotomist did not testify at trial, her deposition was admitted into evidence. (*See* Trial Tr. 721, 788.)

32. HSA Sample supervised Nurse Wagner. (Sample Dep. 24, 27; Trial Tr. 393–94, 502–03.) Sample also supervised the phlebotomist, as he was the Contracting Officer's Technical Representative ("COTR") for her position and was administratively responsible for her. (Sample Dep. 25, 27, 48; S. Wilson Dep. 21.) In that capacity, Sample was responsible for scheduling her hours and ensuring that she showed up on time and performed blood draws. (Sample Dep. 25–26; S. Wil-

son Dep. 21.) The phlebotomist also reported to Wagner, who directed her work and answered her questions. (S. Wilson Dep. 23, 33; Sample Dep. 33.)

33. In March 2007, Wagner permanently left the MCC. (Trial Tr. 779, 787.) Wagner's duties as the staff nurse included, among other things, processing the Physicians' and physician assistants' orders for laboratory tests requiring blood draws, drawing inmates' blood, and following up on laboratory tests to ensure that the Physicians received test results. (Trial Tr. 502–03, 768–69, 773.) On a day-to-day basis, the phlebotomist drew inmates' blood for lab requisitions. (S. Wilson Dep. 27–28; Trial Tr. 132–33, 769, 774.) Unless the phlebotomist needed a patient's medical chart to see a blood test, or unless Sample asked her to pull a chart, the phlebotomist did not pull patients' medical charts on a daily basis. (S. Wilson Dep. 35.)

34. At the MCC, the process for ordering laboratory tests and following up on the results of those tests worked as follows: Physicians ordered laboratory tests that required blood draws by placing the orders on a patient's medical chart. (*See* Trial Tr. 768–69.) Nurse Wagner then transcribed the order onto a requisition form. (Trial Tr. 768–69, 782–83.) If a Physician ordered multiple laboratory tests, Wagner listed all of the tests on a single requisition form. (Trial Tr. 769.) The requisition forms were then sent to a testing laboratory along with the specimens that were collected. (Pl.'s Ex. V at 28.) The Lab Services Statement that was in effect during the relevant time period instructed that the MCC Laboratory was to "maintain a daily accession record of specimens collected, specimens processed, and an appropriate identification system for each." (Pl.'s Ex. E at 5; Trial Tr. 783.) Inmates' blood draws and the laboratory

results for those blood draws were tracked in a logbook ("MCC Laboratory Logbook"); this was the only system in place at the MCC for tracking laboratory results. (Trial Tr. 120–22, 769–73; *see also* Pl.'s Ex. A at 636, 845.) The MCC Laboratory Logbook consisted of a chart with the following information: the date of a blood draw, an inmate's name and number, the laboratory tests that were ordered and the ordering practitioner, the date that the results were returned, and the signature of the person who drew the blood. (Pl.'s Ex. A at 636, 845; Trial Tr. 133, 769–70; Sample Dep. 81–82.) The primary purpose of the MCC Laboratory Logbook was to document the return of laboratory results to the MCC. (Sample Dep. 82–83.)

35. HSA Sample was responsible for implementing policies for the MCC Laboratory regarding the types of containers to be used for specific blood draws. (Sample Dep. 46–47.) Sample's role was limited to informing the MCC personnel that the blood specimens had to go out in a timely manner and that they had to be placed in the proper containers. (Sample Dep. 45–46.)

36. During the relevant time period, all routine blood draws were packaged and sent to the Federal Medical Center in Rochester, Minnesota ("Rochester Lab") for processing. (Trial Tr. 509, 769–70.) The Rochester Lab then faxed or mailed the results back to the MCC. (Trial Tr. 769–70; Sample Dep. 50–5) HSA Sample testified that if the results of a specimen had a panic value, meaning that the results were significant, the Rochester Lab called the MCC in advance. (Sample Dep. 50–51.) Other than laboratory results containing panic values, however, Sample did not have any knowledge of other types of laboratory results that warranted a telephone call from the Rochester Lab prior to

sending the fax to the MCC. (Sample Dep. 51.)

37. The phlebotomist testified that after laboratory results were faxed to the MCC, either the nurse or the Physicians received the results and reviewed them. (S. Wilson Dep. 58.) Nurse Wagner testified that upon receiving laboratory results, he or the phlebotomist logged the date that the results were received in the MCC Laboratory Logbook, but they did not log the actual test results that were returned. (Trial Tr. 770, 772–73.) Laboratory results logged by the phlebotomist were given to her by Nurse Wagner after he reviewed them. (S. Wilson Dep. 84–85.) While it was possible that laboratory results could be placed on the phlebotomist's desk by someone other than Nurse Wagner, the phlebotomist testified that if a Physician had done so after reviewing the results, then the laboratory results would have been stamped. (S. Wilson Dep. 85–86, 102–04.) When multiple laboratory tests were ordered, the results of the tests were not normally returned to the MCC on the same day. (S. Wilson Dep. 56.) Despite this fact, there was no system in place for noting which specific laboratory test results were returned and which ones were outstanding. (Trial Tr. 772–73; S. Wilson Dep. 77–78.)

38. After laboratory results were logged in the MCC Laboratory Logbook, Nurse Wagner testified that the results were sent to the MCC Physicians for their review. (Trial Tr. 771, 773.) Sandra Wilson, the phlebotomist, however, could not remember what she did with laboratory results after logging them. (S. Wilson Dep. 84.) The Physicians were required to review the laboratory results pursuant to an internal MCC policy. (Trial Tr. 499.) After the Physicians reviewed the laboratory results, all such results were supposed to be timely filed into the inmates'

medical charts. (Trial Tr. 500, 773; Sample Dep. 45.) Dr. Nowakowski testified that different patients' laboratory results were viewed at the same time and then signed. (Trial Tr. 500.) The laboratory results were then placed in a to-be-filed pile that was known as "the black hole." (Trial Tr. 548.) The to-be-filed pile contained documents that were supposed to be filed in the inmates' medical charts. (Trial Tr. 500, 548.) The purpose of placing laboratory results in an inmate's medical chart was to ensure that there was a history of blood draws and the corresponding laboratory test results, and that the Physicians were aware of an inmate's blood levels for a particular laboratory test. (Trial Tr. 125–26, 500, 773.) Nurse Wagner did not make entries in the inmates' medical charts to note that laboratory results were returned. (Trial Tr. 771.) Nurse Wagner testified that he had an obligation to timely follow up on all laboratory results, based on his training and the policy manual that he was familiar with at the MCC. (Trial Tr. 783.)

39. When a blood specimen that was shipped to the Rochester Lab was unacceptable for testing, the Rochester Lab notified the MCC via a fax or telephone call. (Trial Tr. 774–75.) If the notice was received via fax, that fax was sent to the Physicians. (Trial Tr. 775.) Upon receiving a notice about an unacceptable specimen, Nurse Wagner had the authority to order that an inmate's blood be redrawn. (Trial Tr. 775.) Nurse Wagner could let the Physicians or a physician assistant know that the blood sample was bad. (Trial Tr. 775.) He did not need permission or an additional order from the Physicians to take another blood draw when a blood specimen that was shipped to the Rochester Lab was unacceptable. (Trial Tr. 775.) There was no system in place, however, to make sure that the nurse in fact called the inmate back down for a

blood draw. (Trial Tr. 782.) When blood was redrawn, the nurse needed to have a new requisition sheet that would be sent to the Rochester Lab. (Trial Tr. 782–83.) The phlebotomist did not make the decision to redraw blood. (S. Wilson Dep. 44.) Based on the phlebotomist's experience, when a sample was unacceptable or rejected, a Physician would reorder the lab. (S. Wilson Dep. 79.)

40. If the notice that the specimen was unacceptable was received through a telephone call, someone, such as the phlebotomist, informed the nurse about the telephone call. (Trial Tr. 781–82.) This was the only system in place at the MCC to account for such telephone calls. (Trial Tr. 782.) The phlebotomist testified that she sometimes followed up by calling the Rochester Lab to determine what happened with the unacceptable specimen. (S. Wilson Dep. 40.) She also testified that the Physicians were responsible for ensuring that laboratory test results were returned to the MCC Laboratory or to the Medical Records department. (S. Wilson Dep. 72.)

41. The Physicians relied on Nurse Wagner to inform them that laboratory results were not returned. (Trial Tr. 512.) Although the Physicians could call the Rochester Lab themselves and ask for the laboratory results that day, this was not routinely done. (Trial Tr. 512.) Dr. Hoffman testified that at the clinical level, he, as the Clinical Director, was ultimately responsible for ensuring that results for laboratory tests that were ordered for inmates were actually performed. (Trial Tr. 436.) At an operational level, however, HSA Sample possessed that responsibility. (Trial Tr. 436–37.) Dr. Hoffman testified that he was responsible for attending to what was and was not being done, and for giving recommendations and suggestions to Sample, the associate warden, and War-den Wilson as to how he thought things could be best done to serve the interests of the patients. (Trial Tr. 437.)

42. The customary turn-around time for a blood test for a Dilantin level, from the time that a Physician ordered the test until the laboratory results were returned, was anywhere from a few days to between two and three weeks. (Trial Tr. 508, 786.) The delay was caused in part by the volume of the requests and by the procedures involved in delivering the results to the Physicians, including logging the results, making copies, and sending the results to the Physicians. (Trial Tr. 509, 786.)

43. Nevertheless, a STAT lab could be ordered to expedite the process; STAT labs were drawn on the day of the request and usually returned in 24 hours. (Trial Tr. 787; Trial Tr. 507.) The Physicians had the ability to order a blood test for a Dilantin level STAT, and if they did so, they would receive the results in approximately 24 hours. (Trial Tr. 507.)

44. The Lab Services Statement in effect during the relevant time period outlined the following objectives: (a) "Testing will be performed by qualified health care personnel;" (b) "Medical laboratory test reports will be accurate and timely;" (c) "Laboratory test results will be reported to inmates as necessary and incorporated into the inmate's health record;" (d) "Accurate records will be maintained;" and (e) "Safety and quality control procedures will be enforced." (Pl.'s Ex. E at 1; Trial Tr. 701, 783.) Warden Wilson was responsible for ensuring that the Lab Services Statement was actually implemented. (Trial Tr. 703.) Dr. Hoffman testified that the objectives in the Lab Services Statement should be followed. (Trial Tr. 448–50.) According to Nurse Wagner, objectives 2(b)-(e) were objectives of the MCC Laboratory in 2007. (Trial Tr. 783–84.) Warden Wilson also testified that objectives

2(c)-(d) were being followed at the MCC. (Trial Tr. 704.) HSA Sample agreed that medical objectives 2(b)-(d) were being followed at the MCC. (Sample Dep. 85.)

45. The Lab Services Statement also contains a section on Laboratory Manuals. (Pl.'s Ex. E at 3.) That section provides, in part: "The director of the laboratory must approve, sign, and date any policies and procedures manuals." (Pl.'s Ex. E at 3.) Sample agreed that this statement was in effect. (Sample Dep. 85–86.)

### 5. MCC correctional officers

46. Beginning February 9, 2007, Solebo was housed in housing Unit 17E. (Pl.'s Ex. B at 1–2; Trial Tr. 186.) In 2007, Andrew Blanco was one of the officers assigned to Unit 17E. (Blanco Dep. 5–6, July 21, 2010.) Although Blanco did not testify at trial, his deposition was admitted into evidence. (*See* Trial Tr. 721, 788.) Vincent Cannon, a correctional officer, was occasionally assigned to Unit 17E during the evening watch in 2007. (Trial Tr. 176, 186.) Cannon was called to testify at trial. (Trial Tr. 175–90.)

47. Correctional officers assigned to Unit 17E maintained a logbook ("Unit 17E Logbook") that they updated when they were on duty. (Pl.'s Ex. B at 1–148; Trial Tr. 176–77, 180.) Post orders instructed correctional officers on what to write down in the Unit 17E Logbook. (Trial Tr. 177.)

48. Correctional Officers did not receive any instructions on how to handle the pill line, nor were there any post orders to instruct them on how to handle the pill line. (Trial Tr. 177–78; Blanco Dep. 16.) Although correctional officers sometimes noted that the pill line was administered on Unit 17E, they were not required to make entries about the pill line or whether an inmate received or did not receive medication on the pill line. (Blanco Dep. 13–14, 44, 47; *see also* Pl.'s Ex, B at 1–148.) If an inmate missed the pill line for any

reason, Officer Cannon's practice was to note it in the Unit 17E Logbook and notify a physician assistant that the inmate had missed the pill line. (Trial Tr. 178–79.) If an inmate missed the pill line, Cannon did not call the Physicians to inform them of this, nor did he ask the inmate why he missed the pill line. (Trial Tr. 178–79.) Cannon did not discuss the importance of taking medication with the inmates when they missed me pill line. (Trial Tr. 179.)

49. Cannon knew that Solebo was taking medication on the pill line because the physician assistants called Cannon and requested that Solebo be brought down to the 7th Floor Health Services Unit ("7th Floor") for medication. (Trial Tr. 179.) Cannon did not, however, know that Solebo was taking medication for seizure disorder. (Trial Tr. 179.) Cannon testified that when he was on duty, inmates always received their medications. (Trial Tr. 179–80.)

### B. MCC policies and procedures regarding medication

#### 1. Pill line at the MCC

50. During the relevant time period, some medication, including Dilantin, was administered to MCC inmates through the pill line and under the direct supervision of the physician assistants. (Pl.'s Ex. A at 493; Trial Tr. 81, 126–27, 427–28.) The physician assistant administering the doses verified the patient's identity and the medication, and ensured that the inmate actually consumed his medication. (Trial Tr. 526.) The Physicians did not administer medication on the pill line. (Trial Tr. 428.) The pill line occurred twice a day, once in the morning and once in the evening. (Pl.'s Ex. A at 493; Trial Tr. 34.) The pill line took place either on the inmates' housing unit or on the 7th Floor. (Pl.'s Ex. A at 493; Trial Tr. 29–30, 81–82, 186–87.)

51. When the pill line took place on the inmates' housing unit, the physician assistant administering the medication placed it on a cart ("medication cart") and yelled, announcing, "pill line," or some variation thereof on the unit. (Trial Tr. 29, 84, 127; Blanco Dep. 23). The physician assistant then called out the names of each inmate receiving medication on that housing unit. (Trial Tr. 84; Blanco Dep. 25.) Those inmates then brought their identification and a glass of water and stood in a single-file line to receive their medication. (Trial Tr. 84–85, 127.) Officer Blanco's practice was to stand next to the physician assistant while medication was being administered. (Blanco Dep. 17, 23).

52. When the pill line took place on the 7th Floor, a physician assistant called the correctional officers and provided them with the names of the inmates who were supposed to receive medication on the pill line. (Trial Tr. 178.) The correctional officer on the floor then yelled, announcing, "pill line" on the housing unit. (Aruiza Dep. 33–34.) An internal security officer accompanied the inmates on an elevator to the 7th Floor. (Trial Tr. 30; Aruiza Dep. 29, 31–32.) When the physician assistants administered medication on the 7th Floor, they knew that an inmate had refused his medication because the officers told them. (Trial Tr. 187.) In 2007, if an inmate did not come down for his medication, Physician Assistant Iskandar did not request that someone bring the inmate to the 7th Floor so that he could receive his medication. (Trial Tr. 35.)

## 2. Medication Administration Records

53. During the relevant time period, the MCC personnel were required to follow a BOP Program Statement on Pharmacy Services ("Pharmacy Services Statement"). (Pl.'s Ex. J at 16–23; Trial Tr. 528.) Pursuant to the Pharmacy Services Statement, the administration of medication to an inmate was to be documented in an inmate's Medication Administration Record ("MAR"). (Pl's Ex. J at 19; Trial Tr. 81, 527.) The MARs were created for the benefit of the Physicians because the Physicians did not administer medication on the pill line and did not have direct knowledge of whether an individual inmate was receiving his medication. (Trial Tr. 529.) The purpose of the MAR was to have a record that the Physicians could review to see whether an inmate was refusing or missing his medication, and which a Physician could then use when making clinical judgments. (Trial Tr. 36, 529.) The Physicians were supposed review the MARs when they were treating the inmates. (Trial Tr. 36.)

54. Every inmate receiving medication on the pill line, including Solebo, had a MAR that was generated by the Pharmacy department on a monthly basis. (Trial Tr. 37–38, 528–29.) The MAR contained information such as the inmate's name, the name of the medication, and the dosage the inmate was to receive. (Trial Tr. 528.) Solebo's MAR indicated that he was taking Dilantin. (Trial Tr. 528; Jt. Ex. 1 at 786–803.)

55. When administering medication on the pill line, the physician assistants had the inmates' MARs in front of them and the information in the MARs was readily available to them. (Trial Tr. 61.) The MAR contained a designated box for each and every dose, which corresponded to the days of the month, for an appropriate code to be noted in the box by the person who was administering the medication. (Trial Tr. 528.) When an inmate received his medication on the pill line, the physician assistant administering his medication placed his or her initials in a designated box on the MAR. (Trial Tr. 35, 428.) When an inmate refused his medication on

the pill line by telling the physician assistant or correctional officer that he did not want to take his medication, the physician assistant wrote "R" in the designated box on the MAR, per the Pharmacy Services Statement. (Pl.'s Ex. J at 19; Trial Tr. 35, 57, 528–29.) When an inmate did not present himself to the physician assistant or correctional officer on the pill line, the physician assistant wrote "NS" for no-show, per the Pharmacy Services Statement. (Pl.'s Ex. J at 19; Trial Tr. 35–37, 59, 62, 528–29.) Thus, there were times when the physician assistants relied only on what the correctional officer told them when they noted "R" or "NS" on an inmate's MAR. (Trial Tr. 58.)

56. MARs were kept on the medication cart and were available for the Physicians to review during the month that they were in use. (Trial Tr. 37–38, 89.) In addition to reviewing the MAR on the medication cart, the Physicians could also find out whether an inmate was taking his medication during the month by consulting with the physician assistants. (Trial Tr. 89.) At the end of each month, the MARs were given to the Physicians to review, and the MARs then became part of an inmate's medical chart. (Trial Tr. 90; Aruiza Dep. 75.)

### 3. Missing medication and Medical Treatment Refusal Forms

57. Inmates commonly failed to line up for the pill line. (Trial Tr. 127, 137). Although there were no written rules at the MCC requiring the physician assistants to notify the Physicians if a patient missed three consecutive doses of medication, Dr. Nowakowski requested the pill line staff to notify her when an inmate missed three or four consecutive doses of medication because it was possible for her to do something about it in that situation. (Trial Tr. 530–531, 555.) Similarly, Dr. Hoffman testified at trial that if he personally knew, in

his capacity as a physician, that Solebo had missed three doses of his medication in a row, he would have "definitely" wanted someone to speak to Solebo. (Trial Tr. 474.) Dr. Hoffman also testified that if Solebo had missed two days of medication, he would have wanted to find out why and he may have wanted to speak to Solebo and ask him what was going on. (Trial Tr. 458.)

58. An admissions and orientation handbook ("A & O Handbook") for inmates instructed them to report to the pill line when scheduled and warned that a failure to show up at the pill line when scheduled *"will* result in an incident report." (Pl.'s Ex. A at 493) (emphasis added). Although incident report forms were available, Dr. Nowakowski testified that it was not the custom or practice at the MCC to complete an incident report form if an inmate missed the pill line. (Trial Tr. 546–47.)

59. Additionally, a BOP Program Statement on Patient Care ("Patient Care Statement"), that was in effect at the MCC during the relevant time period, instructed that "[a]ny refusal of recommended or offered treatment or a diagnostic procedure will be documented in the inmate health record. The inmate will be asked to sign a Refusal of Medical Treatment form." (Pl.'s Ex. S at 51; Trial Tr. 94–95, 522.) The Patient Care Statement further instructed that if the inmate refused to sign the Medical Treatment Refusal Form ("Refusal Form"), (*see* Pl.'s Ex. H; Trial Tr. 78, 522), "two staff witnesses will attest and sign to the fact that the consequences of refusing the proposed treatment or procedure were explained to the inmate in a language he/she understood," (Pl.'s Ex. S at 51; Trial Tr. 95, 522–23). In addition, the Patient Care Statement provided that "[a]s a general rule, medical and dental treatment, *including medication,* are given only when the inmate consents." (Pl.'s Ex. S at 51) (emphasis added). The Pa-

938

tient Care Statement also identified exceptions to the general rule, i.e., situations when medical treatment was to be provided without the patient's consent or on an involuntary basis. (Pl.'s Ex. S at 51). Thus, per the Patient Care Statement, an inmate who refused his medication was required to sign a Refusal Form. (Pl.'s Ex. S at 51.) Contrary to a plain reading of the Patient Care Statement, Dr. Nowakowski testified, quite incredibly, that the Refusal Form did not apply to the administration of voluntary medication. (Trial Tr. 523–24.)

60. Signed Refusal Forms were supposed to be placed in an inmate's medical chart, (Trial Tr. 33, 429–30, 547), so that the Physicians could see that an inmate refused medication on a certain date, (Trial Tr. 56–57, 78). Despite this purpose, Dr. Nowakowski testified that Refusal Forms were not commonly used at the MCC for medication refusal. (Trial Tr. 521.) Physician Assistants Iskandar and Velasquez testified that there was no written policy at the MCC as to when a physician assistant should provide an inmate with a Refusal Form, and instead each physician assistant could decide whether to provide an inmate who was refusing his medication with a Refusal Form. (Trial Tr. 61, 79–80.) Because Refusal Forms were not signed every single time an inmate missed his medication, there might not be a Refusal Form in an inmate's medical chart for each instance that an inmate missed his medication. (Trial Tr. 79–81.) In those circumstances, the only documentation the physician assistants made that an inmate refused medication on the pill line was the notation of an "R" in the MAR. (Trial Tr. 58.)

61. If a Refusal Form was completed, there could be a record in an inmate's medical chart of when he missed his medication on a day-to-day basis. (Trial Tr. 547.) And, if the incident reports or medical Refusal Forms were in the chart, such as the MARs were, Dr. Nowakowski testified that it could be easy to track when a patient was missing his medication. (Trial Tr. 547–48.)

62. There were occasions when an inmate talked to Officer Cannon and asked if he could receive his medication. (Trial Tr. 188.) When an inmate on Unit 17E who failed to line up for the pill line subsequently changed his mind and decided he wanted his medication or showed up to receive his medication, the inmate needed to speak with the correctional officer on duty. (Trial Tr. 188.) During those occasions, Cannon's practice was to call the physician assistant and send the inmate down to the 7th Floor to receive his medication. (Trial Tr. 188.) Cannon testified that he never refused an inmate's request to be sent down for his medication or to receive his medication. (Trial Tr. 188.) On the occasions that Cannon contacted a physician assistant and asked them to either return to the housing unit to administer medication to an inmate or to allow an inmate go down to the 7th Floor to receive his medication, a physician assistant never refused. (Trial Tr. 188.)

63. Physician Assistant Iskandar testified that the physician assistants gave the inmates second chances and accommodated any inmate who came to an officer after missing the pill line and asked for his medication. (Trial Tr. 63.) Physician Assistant Iskandar also testified that he was not aware of any instance in which an inmate requested his medications and was denied them. (Trial Tr. 63.)

#### 4. Daily Meetings

64. In 2006 and 2007, the Physicians held morning endorsement meetings and close-out meetings to discuss patients. (Trial Tr. 68, 73, 131, 541, 778.) The endorsement and close-out meetings were not held on the weekends because the Physicians were not present. (Trial Tr.

92–93.) If both Physicians were present, they would both attend the endorsement and close-out meetings. (Trial Tr. 541.) Although the meetings were supposed to be held on a daily basis, Dr. Nowakowski testified that when she was present at the MCC the Physicians did not always hold a daily meeting. (Trial Tr. 541–42.) In April 2007, when Dr. Hoffman was on leave, Dr. Nowakowski ran the daily meetings. (Trial Tr. 542.) On the days in April that Dr. Nowakowski was not present, such as the week prior to Solebo's death, a daily meeting did not take place. (Trial Tr. 542.)

65. Daily meeting participants typically included both Dr. Hoffman and Dr. Nowakowski when they were present, the physician assistants, Nurse Wagner, and HSA Sample. (Trial Tr. 541, 778.) Pharmacists did not normally attend the daily meetings. (Trial Tr. 92.) The purpose of the daily meetings was to ensure that the Physicians and physician assistants discussed and were made aware of important or significant medical issues concerning the inmates. (Trial Tr. 68, 73, 131.) One such important or significant medical issue was inmates who were not taking their medication as prescribed. (Trial Tr. 69, 70, 74; *see also* Trial Tr. 459, 541.) Thus, during the daily meetings, the Physicians and physician assistants discussed what to do when an inmate was not taking his medication as prescribed. (Trial Tr. 71.) Additionally, if the physician assistants had any concerns about an inmate, like Solebo, missing his medication, they could raise and discuss these concerns with the Physicians. (Trial Tr. 131.)

## IV. Solebo's time at the Metropolitan Correctional Center: August 2006 to May 2007

### A. August 2006

66. Solebo was incarcerated at the MCC from August 28, 2006 until May 1, 2007, while awaiting trial. (Def.'s Ex. 22 at 1; R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶ 1.) Prior to Solebo's death, none of his medical records from Kankakee were ever at the MCC. (Trial Tr. 540–41.) Although an MCC Physician could have requested those records by signing a standard consent form, having Solebo sign the form, and noting what was requested from where and during what time period, no one did so. (Trial Tr. 493–94.)

67. On August 28, 2006, Physician Assistant Aruiza conducted an initial medical evaluation of Solebo and prepared the first note in Solebo's medical chart at the MCC. (Jt. Ex. 1 at 804; Aruiza Dep. 79–80.) Aruiza recorded that Solebo stated, "I need my medications." (Jt. Ex. 1 at 804; Aruiza Dep. 81.) Solebo also informed Aruiza that his last seizure occurred one month prior and that he had been taking Dilantin for four months. (Jt. Ex. 1 at 804; Trial Tr. 497; Aruiza Dep. 81.) The assessment at this time was that Solebo had a history of seizure disorder. (Jt. Ex. 1 at 804; Aruiza Dep. 81.)

68. Solebo's treatment plan included an order by Aruiza to check Solebo's Dilantin levels. (Jt. Ex. 1 at 804.) Significantly, Aruiza entered an order to continue Solebo's Dilantin. (Jt. Ex. 1 at 805; Trial Tr. 494; Aruiza Dep. 84.) Solebo's dosage of Dilantin was increased to three 100–milligram capsules, equaling 300 milligrams, to be taken each evening. (Jt. Ex. 1 at 805.) Aruiza also ordered that Solebo be placed in a lower bunk until December 28, 2006, because of his history of seizure disorder. (Jt. Ex. 1 at 804; Aruiza Dep. 81, 88.) Aruiza considered this a safety issue, meaning that if Solebo had a seizure, he would be safer if he did not fall from a higher bunk. (Aruiza Dep. 88.)

69. Finally, Aruiza ordered that Solebo visit the Chronic Care Clinic ("CCC") for Neurology ("Neurology CCC") for his seizures by September 18, 2006. (Jt. Ex. 1 at 804; Aruiza Dep. 81.) The first time that Solebo was seen by an MCC Physician in the Neurology CCC, however, was on November 30, 2006—over three months after his arrival at the MCC, and over two months after the date specified in Aruiza's order. (Jt. Ex. 1 at 806.) The Neurology CCC was for patients who exhibited neurological-related problems, such as seizure disorder. (Trial Tr. 464.) According to the BOP Patient Care Statement, CCCs were intended to be "a means for inmates with ongoing medical needs to be tracked on [an internal database known as] SENTRY and seen by a health care provider at clinically appropriate intervals." (Pl.'s Ex. S at 18; see also Trial Tr. 155). The Patient Care Statement provided that "a physician will see all inmates assigned to a CCC every six months, or more often if clinically indicated." (Pl.'s Ex. S at 18.) The Patient Care Statement further provided that "[h]igh risk or medically complex chronic care inmates will be seen more frequently in accordance with good clinical judgment, in addition to or in conjunction with regular visits with their primary provider." (Pl.'s Ex. S at 18.) Warden Wilson expected that the Patient Care Statement would be enforced and followed at the MCC. (Trial Tr. 711.)

70. Aruiza also prepared an Intake Screening form ("Intake Form") for Solebo. (Jt. Ex. 1 at 828–29; Trial Tr. 159.) Aruiza noted that Solebo had a history of seizure disorder and designated Solebo a Care Level 1. (Jt. Ex. 1 at 828–829; Trial Tr. 159.) That same day, Dr. Nowakowski reviewed the Intake Form and signed-off on the Care Level 1 for Solebo. (Jt. Ex. 1 at 828; Trial Tr. 169.) During the relevant time period, there were four levels of care for MCC inmates on a continuum from 1 to 4. (Pl.'s Ex. Q; Trial Tr. 156.) Care Level 1 was considered the least serious medical level, whereas Care Level 4 was considered the most serious medical and psychiatric level. (Trial Tr. 156.) The MCC Physicians determined an inmate's care level. (Trial Tr. 159.)

71. On August 29, 2006, Dr. Nowakowski conducted an administrative chart review. (Jt. Ex. 1 at 804.) Dr. Nowakowski reviewed, signed and approved Aruiza's orders in Solebo's medical chart, including the prescription for Dilantin. (Jt. Ex. 1 at 804–805, 821; Trial Tr. 494.) When Dr. Nowakowski conducted administrative chart reviews, she would not typically communicate contemporaneously with the physician assistant who had made the notes, unless there was a specific problem that needed to be addressed. (Trial Tr. 492–93.) During the administrative chart review, Dr. Nowakowski questioned the etiology of the seizures and commented in Solebo's medical chart that she needed clarification of the history, prescription, and seizure type. (Jt. Ex. 1 at 804; Aruiza Dep. 83.) Dr. Nowakowski did not meet with Solebo during the administrative chart review. (See Trial Tr. 484.)

72. At trial, Dr. Hoffman testified that he did not disagree with the initial prescription of Dilantin that Solebo received during the MCC's intake process. (Trial Tr. 409–10.) Solebo's prescription, prescription number 96516, did not include any refills and was to expire on September 27, 2006. (Jt. Ex. 1 at 821.)

73. On August 29, 2006, a "Patient Problem List" that was likely prepared by a Physician provided that the "Significant Diagnosis" for Solebo was status post-seizure and designated Solebo a Care Level 2, (Jt. Ex. 1 at 823; Trial Tr. 159, 170.) According to Dr. Hoffman, Solebo was in the Neurology CCC because he was classi-

fied as a Care Level 2 inmate. (Trial Tr. 461–62.)

74. On August 30, 2006, Physician Assistant Carrera performed an initial physical examination of Solebo and completed a Report of Medical Examination ("Initial Report"). (Jt. Ex. 1 at 824–25; Trial Tr. 105–06.) In the Initial Report, Carrera noted that Solebo had seizure disorder and that he was currently on medication. (Jt. Ex. 1 at 824; Trial Tr. 106.) Carrera also summarized Solebo's prescription for Dilantin and noted that he was to take 300 milligrams of Dilantin every evening. (Jt. Ex. 1 at 825; Trial Tr. 107–08; 495–96.) In the "Summary of Defects and Diagnoses" section of the Initial Report, the only medical condition noted was that Solebo had a history of seizures that were controlled with medication. (Jt. Ex. 1 at 825; Trial Tr. 107, 496.) Carrera testified that this information was entered into Solebo's medical chart so that all medical personnel who came into contact with Solebo would be aware of his medical history. (Trial Tr. 108.) Carrera also recommended that Solebo be placed in a lower bunk so that he could not fall from an upper bunk if he had a seizure. (Trial Tr. 109.)

75. On August 30, 2006, Dr. Nowakowski reviewed the Initial Report. (Trial Tr. 109, 496.) In reviewing and signing off on the Initial Report, Dr. Nowakowski was aware that Solebo was presenting with seizure disorder controlled with medication. (Trial Tr. 497.) According to Dr. Nowakowski, the Initial Report did not outline a treatment plan for Solebo at that time because that plan was going to be created when he saw an MCC Physician, which was generally done at the CCC. (Trial Tr. 496–97.) Dr. Nowakowski again did not meet with Solebo during this review. (*See* Trial Tr. 484.)

76. When Solebo initially presented to the MCC, his prescription for Dilantin needed to be renewed. (Trial Tr. 524–25.) Dr. Nowakowski testified that it was common practice at the MCC to write a prescription for medication that an inmate was already taking when a Physician did not have time to see the patient. (Trial Tr. 525.) She further testified that even after a Physician saw the patient during a clinical visit, it was also common practice to write a prescription for medication that a patient did not medically require. (Trial Tr. 525.) According to Dr. Nowakowski, because Solebo came in to the MCC on Dilantin, his Dilantin was continued because it was better to be safe than sorry. (Trial Tr. 525.) But, in accordance with the MCC's custom and practice, Solebo was to be evaluated in a CCC. (Trial Tr. 525.) At the CCC, a Physician would then determine whether medication was medically necessary. (Trial Tr. 525.) Dr. Nowakowski testified unequivocally that Solebo would not have been prescribed anti-seizure medication if it was of no medical benefit to him. (Trial Tr. 525–26.) Dr. Nowakowski also testified that although she had prescribed medication that was medically unnecessary, such as Tylenol, for a patient at the MCC, she had never written a prescription for a controlled substance, such as Dilantin, when it was not necessary for a patient. (Trial Tr. 526.)

77. After arriving at the MCC, Solebo took his Dilantin on August 29, 30, and 31. (Jt. Ex. 1 at 802; Trial Tr. 531.)

**B. September 2006**

78. In early September 2006, Dr. Nowakowski reviewed Solebo's August 2006 MAR. (Jt. Ex. 1 at 802; Trial Tr. 531–532.)

79. On September 16, 2006, Solebo missed his Dilantin; it was the only dose of medication he missed that month. (Jt. Ex. I at 800; Trial Tr. 532.)

80. On September 18, 2006, Solebo's blood was drawn pursuant to an order by Dr. Nowakowski to test, among other things, his Dilantin level. (Jt. Ex. 1 at 817; Trial Tr. 117–18). The purpose of obtaining a blood draw and corresponding laboratory results for a Dilantin level was to determine the concentration of Dilantin in Solebo's blood; that is, to determine whether the Dilantin was at a therapeutic level. (*See* Trial Tr. 498.) Dr. Nowakowski testified that the purpose of administering Dilantin to Solebo was to keep him in a therapeutic range because maintaining his Dilantin level in a therapeutic range lessened his chances of having a seizure. (Trial Tr. 549.) If Solebo missed multiple doses of Dilantin, this could increase his risk of having a seizure. (Trial Tr. 549.) Dr. Nowakowski explained that there are reference ranges for laboratory tests, which are basically a generic range, i.e., a bell-shaped curve, of the expected test results for a patient. (Trial Tr. 499.) Dr. Nowakowski further testified that the therapeutic range for Dilantin, according to the Rochester Lab, is between 10 μ/ml and 20 μ/ml, and that the therapeutic range and reference range are fairly similar. (Trial Tr. 499–500.)

81. On September 20, 2006, the Rochester Lab faxed the results of Solebo's September 18 blood draw to the MCC. (Jt. Ex. 1 at 817.) The September 20 laboratory results revealed that the Dilantin level in Solebo's blood was 8 μ/ml, which was subtherapeutic. (Jt. Ex. 1 at 817; Trial Tr. 117–18.)

82. On September 21, 2006, Dr. Nowakowski reviewed the results of the September 18 blood draw and became aware that Solebo's Dilantin level was sub-therapeutic. (Jt. Ex. 1 at 817; Trial Tr. 119.)

## C October 2006

83. On October 2, 2006, Dr. Nowakowski reviewed Solebo's September 2006 MAR. (Jt. Ex. 1 at 800; Trial Tr. 532.) Because the MAR indicated that Solebo had only missed one dose of his Dilantin, Dr. Nowakowski was not concerned about Solebo. (Trial Tr. 533.)

84. On October 3, 2006, Solebo made a visit to "sick call" and was seen by Physician Assistant Carrera. (Jt. Ex. 1 at 806; Trial Tr. 109–10.) During this visit, Carrera made a note in Solebo's medical chart ("October 3rd Note"). (Jt. Ex. 1 at 806; Trial Tr. 109–10.) The subjective portion of the October 3rd Note provided, in part: "[i]ncarceration started with seizure eight months ago. Wants medication refill. Is study case." (Jt. Ex. 1 at 806; *see also* Trial Tr. 110.) Carrera also noted that Solebo's Dilantin level from September 18, 2006, was 8 μ/ml. (Jt. Ex. 1 at 806.) The only assessment Carrera made, meaning the finding she made as a result of the information she had regarding Solebo, was subjective seizure disorder. (Jt. Ex. 1 at 806; Trial Tr. 110–11, 138–39.) If Carrera had any questions regarding whether Solebo had seizure disorder, she could have verified this with the Physicians. (Trial Tr. 139.)

85. At trial, Physician Assistant Carrera testified that in light of Solebo's history of seizure disorder, the treatment plan for him at this time was to continue his Dilantin. (Trial Tr. 139.) Specifically, Solebo was to continue taking three 100–milligram capsules of Dilantin by mouth every evening for 180 days. (Jt. Ex. 1 at 806; Trial Tr. 110–11.) The only medical condition for which Solebo was taking Dilantin was seizure disorder. (Trial Tr. 111.) The treatment plan also provided that Solebo was to be added to the Neurology CCC for seizures, so that he could be followed up for his seizure disorder. (Jt. Ex. 1 at 806; Trial Tr. 110–11.) There was no other reason that Solebo was being

sent to the Neurology CCC, and Solebo did not have any other medical condition that was being considered. (Trial Tr. 111–112.) Although Carrera ordered "lab results in chart for Dilantin," (Jt. Ex. 1 at 806), she did not order any medical tests, (Trial Tr. 111).

86. The October 3 Note contains a stamp on the lower left-hand corner that states: "Written: Patient medication information was provided regarding use, precautions and possible side effects." (Jt. Ex. 1 at 806; Trial Tr. 167.) According to Assistant HSA Lamping, the stamp indicates that a written patient information sheet ("Information Sheet") for Dilantin was provided to Solebo on or about October 3. (Trial Tr. 167; *see also* Def.'s Ex. 1B–C.) The Information Sheet cautioned, "DO NOT STOP TAKING THIS MEDICINE without first checking with your doctor. TO PREVENT SEIZURES, continue taking this medicine on a regular schedule." (Def.'s Ex. 1B–C; Trial Tr. 166.) Although Assistant HSA Lamping testified that Information Sheets were given to inmates by staff members conducting the pill line, (Trial Tr. 164; *see also* Aruiza Dep. 49–50), she personally did not give Solebo an Information Sheet, nor did she have any personal knowledge that Solebo ever received an Information Sheet. (Trial Tr. 173.) Furthermore, none of the physician assistants testified that they had given Solebo the Information Sheet. Thus, the inference that Solebo actually received the Information Sheet is incredibly weak.

87. Effective October 4, 2006, the day after Solebo's sick call visit, a Physician changed elevated his care level to Care Level 3. (Pl.'s Ex. A at 299; Trial Tr. 155, 171; *see also* Trial Tr. 159.) At the MCC, inmates classified at a Care Level 3 were considered to be "fragile outpatients with conditions that require frequent clinical contacts (daily to monthly)." (Pl.'s Ex. Q; Trial Tr. 157.) According to Assistant HSA Lamping, Solebo was designated a Care Level 3 because he was a forensic study case, as reflected in the October 3 Note, meaning that a judge had ordered Solebo to undergo a forensic or psychiatric evaluation to determine his competency to stand trial. (Trial Tr. 158, 160.) However, according to an internal SENTRY document that contained an inmate profile for Solebo, (Trial Tr. 154), the "current assignment" for Solebo under Care Level 3 was "Unstable, complex chronic care." (Pl.'s Ex. at 299; Trial Tr. 156.) The SENTRY document did not reflect that Solebo was a forensic study case as of October 4. (Pl.'s Ex. A at 299; Trial Tr. 171.) Between October 4, 2006 and May 1, 2007, Solebo's care level was never changed. (Pl.'s Ex. A at 299; Trial Tr. 174.)

88. On October 10, 2006, Dr. Hoffman reviewed the October 3 Note. (Jt. Ex. 1 at 806; Trial Tr. 112.) If Dr. Hoffman had wanted to add anything regarding Solebo's medical care or treatment, he could have done so at this time, but he did not make any such notation on the October 3 Note. (Jt. Ex. 1 at 806; Trial Tr. 112.) That same day, Dr. Hoffman renewed Solebo's Dilantin prescription with five refills. (Jt. Ex. 1 at 821; Trial Tr. 410.) Solebo was to take three 100–milligram capsules of Dilantin by mouth each evening. (Jt. Ex. 1 at 821.) Solebo's prescription, prescription number 97535, was effective October 10, 2006, and was set to expire on April 7, 2007. (Jt. Ex. 1 at 821.)

89. Between October 1 and October 9, it is unclear whether Solebo received his Dilantin. (Jt. Ex. 1 at 798.) On October 14 and 25, Solebo's MAR reflects that he was a "no-show" on the pill line and missed his doses of Dilantin. (Jt. Ex. 1 at 798.)

## D. November 2006

90. On November 1, 2, and 3, Solebo's MAR reflects that he was a "no-show" on the pill line and missed three consecutive doses of Dilantin. (Jt. Ex. 1 at 796; Trial Tr. 533.) Although missing three consecutive doses was the kind of activity that Dr. Nowakowski wanted to be made aware of, she did not become aware of the missed doses until she reviewed Solebo's MAR in December 2006. (Trial Tr. 533–34; Jt. Ex. 1 at 796.)

91. On November 15, 2006, a report on a forensic evaluation ("Forensic Report") of Solebo was completed. (Def.'s Ex. 22 at 1–6; Trial Tr. 160–61.) The Forensic Report noted that according to Solebo, "he began experiencing seizures for the first time, beginning in January 2006." (Def.'s Ex. 22 at 2.) Solebo also told the examiner that he had "suffered multiple seizures while detained in a county jail, prior to his transfer to MCC Chicago." (Def.'s Ex. 22 at 2.) Solebo's mental health prognosis at this time was "determined to be good," and it was determined that he was competent to stand trial. (Def.'s Ex. 22 at 6; Trial Tr. 161.) After the Forensic Report was completed, Solebo's care level did not change. (Trial Tr. 161.) According to Assistant HSA Lamping, Solebo's care level did not change because the information was not communicated to the Health Services department for them to change it. (Trial Tr. 161.) According to Lamping, an inmate's care level is typically changed once an inmate is sentenced, and the care level is a factor the BOP uses to determine to which institution to send an inmate. (Trial Tr. 161–62.) Lamping testified that therefore, the fact that Solebo had a Care Level 3 after November 15, 2006, was just an artifact of the fact that he originally came to the MCC as a study case. (Trial Tr. 162.) Lamping also testified that Solebo's care level did not make a difference in the care that Solebo received while he was at the MCC because the Physicians did not look at an inmate's care level when deciding what care to provide to an inmate. (Trial Tr. 162.)

92. On November 21, 2006, Dr. Nowakowski reviewed Solebo's October 2006 MAR. (Jt. Ex. 1 at 798.)

93. On November 30, 2006, Dr. Hoffman examined Solebo in the Neurology CCC for his seizures. (Jt. Ex. 1 at 806–07; Trial Tr. 112–13.) Dr. Hoffman noted that Solebo's seizures began in February 2006, during Solebo's incarceration, and that his last seizure occurred in August 2006. (Jt. Ex. 1 at 806; Trial Tr. 433.) Dr. Hoffman also noted that Solebo began taking 100 milligrams of Dilantin in March 2006 and that the prescription was increased to 300 milligrams in July,[3] at which point his seizures stopped. (Jt. Ex. 1 at 806–07; Trial Tr. 433.) Dr. Hoffman also noted that Solebo experienced loss of consciousness when he seized, that he fell off the top bunk, experienced incontinence, and that the seizures only happened in his sleep. (Jt. Ex. 1 at 807; Trial Tr. 433.)

94. Dr. Hoffman's assessment was "grand mal seizure-strong history except only occurs in sleep suggesting [possible] sleep movement [disorder] or [secondary] gain." (Jt. Ex. 1 at 807; Trial Tr. 433–34.) At trial, Dr. Hoffman testified that his assessment was a differential diagnosis of three possibilities: seizure disorder; sleep movement disorder; or that Solebo was seeking a secondary gain. (Jt. Ex. 1 at 807; Trial Tr. 444.) Out of these three possibilities, Dr. Hoffman medicated Solebo for seizure disorder. (Trial Tr. 445.)

---

**3.** Dr. Hoffman's note was incorrect. Solebo's Dilantin was increased to 300 milligrams upon his arrival at the MCC. (*See* Jt. Ex. 1 at 804–05.)

95. Solebo's treatment plan at this time was to continue his Dilantin. (Jt. Ex. 1 at 807.) Accordingly, Dr. Hoffman ordered that Solebo continue taking three 100–milligram capsules of Dilantin every evening on the pill line for 180 days. (Jt. Ex. 1 at 807; Trial Tr. 434.) The treatment plan also required that Solebo's Dilantin levels be monitored, that Solebo visit the Neurology CCC in two months, and that he undergo CT scan of his head. (Jt. Ex. 1 at 807; Trial Tr. 434.) The only tests ordered at this time were a blood draw to determine Solebo's Dilantin levels and the CT scan. (Trial Tr. 114.) Dr. Hoffman ordered that Solebo's Dilantin levels be monitored because in Dr. Hoffman's clinical judgment, it was indicated in Solebo's case. (Trial Tr. 434–35.)

96. According to Dr. Hoffman, when diagnosing seizure disorder in someone, a primary care doctor takes a history from the patient or an observer, or both. (Trial Tr. 442–43.) In making this diagnosis, Dr. Hoffman testified that it does not have to be a physician who witnesses the seizure. (Trial Tr. 442–43.) According to Dr. Hoffman, no one ever witnessed tonic-clonic movement, loss of consciousness, or any kind of incontinence in Solebo. (Trial Tr. 443.) At trial, Dr. Hoffman testified that he did not diagnose Solebo with seizure disorder at this time because Solebo's seizures had not been witnessed and because it would have been medically incorrect to diagnose Solebo based on history alone. (Trial Tr. 440–42.) Therefore, Dr. Hoffman believed that the safest thing to do was to treat Solebo as if he had seizure disorder. (Trial Tr. 442.)

**E. December 2006**

97. Sometime during the first few days of December 2006, Dr. Nowakowski reviewed Solebo's November 2006 MAR and at that point became aware that Solebo had missed three consecutive doses of Dilantin that month. (Jt. Ex. 1 at 796; Trial Tr. 533.) Although Dr. Nowakowski would have wanted to be made aware of the fact that Solebo missed three consecutive doses of Dilantin, by the time she reviewed his November 2006 MAR, Solebo had received the next 28 doses. (Trial Tr. 533.) Thus, Dr. Nowakowski was not concerned that his Dilantin level was subtherapeutic, and she did not counsel Solebo about these missed doses of Dilantin. (Trial Tr. 533–34, 556.)

98. On December 7, 2006, pursuant to an order by Dr. Hoffman, Solebo's blood was drawn to test his Dilantin level. (Jt. Ex. 1 at 816; Trial Tr. 498.) On December 9, 2006, the Rochester Lab faxed to the MCC the results of Solebo's December 7 blood draw, which revealed that his Dilantin level was 11 µ/ml. (Jt. Ex. 1 at 816; Trial Tr. 119, 497–98.) Solebo's Dilantin level at the time was low normal, but it was still within the therapeutic range for Dilantin, which is between 10 µ/ml and 20 µ/ml. (Trial Tr. 119, 499.)

99. On December 11, 2006, Dr. Nowakowski reviewed the laboratory results from Solebo's December 7 blood draw and thus became aware of the Dilantin level in his blood. (Jt. Ex. 1 at 816; Trial Tr. 119–20, 499.) After reviewing the laboratory results, Dr. Nowakowski testified that she more than likely placed the December 9 laboratory results in a stack of many different patients* laboratory reports. (Trial Tr. 500.) Dr. Nowakowski testified that she may not have had Solebo's medical chart at the time she reviewed the December 9 laboratory results. (Trial Tr. 501.)

100. On December 18, 2006, a week after reviewing Solebo's laboratory results from his December 7 blood draw, Dr. Nowakowski conducted an administrative review of Solebo's medical chart and reordered a blood draw to check So-

lebo's Dilantin levels. (Jt. Ex. 1 at 808; Trial Tr. 500–01.) Dr. Nowakowski also added orders for RPR and HIV tests. (Jt. Ex. 1 at 808.) At some point in December 2006 and following, HSA Sample delegated to Nurse Wagner the duty of ensuring that laboratory tests that were ordered were carried out and that the corresponding results were returned to the MCC. (Trial Tr. 501.) Nurse Wagner was the only nurse at the MCC at this time. (Trial Tr. 501.)

101. On December 19, 2006, this Court entered an order as the presiding trial judge in Solebo's pending criminal case instructing the BOP and the United States Marshals to transport Solebo "to a suitable medical facility outside of the [BOP]" to undergo an MRI. (Pl.'s Ex. A at 631–33.) The order stated that, "[t]he examination shall include an MRI and any other test that the examiner deems appropriate in determining the cause of Mr. Solebo's seizures and blackouts." (Pl.'s Ex. A at 631.) The order also requested that a written report be prepared that included: "a) [Solebo's] history and present symptoms; b) a description of the medical tests that were employed, and their results; c) a statement regarding whether the condition may impact Mr. Solebo's cognitive functioning; [and] d) the examiner's opinions as to diagnosis and prognosis." (Pl.'s Ex. A at 631.) The MRI ordered by this Court was never performed. (See Trial Tr. 452–53.)

102. On December 26, 2006, Dr. Hoffman examined and assessed Solebo at the Neurology CCC. (Jt. Ex. 1 at 809; Trial Tr. 114, 503.) Dr. Hoffman's assessment at this time was "possible seizure disorder"; no other medical condition was indicated for Solebo at this time. (Jt. Ex. 1 at 809; Trial Tr. 114–15, 134). At this visit, Dr. Hoffman increased Solebo's Dilantin dosage from 300 milligrams to 400 milligrams to be taken each evening for 180 days. (Jt. Ex. 1 at 809; Trial Tr. 114–15, 411, 504.) Dr. Hoffman again ordered that Solebo's Dilantin levels be monitored via a blood draw and scheduled a Neurology CCC follow-up visit for the second week of February. (Jt. Ex. 1 at 809; Trial Tr. 114–15, 503.) Dr. Hoffman did not reference Dr. Nowakowski's December 18 order for a Dilantin level in his December 26 note. (Trial Tr. 503–04.) Dr. Hoffman also approved a CT scan for Solebo. (Jt. Ex. 1 at 809; Trial Tr. 504.)

103. Although both Dr. Nowakowski and Dr. Hoffman requested that Solebo's blood be drawn in December 2006, Solebo's blood was not drawn until February 1, 2007. (See Trial Tr. 777–78; Pl.'s Ex. A at 636, 845.)

104. Solebo's revised prescription, prescription number 99214, became effective December 27, 2006, with an expiration date of June 24, 2007. (Jt. Ex. 1 at 794, 821; Trial Tr. 163–64.) The December 26 note is stamped with the following: "Written: Patient medication information was provided regarding use, precautions and possible side effects." (Jt. Ex. 1 at 809; Trial Tr. 166–67.) According to Assistant HSA Lamping, the stamp indicates that an Information Sheet for Dilantin was provided to Solebo on or about December 26. (See Trial Tr. 167; see also Def.'s Ex. 1B–C.) Assistant HSA Lamping, however, did not personally give Solebo an Information Sheet, nor did she ever see anyone give Solebo an Information Sheet, and did not have any personal knowledge that Solebo ever received an Information Sheet. (Trial Tr. 172–73.) Furthermore, none of the physician assistants testified that they had given Solebo the Information Sheet. Again, the inference that Solebo actually received the Information Sheet is incredibly weak.

105. Although Solebo did not miss any doses of Dilantin in December 2006, a Phy-

sician never reviewed Solebo's December 2006 MAR. (Jt. Ex. 1 at 794; Trial Tr. 534.)

### F. January 2007

106. In January 2007, Solebo was to take four 100–milligram capsules of Dilantin by mouth each evening on the pill line pursuant to the prescription entered by Dr. Hoffman. (Jt. Ex. 1 at 792, 809.) On January 10, 2007, Solebo's MAR reflects that he was a "no-show" on the pill line and missed his dose of Dilantin. (Jt. Ex. 1 at 792.) As with the prior month, a Physician never reviewed Solebo's January 2007 MAR. (Jt. Ex. 1 at 792; Trial Tr. 534.)

107. On January 9, 2007, pursuant to Dr. Hoffman's prior order, a CT scan of the head performed on Solebo. (Jt. Ex. 2 at 13.) The CT scan findings provided, in part, "There is no evidence of an acute intracranial hemorrhage, mass effect, midline shift or extra-axial fluid collection. The ventricular system and basilar cisterns appear normal.... There are no depressed skull fractures." (Jt. Ex. 2 at 13.) The CT Scan impression provided, in part, "No CT evidence of an intracranial hemorrhage, mass effect or midline shift." (Jt. Ex. 2 at 13.)

108. In January 2007, no one at the MCC drew Solebo's blood to test his Dilantin level. (*See* Trial Tr. 777–78.)

### G. February 2007

#### 1. February 1, 2007 blood draw

109. On February 1, 2007, the phlebotomist drew Solebo's blood to test his Dilantin level, as well as for chemistry metabolic panel, thyroid stimulating hormone ("sTSH"), RPR and HIV testing, pursuant to an order by Dr. Nowakowski. (Pl.'s Ex. A at 636, 845; Trial Tr. 120–21, 132–33, 772; S. Wilson Dep. 49.) The blood specimen from Solebo's February 1 blood draw

was sent to the Rochester Lab for processing. (*See* Jt. Ex. 1 at 813; Trial Tr. 509.)

110. On February 6, 2007, the Rochester Lab faxed to the MCC a final report dated February 3, 2007, that contained the results of Solebo's sTSH and RPR tests. (Pl.'s Ex. A at 813, 851; Trial Tr. 779–80.) The next day, the phlebotomist noted in the MCC Laboratory Logbook that the MCC had received the results of Solebo's February 1 blood draw on February 7, 2007. (Pl.'s Ex. A at 636, 845; S. Wilson Dep. 54; Trial Tr. 121–23, 132, 772.) The phlebotomist did not indicate anywhere in the MCC Laboratory Logbook, however, that some laboratory results were still outstanding. (Pl.'s Ex. A at 636, 845.) On February 7, 2007, Dr. Nowakowski reviewed the results of Solebo's sTSH and RPR tests. (Jt. Ex. 1 at 813; Trial Tr. 124.)

111. On February 22, 2007, the Rochester Lab faxed a report containing the results of Solebo's HIV test from the February 1 blood draw to the MCC. (Jt. Ex 1 at 815; Trial Tr. 136.) Dr. Hoffman reviewed the results of Solebo's HIV test the following month, on March 12, 2007, (Jt. Ex. 1 at 815, Trial Tr. 137), and reviewed them a second time on March 18, 2007, (Jt. Ex. 1 at 814; Trial Tr. 137.) Neither the February 3 or February 22 laboratory results contained a result for Solebo's Dilantin level. (Jt. Ex. 1 at 813–815; Trial Tr. 123, 125.)

112. Nevertheless, on a copy of the February 3 report ("February 3 Report"), which was faxed to the MCC on February 6, the phlebotomist handwrote a note that read, "Was not in plastic tube or not enough serum[;] reget Dilantin." (Pl.'s Ex. A at 851; *see also* Trial Tr. 779–81.) The February 3 Report was never placed in Solebo's medical chart, but was instead placed in a file cabinet. (Trial Tr. 513). Neither Physician saw the February 3 Re-

port prior to Solebo's death. (Pl.'s Ex. A at 851; Trial Tr. 446–47, 513, 516.)

113. Dr. Hoffman testified that any MCC personnel who saw the February 3 Report knew or should have known, as a result of the handwritten note, that a Dilantin level for Solebo in 2007 was not forthcoming. (Trial Tr. 447.) In light of the handwritten note on the February 3 Report, Dr. Hoffman would have expected the MCC personnel to redraw Solebo's blood so as to obtain his Dilantin level. (Trial Tr. 447–48.) Had Dr. Hoffman seen the February 3 Report, he would have called Solebo down to get another blood draw because it was part of the MCC's clinical evaluation, and if anyone had shown Dr. Hoffman the February 3 Report, he would have signed off on a request for another blood draw. (Trial Tr. 446, 448.) Dr. Nowakowski testified that had Nurse Wagner seen the February 3 Report, he could have redrawn Solebo's blood without obtaining a new order from a Physician because a Physician had already ordered the blood draw. (Trial Tr. 515.) HSA Sample testified that the MCC personnel who saw the handwritten note on the February 3 Report should have acted on it and should have redrawn Solebo's blood. (Sample Dep. 80–81.)

114. At trial, Nurse Wagner testified that he did not recall the phlebotomist telling him that Solebo's blood draw for a Dilantin level was bad and needed to be redrawn. (Trial Tr. 783.) Nor did he recall informing Dr. Hoffman or Dr. Nowakowski that Solebo's blood draw for a Dilantin level was bad and needed to be redrawn. (Trial Tr. 783.) Nurse Wagner further testified that after Solebo's blood was drawn on February 1, he did not recall doing anything to follow up to see if a result for Solebo's Dilantin level was returned to the MCC. (Trial Tr. 778.)

115. A Dilantin level from the February 1 blood draw was never obtained by the MCC prior to Solebo's death, (Trial Tr. 126), and Solebo's blood was not redrawn at any time prior to his death, (Trial Tr. 515–16). Thus, the final laboratory results that the MCC obtained of Solebo's Dilantin level prior to his death were those from the December 7, 2006 blood draw. (Trial Tr. 126.)

116. Between February 7, 2007 and the date of Solebo's death, Dr. Nowakowski did not have any personal knowledge that a Dilantin level was not going to be obtained. (Trial Tr. 516.) Had Dr. Nowakowski known that a valid Dilantin level was not forthcoming, she would have done something about it. (Trial Tr. 516–17.) At trial, Dr. Nowakowski agreed that the MCC personnel knew or should have known that between February 7, 2007 and the date of Solebo's death, no value for his Dilantin level was forthcoming and that something needed to have been done. (Trial Tr. 517–18.)

### 2. February 12, 2007 Neurology CCC visit

117. On February 12, 2007, Solebo had a follow-up visit ("February 12 CCC Visit") with Dr. Hoffman in the Neurology CCC. (Jt. Ex. 1 at 810; Trial Tr. 115, 422, 506.) Dr. Hoffman's assessment of Solebo was that Solebo had a history that was suggestive of seizure disorder. (Jt. Ex. 1 at 810; Trial Tr. 115.) The treatment plan for Solebo included an order for an EEG, a CT scan of his head, and a follow-up visit to the CCC during the first week of May. (Jt. Ex. 1 at 810; Trial Tr. 115–16.) Aside from the seizure disorder, no other medical condition was listed in Solebo's medical records as of the date he was receiving the CCC treatment. (Jt. Ex. 1 at 810; Trial Tr. 115–16.) During this visit, no diagnoses of high blood pressure, arrhythmia,

or heart problems were made. (Jt. Ex. 1 at 810; Trial Tr. 439.)

118. During the February 12 CCC Visit, Dr. Hoffman asked Solebo about side effects and noted that the only possible medication side effect from an increase in Dilantin was a mild headache. (Jt. Ex. 1 at 810; Trial Tr. 423.) Dr. Hoffman also noted that Solebo's Dilantin level on December 9, 2006, was 11 μ/ml, (Jt. Ex. 1 at 810; Trial Tr. 423, 506), which was within the therapeutic range, (Trial Tr. 435). Dr. Hoffman further noted that Solebo's blood was drawn two weeks prior. (Jt. Ex. 1 at 810; Trial Tr. 423). Thus, at the time of this visit Dr. Hoffman knew that the MCC had not yet received a laboratory value for Solebo's Dilantin level from the February 1 blood draw. (Trial Tr. 421.) Nowhere on Solebo's medical chart did Dr. Hoffman re-order or document a follow-up of the February 1 blood draw or the results of the February 1 blood draw, (Jt. Ex. 1 at 810), even though he could have ordered a new blood draw, (Trial Tr. 423).

119. Dr. Hoffman testified that it was his practice to perform blood draws every three months to check Dilantin levels in a patient's blood. (Trial Tr. 417, 424.) Despite Dr. Hoffman's practice, and the fact that a Dilantin level from the February 1 blood draw had not yet been received, Dr. Hoffman asked Solebo to return in three months. (Jt. Ex. 1 at 810.) Nowhere in the notes of the February 12 CCC Visit did Dr. Hoffman indicate that he intended to obtain Solebo's Dilantin level prior to his next visit. (Jt. Ex. 1 at 810.) Dr. Hoffman's testimony at trial was unreliable, as he testified that it would not have been appropriate to write an order for a new blood draw because it would have been "ridiculously expensive." (Trial Tr.

426–27.) Dr. Hoffman testified that had he seen the February 3 Report during the February 12 CCC Visit, he would have had Solebo's blood drawn before he left the CCC. (Trial Tr. 450.)

120. In February and March 2007, the MCC Physicians had the ability to order a STAT lab. (*See* Trial Tr. 507.) Although Dr. Hoffman did not have the lab results of the February 1 blood draw in Solebo's medical chart during the February 12 CCC Visit, (Jt. Ex. 1 at 810; Trial Tr. 465), he could have ordered the laboratory test that day STAT. (Trial Tr. 465.) According to Dr. Hoffman, however, he did not order the STAT lab because he was not worried. (Trial Tr. 466.) Dr. Hoffman testified that Solebo's Dilantin dosage was increased a month-and-a-half prior and since that time Solebo had not reported any seizure episodes. (Trial Tr. 466.) In addition, Dr. Hoffman noted in Solebo's medical chart that Solebo did not have any nystagmus,[4] (Trial Tr. 466; Jt. Ex. 1 at 810), which would have been indicative of Dilantin toxicity, (*see* also Tr. Tr. 643). Dr. Hoffman reasoned that Solebo was "probably either down 10 or 11 or a little bit less." (Trial Tr. 466.) Thus, Dr. Hoffman felt comfortable waiting until the Dilantin level "crossed [his] path through the regular procedures for laboratory return." (Trial Tr. 466.)

### 3. February 2007 pill line

121. In February 2007, Solebo was to take four 100–milligram capsules of Dilantin by mouth each evening on the pill line, pursuant to prescription number 99214 entered by Dr. Hoffman. (Jt. Ex. 1 at 790, 809; Trial Tr. 50, 83–84.) The only medication Solebo was receiving on the pill line during this month was Dilantin. (Trial Tr.

---

4. Nystagmus is defined as "an involuntary, rapid, rhythmic movement of the eyeball, which may be horizontal, vertical, rotatory, or mixed, i.e., of two varieties." Dorland's Illustrated Medical Dictionary at 1307 (32d ed. 2012).

54.) On February 10, 11, and 12, Solebo's MAR reflects that he was a "no-show" on the pill line and missed three consecutive doses of Dilantin. (Jt. Ex. 1 at 790; Trial Tr. 534; Aruiza Dep. 12.)

122. On February 13, 2007 Physician Assistant Velasquez administered Dilantin to Solebo. (Jt. Ex. 1 at 790; Trial Tr. 85.) Velasquez knew that Dilantin was being given to Solebo to control his seizures. (Trial Tr. 89.) In administering medication to Solebo, she had his February 2007 MAR before her and could see that Solebo missed his medication on February 10, 11, and 12. (Trial Tr. 85–86.) At trial, Velasquez could not recall specifically informing the Physicians that Solebo missed three days in a row of his medication. (Trial Tr. 87–88.)

123. On February 15, 2007, Physician Assistant Iskandar administered Dilantin to Solebo. (Trial Tr. 51.) In administering Dilantin to Solebo on this day, Iskandar knew that Solebo had missed three consecutive doses of Dilantin between February 10 and February 12. (Trial Tr. 51.) At trial, Iskandar could not recall if he communicated this fact to a Physician. (Trial Tr. 51.)

124. On February 19, 2007, Physician Assistant Aruiza administered Dilantin to Solebo on the pill line. (Aruiza Dep. 73.)

125. Solebo's February 2007 MAR reflects that he was a "no-show" on the pill line and missed additional doses of medication on February 17, 20, 24 and 25, for a total of seven missed doses during the month of February 2007. (Jt. Ex. 1 at 790; Trial Tr. 534–535.)

126. On February 26, 2007, Physician Assistant Velasquez again administered Dilantin to Solebo on the pill line. (Trial Tr. 88–89.) In administering his medication, Velasquez knew that Solebo had missed his Dilantin on February 10, 11, 12,

24, and 25, and that Dilantin was being given to Solebo to control his seizures. (Trial Tr. 88–89.) Physician Assistant Velasquez testified that an inmate missing multiple days of medication would have been the type of thing about which she would inform a Physician. (Trial Tr. 89.)

127. On February 27, 2007, Physician Assistant Aruiza again administered Dilantin to Solebo on the pill line. (Aruiza Dep. 73.) In February 2007, Aruiza did not make any recommendations regarding the care, treatment or testing of Solebo as a result of his interactions with Solebo on the pill line. (Aruiza Dep. 99.)

128. On February 28, 2007, Physician Assistant Iskandar again administered Dilantin to Solebo. (Trial Tr. 51.) In administering Dilantin to Solebo on this day, Iskandar knew that Solebo had previously missed seven doses of Dilantin. (Trial Tr. 52–53.) Iskandar also knew that it was important for Solebo to receive his medication, and that it was important to tell a Physician that Solebo had missed seven days of medication. (Trial Tr. 54.) Iskandar also knew that seizures could cause death or serious permanent injuries. (Trial Tr. 54.) Despite this knowledge, Iskandar did not remember informing the Physicians about the missed doses, (Trial Tr. 53), or having any discussions with Solebo about him missing his medication, (Trial Tr. 54–55). Furthermore, nothing in Solebo's medical chart would have indicated that Iskandar discussed this with either Dr. Hoffman or Dr. Nowakowski because it was not the practice of the physician assistants to note such discussions in the medical charts. (Trial Tr. 53–54.)

129. Despite the fact that Solebo missed seven doses of Dilantin in February 2007, a Physician never reviewed his February 2007 MAR. (Jt. Ex. 1 at 790; Trial Tr. 534.)

130. Although Dr. Hoffman met with Solebo on February 12 and Solebo was a "no-show" on the pill line on the two prior days, (Jt. Ex. 1 at 790), Dr. Hoffman testified that he did not recall speaking to Solebo in February 2007 about missing his doses of Dilantin, (Trial Tr. 457). Nor did Dr. Nowakowski recall having any discussions with Solebo in February 2007 regarding the importance of taking his medication. (Trial Tr. 519.) Nothing in Solebo's medical chart indicates that any discussions were had with him in February 2007 about the importance of taking his Dilantin every day. (Jt. Ex. 1 at 810–11; Trial Tr. 519.) Furthermore, Dr. Nowakowski did not recall any discussions in February 2007 with any of the physician assistants or anyone else that worked on the pill line regarding Solebo's missed doses of medication. (Trial Tr. 519–20.) Although Dr. Hoffman testified that the MCC personnel attending the morning meetings discussed inmates who missed their medication, he did not recall any discussions about Solebo missing his medication in February 2007. (Trial Tr. 459.)

### H. March 2007

131. In March 2007, Solebo was to take four 100–milligram capsules of Dilantin by mouth each evening on the pill line, pursuant to the prescription entered by Dr. Hoffman. (Jt. Ex. 1 at 788; Trial Tr. 46–47.) The only medication Solebo was receiving on the pill line during this month was Dilantin. (Trial Tr. 54.) That month, Solebo missed a total of eight doses of medication. (Jt. Ex. 1 at 788; Trial Tr. 535.) Specifically, Solebo's March 2007 MAR reflects that he was a "no-show" on the pill line and missed three consecutive doses on March 23, 24, and 25, (Trial Tr. 535, 537, Aruiza Dep. 70), and additional doses on March 4, 10, 11, 18, and 31, (Jt. Ex. 1 at 788; Aruiza Dep. 67–69).

132. On March 12 and 13, 2007, Physician Assistant Aruiza administered Dilantin to Solebo and in doing so, was aware that Solebo had not received his Dilantin on March 4, 10, and 11. (Aruiza Dep. 68–69.)

133. On March 14, 2007, Physician Assistant Iskandar administered Dilantin to Solebo and in doing so, knew that Solebo had missed his Dilantin on March 4, 10, and 11. (Trial Tr. 47–48.) Iskandar testified that it was his practice to inform the Physicians of this type of information at the next daily meeting. (Trial Tr. 48.)

134. On March 19 and 20, 2007, Physician Assistant Aruiza administered Dilantin to Solebo and in doing so, was aware that Solebo had not received his Dilantin on March 4, 10, 11, and 18. (Aruiza Dep. 69–70.)

135. On Friday, March 23, 2007, Dr. Nowakowski was out. (Pl.'s Ex. Y at 3.) Solebo missed three consecutive doses of medication on March 23, 24, and 25. (Jt. Ex. 1 at 788; Trial Tr. 535, 537.) Dr. Nowakowski testified that missing those three consecutive doses may have drawn her attention, but it was not enough for her to make an administrative note in Solebo's medical chart; otherwise, she would have done so. (Trial Tr. 535–36.)

136. The following week, from Monday, March 26 through Friday, March 30, 2007, Dr. Hoffman was on leave and was not present at the MCC. (Pl.'s Ex. Y at 2.) Dr. Hoffman did not return to the MCC at any point in time prior to Solebo's death. (Pl.'s Ex. Y at 2.) On March 26 and 27, 2007, Physician Assistant Aruiza again administered Dilantin to Solebo and in doing so, he had the MAR in front of him and could see that Solebo had not received his Dilantin on March 4, 10, 11, 18, 23, 24, and 25. (Aruiza Dep. 70–72.)

137. On March 28, 2007, Physician Assistant Iskandar administered Dilantin to Solebo. (Trial Tr. 48.) In administering Dilantin to Solebo on that day, Iskandar had the MAR in front of him and therefore, he knew that Solebo had missed his Dilantin on March 4, 10, 11, 18, 23, 24, and 25. (Trial Tr. 48–49; Jt. Ex. 1 at 788.) At trial, Iskandar testified that it was his practice to inform the Physicians of this type of information at the next daily meeting. (Trial Tr. 49.) Iskandar testified that he did this because he knew it was important for Solebo to take his medication and he knew that the Physicians needed to be informed that Solebo had missed his medication. (Trial Tr. 49.)

138. On March 31, 2007, Solebo was again a "no-show" on the pill line and missed his medication. (Jt. Ex. 1 at 788.)

139. Physician Assistant Velasquez testified at trial that Solebo missing his medication on specific days in March 2007 was the type of matter discussed during the endorsement meetings in March 2007 because it was important to share this type of information with the Physicians. (Trial Tr. 76–77.) Nevertheless, she could not recall whether she brought up the fact that Solebo missed his medication during the daily endorsement or close-out meetings in March 2007. (Trial Tr. 76.) Physician Assistant Velasquez also could not recall any meetings with medical personnel at the MCC in March 2007 in which the issue of Solebo missing his medication was discussed. (Trial Tr. 92.) Nor did Physician Assistant Aruiza make any recommendations to the Physicians regarding the care, treatment or testing of Solebo as a result of his interactions with him on the pill line. (Aruiza Dep. 98–99.) Dr. Nowakowski could not recall any discussions in March 2007 with any of the physician assistants or anyone else that worked on the pill line

regarding Solebo's missed doses of medication in March 2007. (Trial Tr. 519–20.)

140. Nothing in Solebo's medical chart indicates that a Physician or physician assistant had discussions with Solebo or counseled him in March 2007 about him taking his medication. (Jt. Ex. 1 at 810–11; Trial Tr. 55, 519.) Dr. Nowakowski did not personally recall any discussions she had with Solebo in March 2007 regarding the importance of taking his medication. (Trial Tr. 519.) In addition, Physician Assistants Velasquez and Iskandar could not recall speaking to Solebo in March 2007 about missing his medication. (Trial Tr. 45, 55, 92.) Nurse Wagner also did not recall ever having a conversation with Solebo about missing multiple days of Dilantin in 2007, nor did he recall talking to Dr. Hoffman or Dr. Nowakowski about Solebo missing his Dilantin. (Trial Tr. 779.)

141. At no point in time in March 2007 did any MCC personnel draw Solebo's blood to obtain or test his Dilantin level. (*See* Trial Tr. 126; 515–16.)

**I. April 2007**

142. On April 1, 2007, Eric Wilson became the MCC warden. (Trial Tr. 694.) Dr. Hoffman was on a leave of absence and not present at the MCC the entire month of April 2007. (Pl.'s Ex. Y at 2; Trial Tr. 698–99.) In Dr. Hoffman's absence, Dr. Nowakowski was the MCC's acting Clinical Director that month. (Trial Tr. 144, 482–83.) After assuming his position as warden, Wilson did not have any meetings with Dr. Hoffman or Dr. Nowakowski in April 2007. (Trial Tr. 700–01.) In addition, Warden Wilson did not review or have discussions with any medical personnel regarding the system that the MCC Laboratory had in place for following up with the Rochester Lab on laboratory tests and results. (Trial Tr. 707–09.) Accord-

ing to him, MCC medical personnel had the responsibility of following up on laboratory tests and results. (Trial Tr. 708.) Warden Wilson also knew that there was only one physician, Dr. Nowakowski, at the MCC during that month and that when she was absent, a physician was not present at the MCC. (Trial Tr. 700.)

143. On April 2, 2007, Dr. Nowakowski reviewed Solebo's MAR for March 2007. (Jt. Ex. 1 at 788; Trial Tr. 535–36.) Dr. Nowakowski did not view the fact that Solebo had missed three consecutive doses of Dilantin in late March, and a total of eight doses of Dilantin in March 2007, as an emergency, and she did not take any action in response to that information. (Trial Tr. 558.)

144. In April 2007, Solebo was to take four 100–milligram capsules of Dilantin by mouth each evening on the pill line, pursuant to a prescription entered by Dr. Hoffman. (Jt. Ex. 1 at 786; Trial Tr. 47, 128–29; Aruiza Dep. 59.) The only medication Solebo was receiving on the pill line during this month was Dilantin. (Trial Tr. 54, 129.) In April 2007, Solebo's MAR reflects that he missed 13 of his 30 doses of Dilantin on the pill line. (Jt. Ex. 1 at 786; Trial Tr. 538.) Specifically, Solebo's MAR reflects that he was a "no-show" on the pill line on April 1, 2, 5, 7, 8, 14, 15, 21, 22, 28, 29, and 30, (Jt. Ex. 1 at 786; Aruiza Dep. 62–63, 66–67; *see also* Trial Tr. 558–59), and that Solebo refused his medication on April 27, (Jt. Ex. 1 at 786). During the month, a copy of Solebo's MAR was kept on the medication cart. (Trial Tr. 37.) If Dr. Nowakowski had wanted to review his MAR that month, she could have gone to the medication cart to do so. (Trial Tr. 46.)

145. On Monday, April 9 and Tuesday, April 10, 2007, Physician Assistant Aruiza administered Dilantin to Solebo on the pill line. (Aruiza Dep. 60, 62; Jt. Ex. 1 at

786.) In administering Dilantin to Solebo on these days, Aruiza was aware that Solebo had not received his medication on April 1, 2, 5, 7, and 8. (Aruiza Dep. 62–63.)

146. On Monday, April 16 and Tuesday, April 17, 2007, Physician Assistant Aruiza again administered Dilantin to Solebo on the pill line. (Aruiza Dep. 63.) In administering Dilantin to Solebo on this day, Aruiza was aware that Solebo had not received his medication on April 1, 2, 5, 7, 8, 14, and 15. (Aruiza Dep. 63.)

147. On April 18, 2007, Dr. Nowakowski was out and was not physically present at the MCC. (Pl.'s Ex. Y at 3; Trial Tr. 489–90.) That evening, Physician Assistant Iskandar administered Dilantin to Solebo. (Jt. Ex. 1 at 786; Trial Tr. 44.) In administering Dilantin to Solebo, he could see that Solebo had missed his doses of Dilantin on April 7, 8, 14, and 15. (Trial Tr. 43.) Iskandar testified that it was his practice to inform the Physicians about this type of issue at the next daily meeting because he knew it was important for Solebo to take his anti-seizure medication. (Trial Tr. 43.) Iskandar testified that he knew it was important so that Solebo would not have any serious permanent injury. (Trial Tr. 43.) Iskandar also knew it was important to inform the Physicians about these missed doses. (Trial Tr. 44.)

148. On Monday, April 23, 2007, Physician Assistant Aruiza again administered Dilantin to Solebo on the pill line. (Aruiza Dep. 64.) In administering Dilantin to Solebo on this day, Aruiza was aware that Solebo had not received his medication on April 1, 2, 5, 7, 8, 14, 15, 21, and 22. (Aruiza Dep. 64.)

149, On Tuesday, April 24, 2007, Solebo underwent an EEG that Dr. Hoffman had ordered on February 12, 2007. (Jt. Ex. 1 at 820; Jt. Ex. 2 at 12.) The EEG summary provides, in part, "no seizure activi-

ty," and the conclusion is "normal wake and drowsy record." (Jt. Ex. 1 at 820; Jt. Ex. 2 at 12.) This EEG scan was normal. (Trial Tr. 286–87.)

150. On the evening of April 24, 2007, Physician Assistant Carrera administered Dilantin to Solebo on the pill line. (Jt. Ex. 1 at 786; Trial Tr. 129.) Carrera testified that she did not talk to Solebo in April 2007 about why he missed his medication on the pill line, nor did she learn from anyone why Solebo missed his medication. (Trial Tr. 128.) Thus, Carrera did not know why Solebo missed his medication on the pill line in April 2007. (Trial Tr. 128.) If an inmate did not appear on the pill line for a number of days to receive his prescribed medication, Physician Assistant Carrera testified that it was her practice to make a note on the inmate's medical chart so that a Physician reviewing the inmate's medical chart was aware of what was going on with the patient. (Trial Tr. 129–30.) Carrera testified that if she had a concern about Solebo missing his medication, she also could have easily contacted a Physician in April 2007 to discuss the issue with them. (Trial Tr. 130.) Nevertheless, Carrera did not recall having any discussions with any Physician about Solebo missing his medication, nor did she recall any meetings she had with any Physician about Solebo missing medication in April 2007. (Trial Tr. 131–132.)

151. On Wednesday, April 25, 2007, Dr. Nowakowski was at the MCC for a half-day and did not return to the MCC until Wednesday, May 2, 2007. (Pl.'s Ex. Y at 3; Trial Tr. 489–91.) On the days that Dr. Nowakowski was out, a Physician was not present at the MCC. (Trial Tr. 719–720.) At trial, Dr. Nowakowski did not recall having any contact with the MCC during these particular days. (Trial Tr. 491.) Warden Wilson also testified at trial that he was not aware of the dates that Dr.

Nowakowski was out in April 2007. (Trial Tr. 718–719.) On the days that Dr. Nowakowski was absent in April 2007, Warden Wilson did not take any additional action to bring in additional physicians. (Trial Tr. 719.) Warden Wilson testified, however, that he was not required to bring a doctor in to the MCC from a different BOP institution. (Trial Tr. 720.)

152. On Thursday, April 26, 2007, Physician Assistant Iskandar administered Dilantin to Solebo; in doing so, he could see that Solebo had missed his doses of medication on April 7, 8, 14, 15, 21, and 22. (Trial Tr. 44.) Iskandar testified that he knew at this time that it was important for Solebo's health to take his anti-seizure medication. (Trial Tr. 44–45.) Iskandar also testified that it was his practice to tell the Physician at the next daily meeting, assuming a Physician was present, that Solebo had missed his doses of anti-seizure medication on those dates in April. (Trial Tr. 45.) Notably, Dr. Nowakowski testified at trial that on days when she was not at the MCC, such as the week prior to Solebo's death, a daily meeting did not take place. (Trial Tr. 542.) Additionally, Iskandar did not recall speaking to Solebo in April 2007 about his missed doses of medication. (Trial Tr. 45.)

153. On Friday, April 27, 2007, the pill line was administered in housing Unit 17E at 9:28 p.m. (Pl.'s Ex. B at 143.) Solebo's MAR reflects that he refused his medication that evening. (Jt. Ex. 1 at 786.) Although Solebo's refusal was not documented in the Unit 17E Logbook, Officer Blanco specifically recalled Solebo refusing his medication this time. (Pl.'s Ex. B at 143; Blanco Dep. 28, 30.) Officer Blanco walked up to a section of Unit 17E where a group of inmates, including Solebo, was gathered around a television and told them that the pill line was here. (Blanco Dep. 29.) According to Officer Blanco, Solebo

did not want to get up from his seat and he told Blanco that he did not want his medication, at which point Blanco told Solebo that the pill line was "down there." (Blanco Dep. 29.) Solebo got upset, stood up, and walked over to the railing and yelled to the person distributing medication on the pill line, "I'm refusing." (Blanco Dep. 29–31.) Solebo then walked past Blanco and sat back down. (Blanco Dep. 30.) Blanco testified that he was not aware of a physician assistant speaking with Solebo on this day. (Blanco Dep. 32.) Other than this single occurrence, Blanco was not aware of any other days that Solebo missed the pill line or refused to take his medication. (Blanco Dep. 37.) Additionally, Blanco did not have any discussions with Solebo at any time before he died about the importance of taking his medication. (Blanco Dep. 37–38.)

154. On Saturday, April 28, 2007, the pill line was administered in housing Unit 17E at 8:40 p.m. (Pl.'s Ex. B at 144–45; Blanco Dep. 48.) Solebo's MAR reflects that he was a "no-show" on the pill line this evening and did not receive his Dilantin. (Jt. Ex. 1 at 786.)

155. On Sunday, April 29, 2007, Solebo's MAR reflects that he was a "no-show" on the pill line and did not receive his Dilantin. (Jt. Ex. 1 at 786.)

156. On Monday, April 30, 2007, both Dr. Hoffman and Dr. Nowakowski were on leave and were not physically present at the MCC. (Pl.'s Ex. Y at 2–3; Trial Tr. 489–90.) From April 30 until May 4, 2007, Warden Wilson was at a warden training conference and was not physically present at the MCC. (Trial Tr. 699.) On the evening of April 30, 2007, the pill line took place on the 7th Floor and was administered by Physician Assistant Aruiza. (Trial Tr. 181–83 185; Pl.'s Ex. B at 148.) Solebo's MAR reflects that Solebo was a "no-show" on the pill line this evening and

did not receive his medication. (Jt. Ex. 1 at 786; Aruiza Dep. 66–67.) According to Officer Cannon, however, Solebo was one of three inmates who refused to go to the pill line. (Trial Tr. 181, 185; Pl.'s Ex. B at 148.) Although Solebo told Officer Cannon that he was not going to go to the pill line that evening, he did not tell Cannon why he was refusing nor did Cannon ask why. (Trial Tr. 182.) Officer Cannon testified that it was not part of his job to talk to Solebo about the importance of taking his medication; therefore, he did not discuss this issue Solebo. (Trial Tr. 182.) After speaking to Solebo, Officer Cannon contacted Aruiza to let him know that Solebo refused his medication. (Trial Tr. 183, 185, 187.) Cannon also contacted his supervisor, Lieutenant Finley, and informed him that Solebo and other inmates were refusing their medication that evening. (Trial Tr. 183.) Lieutenant Finley did not instruct Cannon to do anything to encourage Solebo to take his medication. (Trial Tr. 183.) Cannon did not contact a Physician that evening to let them know that Solebo was refusing to take his medication. (Trial Tr. 184.)

157. Officer Cannon testified that there were occasions when an inmate on housing Unit 17E changed his mind about receiving his medication. (Trial Tr. 188.) Neither Cannon or a physician assistant refused to accommodate the inmate on such occasions. (Trial Tr. 188.) Additionally, although there were occasions in 2007 when a physician assistant came up to the housing unit and spoke to an inmate after being notified by Cannon via a telephone call that the inmate was refusing his medication, Physician Assistant Aruiza did not do this on April 30, 2007. (Trial Tr. 189.) Neither a Physician or physician assistant came up to Solebo's housing unit to speak to Solebo about him not taking his medication. (Trial Tr. 183–84, 89.)

158. Other than putting his initials on the MAR, Physician Assistant Aruiza did not have contact with any Physician or physician assistants regarding the dates in April 2007 that Solebo had missed his medication. (Aruiza Dep. 65–66.) Indeed, he did not with anybody about Solebo missing his medication on those dates. (Aruiza Dep. 66.) During the month of April 2007, Aruiza testified that he did not have any daily meetings with the Physicians regarding the inmates he gave medication to on the pill line. (Aruiza Dep. 66.) In April 2007, Aruiza did not make any recommendations regarding the care, treatment or testing of Solebo as a result of his interactions with him on the pill line. (Aruiza Dep. 99.)

159. Physician Assistant Velasquez testified that Solebo missing his medication during the month of April 2007 probably would have been discussed during the daily endorsement or close-out meetings. (Trial Tr. 76.) According to her, it would have been brought up during those meetings because it was important for the Physicians to know that an inmate had missed his medication. (Trial Tr. 76.) Nevertheless, Velasquez could not recall any meetings with MCC medical personnel in April 2007 about Solebo missing his medication. (Trial Tr. 92.) Velasquez also could not recall any discussions or meetings that she had in April 2007 with Solebo about him missing his medication. (Trial Tr. 91–92.) Again, Dr. Nowakowski testified at trial that when she was not present at the MCC the week prior to Solebo's death, a daily meeting did not take place. (Trial Tr. 542.)

160. Prior to Solebo's death, Dr. Nowakowski was never made aware of the fact that Solebo missed 13 of his 30 doses of Dilantin in April and nothing in Solebo's medical chart reflects that any physician assistant brought this to her attention.

(Trial Tr. 538.) Based on her clinical experience as a physician, Dr. Nowakowski testified that given the quantity of missed doses, it was quite possible that Solebo's Dilantin was not at a therapeutic level. (Trial Tr. 538–39.) But, this possibility could not be confirmed until she saw the laboratory results of a blood draw. (Trial Tr. 538–39.) Blood draws had been ordered but had not been received since December 2006. (Trial Tr. 539.)

161. Had Dr. Nowakowski been made aware of the facts in the April 2007 MAR, she testified that she would have certainly had Solebo evaluated within the week. (Trial Tr. 539, 559.) She would have checked his Dilantin level, reviewed everything in his medical chart, and performed a physical exam. (Trial Tr. 539.) Obtaining a history from Solebo and finding out "what was going on in terms of him missing his medication" would have been equally as important as a physical exam because the April 2007 MAR suggested that Solebo's Dilantin level might be low. (Trial Tr. 539–40.) But, Dr. Nowakowski needed a laboratory test to confirm this suspicion. (Trial Tr. 540.) At no time in April 2007 did any MCC personnel draw Solebo's blood to obtain or test Solebo's Dilantin level. (*See* Trial Tr. 126. 515–16.)

162. Neither Dr. Hoffman nor Dr. Nowakowski reviewed Solebo's April 2007 MAR prior to his death. (Jt. Ex. 1 at 786; Trial Tr. 537.) Dr. Nowakowski did not recall having any contact with the MCC during the last week of Solebo's life. (Trial Tr. 491.)

163. Nothing in Solebo's medical chart indicates that anyone had any discussions with Solebo in April 2007 about him taking his medication. (Jt. Ex. 1 at 810–11; Trial Tr. 519.) Dr. Nowakowski did not personally recall any discussions she had with Solebo in April 2007 regarding the importance of taking his medication. (Trial Tr.

519.) Nor did she recall any discussions in April 2007 with any of the physician assistants or anyone else that worked on the pill line regarding Solebo's missed doses of medication. (Trial Tr. 519–20.)

### J. May 2007

164. In the early morning of May 1, 2007, Solebo was found dead in his cell. (R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶ 2.) Both Dr. Hoffman and Dr. Nowakowski were on leave on this day. (Pl.'s Ex. Y at 2–3.) Warden Wilson was also out. (Trial Tr. 699.) Assistant HSA Lamping responded to a call for assistance on the MCC's 17th floor. (Trial Tr. 151; Jt. Ex. 1 at 811.) She found Solebo face down in his cell; he was unresponsive with rigor mortis. (Jt. Ex. 1 at 811; Trial Tr. 151, 153–54.)

165. The Cook County coroner, Dr. Nancy Jones, personally went to the MCC and viewed Solebo's body. (Trial Tr. 344; Pl.'s Ex. M at 1.) She pronounced Solebo dead, and his body was transported to the Cook County coroner's office. (Pl.'s Ex. A at 58; Trial Tr. 151–52.) At the MCC, non-medical MCC personnel told Dr. Jones that Solebo had been diagnosed with and was being treated for seizure disorder. (Trial Tr. 344; 361). At trial, Dr. Jones clarified that although this information was useful, pathologists such as herself can conclude that a person died from seizure disorder if they find intramuscular hemorrhages of the tongue and cerebral edema and anoxia during an autopsy. (Trial Tr. 344–45.) The MCC personnel also provided her with copies of Solebo's medical records, which she testified indicated that he was diagnosed with seizure disorder. (Trial Tr. 361.) Dr. Jones did not speak with Dr. Hoffman or Dr. Nowakowski. (Trial Tr. 361–62.)

166. On May 1, 2007, Assistant HSA Lamping prepared a report ("Lamping Re-

port") on Solebo's death. (Pl.'s Ex. A at 58; Trial Tr. 150.) The Lamping Report provided, in part, "The 23 year old inmate arrived at MCC Chicago on 2–26–2007 with a history of Grand Mal seizures and was seen 2–12–2007 for his chronic care clinic." (Pl.'s Ex. A at 58; Trial Tr. 152.) Lamping based the information in the Lamping Report on her personal knowledge, a review of Solebo's medical chart, and clinical information provided to her by a Physician or one of the other clinicians at the MCC. (Trial Tr. 150–52.)

167. On May 2, 2007, a letter under Warden Wilson's name was sent to Plaintiff. (Pl.'s Ex. A at 193; Trial Tr. 713.) Warden Wilson informed Plaintiff that her husband was pronounced dead by the Cook County Medical Examiner in Chicago on May 1, 2007. (Pl.'s Ex. A at 193; Trial Tr. 713.) The letter further stated: "The Cook County Medical Examiner's preliminary findings reveal the death was caused by a seizure disorder." (Pl.'s Ex. A at 193; Trial Tr. 713–14.) The letter was signed by James Henry, the associate warden, on Warden Wilson's behalf because Wilson was out of town that day. (Pl.'s Ex. A at 193; Trial Tr. 714.) Warden Wilson knew the letter was to be mailed out to Plaintiff, and he gave his approval to do so. (Trial Tr. 714.) That same day, a second letter was sent under Warden Wilson's name and at his request to Judge Ruben Castillo. (Pl.'s Ex. A at 194; Trial Tr. 714–15.) The first paragraph of that letter provides: "This is to advise you of the death of Habib Solebo. Mr. Solebo was pronounced dead on May 1, 2007, by the Cook County medical examiner. Preliminary findings indicate Mr. Solebo died of a seizure disorder." (Pl.'s Ex. A at 194; Trial Tr. 715.) At trial, Warden Wilson testified that the letters were standard notices that were sent from the MCC and that he was following the rules in effect

regarding inmate death notices. (Trial Tr. 715.) In both letters, Warden Wilson indicated that the cause of death was seizure disorder. (Trial Tr. 716; Pl.'s Ex. A at 193–94.)

168. On May 8, 2007, the Rochester Lab faxed to the MCC an "On Demand Report" informing the MCC that the blood specimen for Solebo was unacceptable because it was placed in the wrong type of tube. (Pl.'s Ex. A at 639; Trial Tr. 776.) Specifically, the On Demand Report indicated that the "Test requires specimen in aliquot tube." (Pl.'s Ex. A at 639.) The On Demand Report made it clear that a Dilantin level for Solebo would not be forthcoming. (Trial Tr. 516.)

**K. June 2007**

169. On June 21, 2007, the MCC prepared a Multi–Level Mortality Review ("Mortality Review") of Solebo's death, (Pl.'s Ex. A at 84–92; Trial Tr. 148), wherein the cause of death was listed as "seizures." (Pl.'s Ex. A at 84; Trial Tr. 148.) The Mortality Review also noted that the only admitting and past diagnoses for Solebo were "seizures." (Pl.'s Ex. A at 84; Trial Tr. 147–48.) Dr. Paul Harvey, the MCC Clinical Director on July 6, 2007, signed the Mortality Review on July 6, 2007. (Trial Tr. 149.)

**V. The autopsy and toxicology report**

170. Dr. Jones performed an autopsy on Solebo's body on May 1, 2007, the same day that he passed away. (Trial Tr. 341.) In May 2007, Dr. Jones was one of three final candidates in contention for Chief Medical Examiner. (Trial Tr. 335.) She became the Chief Medical Examiner for Cook County on August 5, 2007, and held this position at the time of trial. (Trial Tr. 330, 335.)

171. Dr. Jones graduated in 1982 from the Chicago Medical School, which is part of Rosalind Franklin University of Medicine and Science. (Trial Tr. 331.) She completed a two-year residency in anatomic pathology and a second two-year residency in clinical pathology, both at the University of Chicago. (Trial Tr. 331.) Dr. Jones then did a one-year fellowship in forensic pathology at the Robert J. Stein Institute of Forensic Medicine at the Cook County Medical Examiner's Office. (Trial Tr. 331.) Dr. Jones has held a permanent license to practice medicine in the State of Illinois since 1983 and is board certified in anatomic, clinical and forensic pathology. (Trial Tr. 333.) After leaving the University of Chicago, she started her fellowship at the Medical Examiner's Office, completed one year of training and was hired full-time as a staff forensic pathologist in July 1987; she has been with the Medical Examiner's Office ever since. (Trial Tr. 333.) Dr. Jones is also a professor of pathology at the Chicago Medical School, where she teaches both general and forensic pathology. (Trial Tr. 334.) Over the course of her career, she has performed over 10,000 autopsies. (Trial Tr. 336.) She testified at trial pursuant to a subpoena, (Trial Tr. 331), and was the only pathologist to testify at trial.

172. Dr. Jones explained that an autopsy is a detailed, complete external examination coupled with an internal examination of a person's organs and a review of their medical history. (Trial Tr. 336.) One main purpose of an autopsy is to determine cause of death. (Trial Tr. 338.) Dr. Jones explained that a *cause of death* can result from any number of things, such as, in Solebo's case, seizure disorder, or in other cases, gunshot or stab wounds. (Trial Tr. 349–50.) A *mechanism of death,* on the other hand, is the actual physiologic change that takes place in an individual, such as respiratory arrest, cardiac arrest, or exsanguination. (Trial Tr. 349.) Final-

ly, *manner of death* is defined by the circumstances surrounding an individual's death, such as natural, accident, homicide, suicide, or undetermined. (Trial Tr. 350.)

### A. Solebo's autopsy

173. As a result of the autopsy, Dr. Jones opined, to a reasonable degree of medical certainty, that Solebo's cause of death was seizure disorder, (Trial Tr. 341–42; 351–53, 386; Pl's Ex. M at 1–5), and that his manner of death was natural, (Trial Tr. 351). Dr. Jones based her opinion on the physical evidence she found at his autopsy and Solebo's clinical history of seizure disorder. (Trial Tr. 345, 359–60.) Dr. Jones also noted that according to his medical records, Solebo's seizures occurred while he was sleeping and that Solebo went to bed one night and was found dead the next morning in his bed. (Trial Tr. 345.) Dr. Jones testified that even if she had been told that Solebo's clinical history was one of only "possible or questionable seizures," she probably would not have reached a different conclusion regarding his cause of death because the physical findings at autopsy supported the cause of death as being a seizure. (Trial Tr. 366–68.)

174. Dr. Jones listed the following diagnoses on the autopsy report: (1) Clinical history of seizure disorder; (2) Pulmonary congestion and edema; (3) Hepatosplenomegaly, meaning an enlarged liver and spleen, (Trial Tr. 374); (4) Acute congestion of the visceral organs; (5) Marked cardiomegaly (610 grams) with concentric left ventricular hypertorphy; (6) Chronic passive congestion of the liver; (7) Mild cerebral edema; (8) Focal hemorrhage of the soft tissues over the isthmus of the left side of the thyroid gland consistent with body position when found; (9) Rare petechial hemorrhages of the sclerae with scleral injection consistent with the posi-

tion of the body when found; (10) Small intramuscular hemorrhage of the tongue. (Pl.'s Ex. M at 4–5.) Of the ten diagnoses, the most important for her conclusion that Solebo died as a result of seizure disorder were: (a) his clinical history of seizure disorder; (b) the intramuscular hemorrhage, i.e., the bite mark, of his tongue; and (c) the cerebral edema, i.e., swelling of the brain. (Trial Tr. 360–61; *see also* Trial Tr. 348, 353; *see also* Pl.'s Ex. M at 4–5.)

175. The bite mark was significant to Dr. Jones because it is more probably true than not true that a bite mark is associated with a seizure. (Trial Tr. 348–49.) Dr. Jones testified that individuals who experience a seizure frequently bite their tongues, (Trial Tr. 345), and therefore, intramuscular hemorrhages of the tongue are very common in people who die from seizure disorders. (Trial Tr. 348–349.)

176. The finding of cerebral edema was also significant to Dr. Jones because it indicated that Solebo survived for a period of time long enough for his brain to swell and that there was blood flow to his brain for a period of time. (Trial Tr. 354.) Dr. Jones explained that the brain does not have time to swell when a person suffers an immediate cardiac event, and therefore cerebral edema is usually not seen in a person who dies from an acute cardiac arrest. (Trial Tr. 354.) In addition, Dr. Jones testified that an anoxic brain, meaning a brain that has been starved of oxygen, (Trial Tr. 349), has a dusky appearance, (Trial Tr. 354). In her experience, the dusky appearance of a brain is usually found in somebody who has had a fatal seizure. (Trial Tr. 354.)

177. Of the ten diagnoses from the autopsy, the most abnormal was the finding of cardiomegaly, i.e., an enlarged heart weighing 610 grams. (Trial Tr. 369; *see also* Trial Tr. 353.) Owing to the size of

Solebo's heart, a cardiac event would have been in Dr. Jones' differential diagnoses for cause of death. (Trial Tr. 356, 369–370.) In that instance, a typical mechanism of death is a fatal arrhythmia. (Trial Tr. 369–71.) Had Solebo suffered an immediate cardiac event, such as a cardiac arrhythmia, however, he would have died quickly and his brain would not have had time to swell. (Trial Tr. 354, 356.) Thus, the finding of cerebral edema was the linchpin to her opinion that Solebo died of a fatal seizure and not of a heart-related illness, such as a fatal cardiac arrhythmia. (Trial Tr. 356, 386.)

178. Dr. Jones also opined, to a reasonable degree of medical certainty, that Solebo's mechanism of death was more consistent with asphyxia than with cardiac arrest, especially because Solebo had cerebral edema and anoxia. (Trial Tr. 349.) Dr. Jones explained that the breathing pattern of a person who is actively seizing is frequently strenuous. (Trial Tr. 351.) After a seizure has ended, a person's respiratory rate will frequently drop precipitously such that the person is not breathing adequately and can asphyxiate. (Trial Tr. 352.) According to Dr. Jones, at some point Solebo's breathing got slower and more laborious and then eventually stopped. (Trial Tr. 352.) Thus, Dr. Jones opined, to a reasonable degree of medical certainty, that a seizure ultimately caused Solebo's death. (Trial Tr. 352.)

179. Dr. Jones also testified that Solebo's enlarged heart could have made him more susceptible to having a fatal seizure. (Trial Tr. 354–55.) For instance, Dr. Jones explained that if Solebo's seizures were triggered by a reduction in me flow of oxygen to his brain, then Solebo could have had a cardiac event, such as an arrhythmia, that lowered the oxygen flow to his brain and then triggered a seizure, thereby resulting in his death. (Trial Tr. 354–55.) Dr. Jones made clear, however, that while she could speculate as to what role Solebo's enlarged heart played in his seizure, as a result of the physical findings at his autopsy she was certain that Solebo did in fact suffer a fatal seizure. (Trial Tr. 353.)

180. On cross-examination, Dr. Jones testified that in cases where the only finding is an enlarged heart and it is not enlarged for a specific reason, such as hypertension, pathologists describe that as hypertrophic cardiomyopathy ("HCM"). (Trial Tr. 370–71.) Thus, the finding of an enlarged heart would suggest that HCM could be a possible cause of death. (Trial Tr. 375–76.) On cross-examination, Defendant posited a theory that Solebo's cause of death was due to HCM. (Trial Tr. 371.) Under Defendant's theory, the mechanism of death could have been a heart arrhythmia precipitating a seizure-like episode or some kind of syncope or loss of consciousness with monoclonic activity leading to death. (See Trial Tr. 372.) Dr. Jones made it clear that a death by either of these mechanisms would only be consistent if there were a period of time that would allow the anoxic changes in the brain and the cerebral edema to occur, which is more likely to happen in a true seizure than in seizure-like activity precipitated by an arrhythmia. (Trial Tr. 373.) Dr. Jones also reiterated that cerebral edema is not usually seen in an acute cardiac arrest. (Trial Tr. 373–74.)

181. On redirect examination, Dr. Jones opined, to a reasonable degree of medical certainty, that Solebo did not die of HCM and that none of the possibilities posited by Defendant were the actual cause of death. (Trial Tr. 385.) Dr. Jones also explained that HCM is not listed as a secondary cause of death in this particular instance because when performing the autopsy with all the information she had, and

based on all of the findings at autopsy, her opinion was and is that he died as a result of seizure disorder. (Trial Tr. 386.)

### B. Solebo's toxicology report

182. Dr. Jones also ordered a toxicology report for Solebo to detect whether there were any drugs, medications, recreational materials or poisons in his body. (*See* Trial Tr. 343, 379.) Solebo's toxicology report raised a red flag because it showed that the level of Dilantin in his blood at the time of his death was negative. (Pl.'s Ex. M at 6; Trial Tr. 344.) A negative Dilantin level indicates either that there was no Dilantin in Solebo's blood or that the level was below the laboratory's level of detection,[5] and that Solebo was definitely sub-therapeutic. (Trial Tr. 347.) If Solebo had a therapeutic level of Dilantin in his blood at the time of death, or if he had a sub-therapeutic level of 7 $\mu$/ml or 8 $\mu$/ml, it would have been detected on the toxicology report. (Trial Tr. 347–48.) Dr. Jones opined that the negative result was significant because if a person is supposed to be taking medication that is known to prevent seizures, then a negative result on the toxicology report indicates that the person was not taking the medication, or was not taking the medication as prescribed, and that the medication was not present in a therapeutic level therefore, making the person more susceptible to having a seizure. (Trial Tr. 346, 385.)

183. On cross-examination, Dr. Jones testified that although she was able to conclude that Solebo's cause of death was seizure disorder from the autopsy itself, the toxicology report supported the cause of death in that Solebo's Dilantin level was definitely sub-therapeutic. (Trial Tr. 380.) Dr. Jones also testified that in reviewing Solebo's medical records, it seemed to her

that his seizure-like activity was not occurring when he was taking his Dilantin and was in the therapeutic range. (Trial Tr. 380.)

## VI. The Experts

### A. Dr. Holtzman

184. Dr. Steven Holtzman testified for the Plaintiff. Dr. Holtzman is a physician currently licensed to practice medicine in the State of Texas. (Trial Tr. 203.) He graduated from the University of Illinois in 1967, and from the Chicago Medical School in 1971, and has since practiced as a physician. (Trial Tr. 203–04.) Dr. Holtzman completed a residency program in general surgery at the University of Illinois in Chicago and became board certified in general surgery; his certification expires in 2020. (Trial Tr. 204.) As part of his residency program, he entered graduate school at the University of Illinois and obtained a Ph.D. in biochemistry in about 1977. (Trial Tr. 204.) At the time of trial, Dr. Holtzman was the medical director of the emergency room in Harlingen, Texas. (Trial Tr. 203, 205.) As an emergency room physician, Dr. Holtzman sees patients who present to the emergency room with a number of emergency problems, including neurological problems such as seizures. (Trial 205–06.) His specific training relates to emergency room care only. (Trial Tr. 261–62.) Dr. Holtzman also works as a medical expert consultant and has testified over one hundred times as a retained expert at various trials. (Trial Tr. 209, 263–64.)

185. Dr. Holtzman has cared for, diagnosed, and treated between 500 and 1,000 patients who have had seizures. (Trial Tr. 223.) Although Dr. Holtzman does not typically encounter recurring patients as

---

**5.** Although Dr. Jones did not know what the laboratory's level of detection for Dilantin was, she testified that it could be .5 $\mu$/ml or .25 $\mu$/ml. (*See* Trial Tr. 385.)

an emergency room physician, he has seen the continuum of problems that patients have over the course of seizure disorder. (Trial Tr. 223–24, 259–60.) Dr. Holt/man summarized his opinions as follows: Solebo suffered from seizure disorder; he had a seizure on May 1, 2007, that proximately caused his death; and he suffered a fatal seizure because the MCC and its staff failed to provide adequate and timely medical care. (Trial Tr. 213.)

### 1. Testimony on seizure disorder

186. Dr. Holtzman testified that seizure disorder is defined by the International Anti–Epileptic Society, in part, as "a brain disorder that causes an enduring predisposition to degenerate seizures." (Trial Tr. 213.) Dr. Holtzman also explained that seizures are caused by abnormal electrical activity in the brain and manifest in different ways. (Trial Tr. 214.) For instance, seizure-like activity (which must be present when diagnosing a person with seizure disorder) may include violent convulsions of a person's extremities, loss of consciousness, incontinence, salivation, and lip smacking. (Trial Tr. 215–16.)

187. According to Dr. Holtzman, a diagnosis of seizure disorder may be made after a person experiences two or more seizures that are unprovoked and separated by more than 24 hours. (Trial Tr. 214, 216.) Physicians base a diagnosis of seizure disorder on a patient examination, the patient's history, any observer input, and the results of neurological examinations. (Trial Tr. 216, 219.) In addition, a diagnosis of seizure disorder is bolstered when a patient who is thought to have seizures is treated with anti-seizure medication and the treatment is effective in that the patient ceases to have seizures for a long period of time. (Trial Tr. 219.) On cross-examination, Dr. Holtzman conceded that a physician might prescribe anti-seizure medication even in the absence of definitive tests that confirm seizure disorder. (Trial Tr. 267.)

188. Although a patient's history as provided by a patient to a physician is very important in diagnosing seizure disorder, (Trial Tr. 219–20), Dr. Holtzman testified that the most important factor in diagnosing seizure disorder is talking to an observer who witnessed the seizure, (Trial Tr. 216–17). Dr. Holtzman explained that anyone can be an observer because the physician is interested in the description of the seizure-like activity. (Trial Tr. 217.) Dr. Holtzman agreed that while a layperson is not qualified to diagnose a seizure, (Trial Tr. 264, 316), a layperson who witnesses a seizure is competent to report that information to a health care professional. (Trial Tr. 316.) Dr. Holtzman clarified that one does not have to be a physician, nurse, or physician assistant to relay seizure activity that he or she personally observed to a health care professional. (Trial Tr. 317.)

189. With respect to test results, Dr. Holtzman testified that CT scans of the head, MRIs, and EEGs are useful in diagnosing seizure disorder. (Trial Tr. 217–18.) Dr. Holtzman noted, however, that EEGs in patients with seizure disorder are frequently normal and that it may be important for a physician to provoke a seizure to obtain a reliable result. (Trial Tr. 218–219.) According to Dr. Holtzman, most patients who are diagnosed with seizures lack an abnormal CT scan, MRI, and EEG. (Trial Tr. 218–19.)

190. Dr. Holtzman testified that both of Solebo's CT scans and EEGs were normal. (Trial Tr. 286–87.) Dr. Holtzman also testified that an MRI being performed on Solebo was reasonable and necessary medical treatment, (Trial Tr. 228), and that an MRI might have shown some abnormality in Solebo's brain that would have con-

firmed that he had epilepsy, (Trial Tr. 229).

191. Dr. Holtzman offered his opinion to a reasonable degree of medical certainty, that Solebo suffered from seizure disorder while he was at the MCC. (Trial Tr. 225–27.) The primary basis for his opinion was that the doctors who treated and examined Solebo believed that he suffered from seizure disorder and they documented this belief in his medical records. (Trial Tr. 225–26, 268.) Specifically, Dr. Holtzman pointed out that the Kankakee health care personnel who examined Solebo thought he had experienced a seizure and that the MCC Physicians and physician assistants also thought he had seizure disorder. (Trial Tr. 226.) Although there was no firsthand account from anybody who observed Solebo having a seizure, (Trial Tr. 285), Dr. Holtzman noted that Solebo was seen by two cellmates in Kankakee who documented a similar story about Solebo having a seizure, (Trial Tr. 226; see also Jt. Ex. 3 at 18, 24). Dr. Holtzman testified that, based on his review of Solebo's medical records, he did not have any doubt in his opinion that the medical providers at the MCC believed Solebo had seizure disorder based upon what they wrote in their charts, their deposition testimony, and the fact that they treated the seizure disorder. (Trial Tr. 232–33.) Lastly, Dr. Holtzman noted that Dr. Jones concluded that he died from seizure disorder. (Trial Tr. 226.)

192. Dr. Holtzman's second basis for his opinion that Solebo had seizure disorder lies in the fact that while Solebo was taking anti-seizure medication he did not have any seizures. (Trial Tr. 226, 278–79.) Dr. Holtzman testified that when Solebo stopped taking his anti-seizure medication, his risk of having a seizure quadrupled, and after not taking his anti-seizure medication for four days, he had a fatal seizure.

(Trial Tr. 227.) All of these different aspects led Dr. Holtzman to believe, to a reasonable degree of medical certainty, that Solebo had seizure disorder. (Trial Tr. 227.)

193. On cross-examination, Dr. Holtzman did not dispute that the assessment on Solebo's Kankakee medical records did not reveal anything other than questionable seizures, (See Trial Tr. 278), or that the MCC Physicians assessed Solebo as having "possible seizure disorder," (See Trial Tr. 283). Nevertheless, Dr. Holtzman opined, to a reasonable degree of medical certainty, that the two events at Kankakee that were described as seizure activity, specifically the February 17 and May 24 episodes, were reliable evidence by which a physician could diagnose seizure disorder in Solebo. (Trial Tr. 271–72, 276, 318.)

### 2. Testimony on cause of death

194. Dr. Holtzman also opined mat Solebo died of seizure disorder and, more specifically, that Solebo died from Sudden Unexpected Death From Epilepsy ("SUDEP"), (Trial Tr. 234, 236.) Dr. Holtzman based his opinion on the fact that Solebo suffered from seizure disorder and Dr. Jones' conclusion that Solebo's cause of death was seizure disorder. (Trial Tr. 234–35.) According to Dr. Holtzman, the physical findings at autopsy of the bite mark and cerebral edema, and the finding of a nontherapeutic level of Dilantin in Solebo's body were consistent with SUDEP. (Trial Tr. 236–37, 238.)

195. Dr. Holtzman testified that about ten percent of patients who have seizures will eventually die from SUDEP. (Trial Tr. 236, 290.) Dr. Holtzman also testified that the majority of patients that experience SUDEP have subtherapeutic levels of anti-seizure medication. (Trial Tr. 322.) In offering this testimony, Dr. Holtzman relied on a study that demonstrated certain characteristics of patients with SU-

DEP. (*See* Trial Tr. 323.) Characteristics of patients with SUDEP include dying in the prone position and on a bed, being young, having a subtherapeutic level of Dilantin, as well as having cerebral edema. (Trial Tr. 236–38.) Dr. Holtzman opined that, more likely than not, taking anti-seizure medication substantially and significantly reduces a person's risk of having a seizure and of dying from a seizure or SUDEP. (Trial Tr. 237.) He testified that while it is possible for a person to have a fatal seizure even when the person is taking anti-seizure medication, anti-epileptic drugs, such as Dilantin, reduce a person's risk of having a seizure. (Trial Tr. 237, 322). Therefore, the fact that Solebo had an undetectable level of Dilantin at the time of his death greatly increased his chances of having a seizure and contributed to his death from a seizure. (Trial Tr. 235–36, 322.)

196. On cross-examination, Dr. Holtzman explained that subtherapeutic Dilantin levels are part of the syndrome of SUDEP. (Trial Tr. 291.) Dr. Holtzman agreed that a therapeutic range is defined as the range of drug concentration that is associated with the best achievable response in a given person. (Trial Tr. 297.) Generally, the therapeutic range for Dilantin is between 10 μ/ml and 20 μ/ml. (Trial Tr. 235, 292–93.) For some patients, an optimal therapeutic level might lie outside of the range between 10 μ/ml and 20 μ/ml, but treating physicians always want to keep a patient's Dilantin level at 10 μ/ml or higher. (Trial Tr. 295.)

197. Because Solebo had not been taking Dilantin for four days, Dr. Holtzman knew that his Dilantin level was subtherapeutic. (Trial Tr. 322.) This was confirmed by the autopsy findings. (Trial Tr. 322.)

198. Dr. Holtzman testified that patients with HCM experience shortness of breath, chest pain, heart palpitations, fainting, dizziness, and also have heart murmurs. (Trial Tr. 241.) Dr. Holtzman pointed out that none of these symptoms were documented in Solebo's Kankakee or MCC medical records. (Trial Tr. 241, 243.) In addition, Dr. Holtzman pointed out that while Solebo had an enlarged heart, other organs, such as his spleen and liver, were also enlarged. (Trial Tr. 241.) Dr. Holtzman also testified that most people would not mistake fainting and shortness of breath with a seizure. (Trial Tr. 242.)

### 3. Testimony on standard of care

199. Dr. Holtzman first testified that the standard of care in a prison institution is the same as the standard of care outside of a prison institution. (Trial Tr. 212; 263.) Dr. Holtzman also testified that the standard of care dictates that the MCC Physicians were responsible for the care and treatment provided by the MCC physician assistants because they worked under the auspices of the Physicians. (Trial Tr. 233–34.) Therefore, Dr. Holtzman testified that Solebo was under the care of the MCC Physicians upon his arrival at the MCC, and it is not relevant that Solebo was seen by a physician assistant rather than a Physician because the Physicians had the final say in Solebo's care. (Trial Tr. 233.)

200. Dr. Holtzman testified that the standard of care for treating a patient with seizure disorder requires physicians to conduct examinations, (Trial Tr. 245), to review the patient's medical records and inquire into why a patient might not be taking his medication, (Trial Tr. 245–46), to obtain laboratory results and draw blood in order to monitor levels of anti-seizure medication in a patient's blood, (Trial Tr. 247–48), and to counsel a patient about the risks and benefits of taking or

not taking his medication, (Trial Tr. 249–50).

201. With respect to the frequency of the examinations, Dr. Holtzman testified that in this case, monthly evaluations should have been conducted for Solebo because he was classified as a Care Level 3 patient. (Trial Tr. 245.) MCC policy explicitly provides that a Care Level 3 patient should be seen on a daily to monthly basis. (Pl.'s Ex. Q.) On cross-examination, Dr. Holtzman testified that a patient who is on anti-seizure medication and has not had a seizure for an extended period of time does not need to be seen on a frequent basis and would not need drug monitoring, assuming there are no seizures, there is no change in medication, he is not experiencing any effects, he is completely asymptomatic, and he is compliant with his medications. (Trial Tr. 288.)

202. Dr. Holtzman also testified that the standard of care required the MCC Physicians to review Solebo's medical records, specifically the MARs. (Trial Tr. 245–46.) The standard of care also required the MCC Physicians to counsel Solebo about his medication and inquire into why he was not taking his medication. (Trial Tr. 245–46.) Dr. Holtzman also testified that he would expect a reasonably well-qualified physician, according to the standard of care, to inquire into the reasons a patient stopped taking his medication, such as whether the patient was experiencing any side effects from the medication, during a physical examination. (Trial Tr. 246.)

203. Dr. Holtzman testified that the standard of care required the MCC Physicians to obtain blood draws and to follow up on the corresponding laboratory results in order to monitor Solebo's Dilantin level. (Trial Tr. 247–48, 325.) If a blood draw revealed a sub-therapeutic level of Dilantin, Dr. Holtzman testified that the standard of care required the MCC Physicians to counsel Solebo about why he had a sub-therapeutic level. (Trial Tr. 254–55.)

204. Dr. Holtzman testified that physicians have a duty to explain the risks and benefits of medication to a patient. (Trial Tr. 250.) According to Dr. Holtzman, a physician should consult a patient about the risk of not taking his anti-seizure medication because the risk of not taking the medication could be fatal and could cause a seizure. (Trial Tr. 248–49.) Thus, the MCC Physicians had a duty to tell Solebo that if he did not take his medication, he was at risk of having a seizure. (Trial Tr. 249.) Because seizure disorder carries with it a risk of great bodily injury and a risk of death, (Trial Tr. 255), Dr. Holtzman testified that the MCC Physicians and personnel also had a duty and obligation under the standard of care to inform Solebo that if he did not take his Dilantin, he could die, (Trial Tr. 249). Dr. Holtzman did not agree that it would cause Solebo great anxiety if he were told that a failure to take his anti-seizure medication could result in death. (Trial Tr. 249.)

205. Finally, Dr. Holtzman also testified that if Solebo refused to take his medication, the standard of care required the MCC Physicians to administer Solebo's medication involuntarily. (Trial Tr. 251.) For example, Dr. Holtzman suggested that the MCC Physicians could have sprinkled anti-seizure medication on Solebo's vanilla ice cream. (Trial Tr. 251, 326). Such testimony is not credible, however, especially when considered alongside Dr. Curlin's testimony on the most fundamental medical ethics principle of respect for persons. This Court therefore discounts this portion of Dr. Holtzman's testimony.

#### 4. Testimony on breach of the standard of care and proximate cause

206. Dr. Holtzman also offered his opinion, to a reasonable degree of medical

certainty, that Solebo had a fatal seizure because the MCC, through its employees, failed to provide Solebo with timely and adequate medical care. (Trial Tr. 243.) The primary basis for Dr. Holtzman's opinion was that Solebo should have been counseled as to his noncompliance with his medication, but the MCC Physicians failed to do so. (Trial Tr. 243–44.) Specifically, Dr. Holtzman pointed out that one of the reasons the MCC Physicians were unable to consult Solebo was because they did not know he was noncompliant. (Trial Tr. 243–44.) As Dr. Holtzman pointed out, neither Dr. Hoffman nor Dr. Nowakowski was present at the MCC during critical time periods in March, April, and May. (Trial Tr. 244.) In addition, Solebo did not receive monthly examinations as required by the standard of care and the MCC's internal policies. (Trial Tr. 245.) Had Solebo been examined on a monthly basis, Dr. Hoffman and Dr. Nowakowski would have also been required to review Solebo's MARs and to talk to Solebo about how he was doing with his medication. (Trial Tr. 245–46.) Neither Dr. Hoffman nor Dr. Nowakowski reviewed Solebo's MARs, as they were obligated to do, during critical time periods to determine whether Solebo was compliant with his medication. (Trial Tr. 244, 246.) Dr. Holtzman also pointed out that none of the physician assistants informed the Physicians that Solebo was not taking his medication. (Trial Tr. 244.) Had the MCC Physicians been aware that Solebo was noncompliant, they should have consulted with him, asked him why he was not taking his Dilantin, and informed him that by not taking his medicine he increased the risk of having a seizure. (Trial Tr. 244–45.) According to Dr. Holtzman, Solebo should have been consulted about the risk of not taking his anti-seizure medicine because the risk of not taking it could be fatal. (Trial Tr. 248–49.) Finally, Dr. Holtzman testified, on the basis of his review of the records, that Solebo would have taken his medicine had he received proper counseling. (Trial Tr. 251–52.)

207. Dr. Holtzman also pointed out that although Dr. Hoffman ordered a blood draw on December 26, 2006, and Solebo's blood was drawn on February 1, 2007, laboratory results for that blood draw were never returned to the MCC. (Trial Tr. 247–28.) Thus, the very last Dilantin level that the MCC personnel obtained for Solebo was from December 2006, when Solebo's Dilantin level was at 11 μ/ml. (Trial Tr. 247.) Dr. Holtzman testified that a Dilantin level obtained by a blood draw would have revealed whether or not Solebo's blood was in the therapeutic range for Dilantin and, most importantly, whether or not he was compliant with his medication in case the doctors were not performing their duty of reading the monthly MARs. (Trial Tr. 248.) Dr. Holtzman opined, to a reasonable degree of medical certainty, that Solebo was definitively subtherapeutic at the end of April. (Trial Tr. 253–54.) A blood draw taken around this time would have definitively told the MCC Physicians what Solebo's Dilantin level was. (Trial Tr. 254.) Had an MCC Physician been made aware on April 30, while Solebo was alive, that Solebo had not taken his medication the last four days of April, they should have counseled him about why his Dilantin level was zero μ/ml. (Trial Tr. 253–54.) But, Dr. Holtzman agreed that it was impossible for the Physicians to make that determination if they did not know that Solebo had missed his medication. (Trial Tr. 254.)

208. Dr. Holtzman believed, to a reasonable degree of medical certainty, that Solebo not taking his medication from April 27 through April 30 increased his risk of death from a seizure. (Trial Tr. 255.) Dr. Holtzman also believed, to a

reasonable degree of medical certainty, that if Solebo had received his medication on those dates, he would not have died on May 1, 2007. (Trial Tr. 255.)

209. In sum, Dr. Holtzman testified that through examinations, a review of Solebo's medical records, and blood draws, the MCC personnel knew or should have known that Solebo's Dilantin level was reaching nontherapeutic levels. (Trial Tr. 248.)

## B. Dr. Curlin

210. Dr. Farr Curlin was the Defendant's first expert witness to testify at trial. Dr. Curlin is board certified by the American Board of Internal Medicine with a subspecialty certification in hospice and palliative medicine. (Trial Tr. 565.) He obtained an undergraduate degree at the University of North Carolina and a medical degree in 1998 at the University of North Carolina Medical School. (Trial Tr. 561.) He completed his internal medicine residency in 2001 at the University of Chicago Hospital. (Trial Tr. 561.) From 2001 to 2003, he participated in the Robert Wood Johnson Clinical Scholars Program, which is a research training program. (Trial Tr. 561–562, 564.) From 2003 to 2004, he was a fellow at the MacLean Center for Clinical Medical Ethics at the University of Chicago, which is a program focused on the moral and ethical dimensions of the practice of medicine. (Trial Tr. 562, 565.) During and after his fellowship, he practiced outpatient primary care internal medicine at the University of Chicago Clinics on a part-time basis. (Trial Tr. 562.) Since his fellowship, he has been a part of the faculty in ethics and he lectures on medical ethics. (Trial Tr. 563, 566.) At the time of trial, Dr. Curlin was employed at the University of Chicago as an associate professor of medicine and was also the associate medical director for Ho-

rizon Hospice. (Trial Tr. 561–62.) Through his role with Horizon Hospice, he saw hospice patients in their home. (Trial Tr. 562.) In sum, Dr. Curlin's area of expertise is on hospice care, ethical issues, and general internal medicine. (Trial Tr. 658.) Prior to this case, Dr. Curlin had never been retained as an expert witness. (Trial Tr. 571.)

### 1. Testimony on seizure disorder

211. Dr. Curlin opined that Solebo did not have seizure disorder because his autopsy showed that he had HCM, and in his opinion, there was no definitive evidence that Solebo had seizure disorder. (Trial Tr. 572.) According to Dr. Curlin, a definitive diagnosis of seizure disorder can only be made on one of two bases. (Trial Tr. 572.) First, a diagnosis of seizure disorder may be made on the basis of an expert who witnesses a person having a seizure on more than one occasion. (Trial Tr. 572–73.) Second, a diagnosis of seizure disorder may be made where the person has an EEG showing that the person has epileptiform activity. (Trial Tr. 572–73.) Nevertheless, Dr. Curlin testified that an EEG of a person with seizure disorder could be normal and that EEGs are almost never performed when a person is actively seizing. (Trial Tr. 677.) According to Dr. Curlin, Solebo's Kankakee medical records only demonstrated that Solebo had a "questionable seizure disorder." (Trial Tr. 577, 582.) With regards to the February 23, 2006 episode, Dr. Curlin testified that while the roommate's account that he saw Solebo shaking during the episode could not be a basis on which a physician could reasonably diagnose seizure disorder, it could add to the physician's certainty that the person had a seizure. (Trial Tr. 579–80; Jt. Ex. 3 at 24.)

212. On direct examination, Dr. Curlin also testified that when a person has had "episodes that may be seizures" and has

been injured as a result, and a physician believes that there is "a high enough threshold," then the physician may treat the person empirically, meaning that the patient is treated for a possible or likely diagnosis. (Trial Tr. 577–78.) On cross-examination, however, Dr. Curlin testified that once a person has two episodes that a physician "ha[s] a reasonable degree of certainty were seizures, then it is appropriate to start treating for a seizure disorder." (Trial Tr. 664.) Dr. Curlin also testified that it was reasonable for the Kankakee physicians to treat Solebo for a possible seizure disorder. (Trial Tr. 583, 663–64.) Although Dr. Curlin opined that it was reasonable for the Kankakee physicians to treat Solebo for seizure disorder, (Trial Tr. 663), he was not willing to concede that Solebo had two documented seizures at Kankakee, (Trial Tr. 664).

213. On cross-examination, Dr. Curlin also testified that he could not rule out with certainty the possibility that Solebo had seizure disorder, and that it was controlled at the MCC because he was compliant with his medication. (Trial Tr. 656.) Dr. Curlin opined that if Solebo had seizure disorder, he was therapeutic as a result of the medication he was given until March or April 2007. (Trial Tr. 670–71.) Dr. Curlin agreed that in March or April 2007, when Solebo began missing more doses of his medication, he would have started to become subtherapeutic. (Trial Tr. 671.) Dr. Curlin then conceded that if Solebo had seizure disorder, in March and April 2007, not taking his medication could have contributed to him having another seizure. (Trial Tr. 671.) Dr. Curlin also agreed that seizures could result in death and that a person could die of a fatal arrhythmia following a seizure. (Trial Tr. 671–72.) Finally, Dr. Curlin also agreed that everyone is qualified to report what they see to a physician who is diagnosing seizure disorder. (Trial Tr. 663.)

## 2. Testimony on cause of death

214. Dr. Curlin also gave unconvincing testimony as to Solebo's cause of death at trial. Dr. Curlin, who is neither a cardiologist nor pathologist, opined, to a reasonable degree of medical certainty, that Solebo did not die of seizure disorder, (Trial Tr. 598, 686), and that his cause of death was HCM, with the mechanism of death being a cardiac arrhythmia, (Trial Tr. 588). Dr. Curlin testified that Solebo died of HCM because there are objective findings to support that Solebo had HCM. (Trial Tr. 598.) Dr. Curlin testified that the only type of death that Solebo could have suffered from seizure disorder was SUDEP, but that SUDEP is uncommon. (Trial Tr. 598.) Dr. Curlin testified that the reason he believed that Solebo died of HCM as opposed to seizure disorder was because the likelihood of Solebo dying from HCM was much higher than the likelihood of Solebo dying from seizure disorder. (Trial Tr. 598–99.) Dr. Curlin based his opinion on a number of general statistical studies. (*See* Trial Tr. 598, 608–611.)

215. Dr. Curlin's testimony on cross-examination did not fare well. Dr. Curlin first conceded that the only training he had in diagnosing and treating HCM was the training he received as an internist and his reading of the literature. (Trial Tr. 673.) Dr. Curlin next testified that if an autopsy had not been performed, he would not have been able to render his opinions regarding HCM. (Trial Tr. 681–82.) He also conceded that Solebo's medical charts prior to his death did not contain a single reference to HCM, that there were no factors while Solebo was alive to diagnose him with HCM other than an enlarged heart, which was not detected while he was alive, and that there were no documented arrhythmias. (Trial Tr. 657, 674.) Although Dr. Curlin testified that Solebo's

episodes of losing consciousness were consistent with arrhythmias, he conceded that they were also consistent with seizures. (Trial Tr. 657, 674–75.)

216. Dr. Curlin also testified that the basis for his opinions that Solebo died of HCM as opposed to SUDEP was simply "it's the math." (Trial Tr. 684.) According to Dr. Curlin, HCM posed a higher risk of death than SUDEP. (Trial Tr. 683.) Nonetheless, Dr. Curlin conceded that simply because statistics say a person is more likely to die of cause A over B, it is not necessarily the case that the person will die of cause A. (Trial Tr. 684.) When asked whether it was possible that Solebo died due to a seizure or seizure disorder, Dr. Curlin testified, "I can't with a hundred percent certainty rule that out." (Trial Tr. 598.) Furthermore, on cross-examination, Dr. Curlin was impeached, as he had previously testified at his deposition that it was his opinion that there was no way to know to a reasonable degree of medical certainty whether Solebo died of seizure disorder or a heart ailment.[6] (Trial Tr. 690–93.)

217. Given the overall inconsistencies in Dr. Curlin's testimony regarding Solebo's cause of death, this Court cannot credit his medical conclusions, as they are primarily based on general statistical studies that have been used to reach broad, unfounded and speculative conclusions about Solebo's cause of death.

### 3. Testimony on standard of care

218. Dr. Curlin testified that the most fundamental medical ethics principle is the principle of respect for persons. (Trial Tr. 612.) According to Dr. Curlin, this principle divides into two separate moral requirements: First, the requirement to acknowledge autonomy, meaning the ability to make one's own choices, and second, the requirement to protect those with diminished autonomy. (Trial Tr. 613.) With respect to the first moral requirement, respect for persons requires that people be given the opportunity to choose what should or should not happen to them. (Trial Tr. 613.) With respect to the second moral requirement, Dr. Curlin testified that whenever patients have diminished autonomy, such as prisoners, their freedoms are limited and this principle becomes even more sensitive. (Trial Tr. 613.) In those circumstances, physicians have to be particularly careful not to violate a patient's freedom to refuse medical treatment. (Trial Tr. 613, 629–30.) Thus, Dr. Curlin testified that it is absolutely unacceptable to force a mentally competent patient to take medication that he refuses and that the MCC Physicians did not have the option of forcing Solebo to take his anti-seizure medication. (Trial Tr. 613, 627–28.)

219. On direct examination, Dr. Curlin testified that when prescribing medication, a physician's responsibility is to give a reasonable amount of information so that the patient can come to what is called "informed consent." (Trial Tr. 613–14.) Patients should be given the information they need to understand the benefits of the medication, the purpose for which the medication is being prescribed, the risks of taking the medication, and that the patient is free to say yes or no. (Trial Tr. 613–14,

---

**6.** Dr. Curlin's deposition testimony, as read into the trial transcript reads as follows:

Question: So it's your opinion here today that Mr. Solebo died of a heart-related ailment and not of a seizure disorder?
Answer: It is my opinion that's more likely. The truth is, we don't know and there's no way to know. It's my opinion that there's no way to know to a reasonable degree of medical certainty whether he died of—which one he died of.
(Trial Tr. 692–93.)

620.) Dr. Curlin also testified that, based on Solebo's visit to the Neurology CCC on November 30, 2006, he was certain that Solebo knew that Dilantin was for seizure disorder. (Trial Tr. 625.)

220. Dr. Curlin also testified that when a physician initially prescribes Dilantin to a patient, the standard of care requires the physician to inform the patient about the risks of Dilantin's side effects, which include tremors, nausea, slurred speech, and gingival hyperplasia. (Trial Tr, 664–65.) Dr. Curlin testified that he would also tell seizure patients that they are at risk of injury. (Trial Tr. 665.) Although Dr. Curlin acknowledged that seizure disorder carries with it a risk of death, (Trial Tr. 665–66), he testified that the standard of care did not impose a duty on the MCC Physicians to warn Solebo that he could die if he did not take his medication, (Trial Tr. 630). Dr. Curlin reasoned that the MCC Physicians did not have such a duty because, in his words, "medications do not prevent ... [SUDEP]." (Trial Tr. 630.) Dr. Curlin testified that the risk of death is so low that it is not recommended that a physician inform the patient of that risk because it potentially adds unwarranted anxiety. (Trial Tr. 630.) Dr. Curlin testified that he customarily does not advise his patients that they have a risk of death from SUDEP because the risk is extraordinarily small and nothing can be done to reliably prevent SUDEP. (Trial Tr. 630–31.)

221. On cross-examination, Dr. Curlin's direct testimony was again directly undermined. Dr. Curlin agreed that seizure disorder carries with it a risk of death. (Trial Tr. 666.) And, at his deposition, Dr. Curlin had testified that the only thing a patient could do to prevent his risk of

death from seizure disorder was to take his medication.[7] (Trial Tr. 666.) At trial, however, Dr. Curlin was only willing to concede that while it was a reasonable hypothesis that medication reduces someone's risk of death from seizure disorder, he did not know that it had "been shown to be the case." (Trial Tr. 667.) According to Dr. Curlin, while it is true that the purpose of anti-seizure medication is to reduce the likelihood that a patient will have further seizures, "that's not death." (Trial Tr. 667.) Additionally, although Dr. Curlin agreed that anti-seizure medication lessens the chance of having seizures and the potential for complications from those seizures, he did not agree that it was "as simple as taking the medication reduces the chances of dying from a seizure." (Trial Tr. 667.) At his deposition, however, Dr. Curlin had testified that it was that simple; that taking anti-seizure medication lessened a person's chances of dying from a seizure. (Trial Tr. 668.) Dr. Curlin testified that the basis for his opinion was that while medication did not reduce the risk of SUDEP, it did reduce the risk of dying from seizure disorder. (Trial Tr. 668.) Dr. Curlin also conceded that if the medication did not have a function, no one would prescribe it. (Trial Tr. 669.) Dr. Curlin further conceded that people who adhere to their medication reduce their risk of future seizures by percentages. (Trial Tr. 669.)

222. Dr. Curlin also testified on direct examination that if a patient like Solebo did not want to take his medication, it would be reasonable to tell him, "why don't you not take them and we'll follow it, and I want you to let me know first thing if you have a seizure." (Trial Tr. 637.) Dr. Curlin testified that if Solebo had told him that

---

7. The trial transcript reflects that at his deposition, Dr. Curlin testified that "[t]here is nothing we can do to prevent risk of death from a seizure disorder except to take your medicines, and that's it." (Trial Tr. 666.)

he did not want to take his medication, Dr. Curlin would have advised Solebo that if he had seizure disorder, he may suffer a seizure that he could avoid by taking the medication, but that it was reasonable to try a period off the medications. (Trial Tr. 637.)

223. Dr. Curlin next testified that the usual practice of competent internists following patients for seizure disorder in terms of frequency of clinic visits is highly variable, depending on whether the patient continues to have seizures and whether they tolerate their medication. (Trial Tr. 640.) According to him, for a patient who is not having seizures and who is not reporting problems with their medications, the frequency of clinic visits could range from once a month to once at every six months, or less frequently. (Trial Tr. 640.) Dr. Curlin testified that Solebo fell into this category and that the usual practice of competent internists taking blood levels of patients with seizure disorder is to order tests only when the physician can use the information to change what the physician is doing in some way. (Trial Tr. 640.)

224. Dr. Curlin next testified that drug levels are typically obtained after a person is initially given his medication to obtain a reference point. (Trial Tr. 640.) Thereafter, drugs levels are obtained to gauge patient's levels if the patient has recurrent seizures, if there has been an increase or decrease in the medication, or if the physician anticipates changing the medications. (Trial Tr. 640.) Nonetheless, Dr. Curlin testified that the fact that Dr. Hoffman raised Solebo's does of Dilantin in December 2006 did not obligate him to conduct another Dilantin level test. (Trial Tr. 641.) Dr. Curlin disagreed that Dr. Hoffman should have done something immediately after Solebo's February 12, 2007 visit to the Neurology CCC to obtain a laboratory result for his Dilantin level because there

was "no pressing reason to get a lab result," (Trial Tr. 643), and it would not have changed what the MCC Physicians could have done, (Trial Tr. 644). Dr. Curlin did agree, however, that a laboratory result for Solebo's Dilantin level could have been useful for Solebo's future care. (Trial Tr. 644–45.)

225. Dr. Curlin also opined that engaging in discussions with a patient who is not adherent to his medications does not increase the likelihood that the patient will take his medications. (Trial Tr. 646.) Dr. Curlin based his opinion on various statistical studies. (Trial Tr. 646–47.) Dr. Curlin also believed that Solebo would not have been susceptible to motivational counseling. (Trial Tr. 652.)

226. In light of Dr. Curlin's inconsistent testimony on whether medication may reduce a person's risk of death from seizure disorder, this Court discredits his testimony that the standard of care did not require the MCC Physicians to inform Solebo that he could die from seizure disorder. For the same reasons, this Court discredits his testimony that although taking medication reduces a patient's risk of dying from seizure disorder, it does not reduce the risk of dying from SUDEP.

## C. Dr. Ebersole

227. Dr. John Ebersole was the Defendant's second expert witness. Dr. Ebersole is a professor of neurology at the University of Chicago. (Trial Tr. 728.) Dr. Ebersole completed his medical school training at Yale University School of Medicine. (Trial Tr. 728.) He later did a three-year residency in neurology at Yale University ("Yale"), and between 1978 and 2000, he was on the faculty at Yale. (Trial Tr. 728.) Since 2000, he has been a professor at the University of Chicago, director of the Adult Epilepsy Center, and director of the Clinical Neurophysiology

Laboratories there. (Trial Tr. 728–729; see also Def.'s Ex. 19.) Dr. Ebersole's clinical specialty in neurology is epilepsy diagnosis and treatment. (Trial Tr. 729.) In his capacity as a professor, he cares for patients, teaches, and conducts research. (Trial Tr. 730.) With respect to patient care, he is responsible for the evaluation and treatment of inpatients in the Adult Epilepsy Monitoring Unit. (Trial Tr. 730.) Dr. Ebersole has an epilepsy clinic where he sees outpatients weekly and reads EEGs two days a week. (Trial Tr. 730.) With respect to his teaching duties, he is responsible for teaching fellows, that is to say, physicians who have finished their residency and are receiving extra education in clinical neurophysiology and epilepsy. (Trial Tr. 730.) He also conducts clinical neurophysiology research and tries to determine ways to better analyze electroencephalography in order to help patients with epilepsy. (Trial Tr. 730.) In his clinical practice, Dr. Ebersole is responsible for the diagnosis, care, and evaluation of patients in the Epilepsy Monitoring Unit four months a year. (Trial Tr. 730.) He typically has four patients a week in the monitoring unit. (Trial Tr. 730–31.) He has epilepsy clinic two days a week and sees approximately 25 patients with epilepsy weekly. (Trial Tr. 731.) Over the course of his career, Dr. Ebersole has treated or diagnosed thousands of patients with seizure disorder or possible diagnoses of seizure disorder. (Trial Tr. 731–32.)

### 1. Testimony on seizure disorder

228. Dr. Ebersole defined seizure disorder as a disorder of chronic recurrent seizures. (Trial Tr. 729.) Dr. Ebersole defined a seizure as a brief period of time, lasting a minute or two, sometimes longer, when the normal control functions in the brain go awry resulting in excessive, uncontrolled, excitatory activity in the brain. (Trial Tr. 732.) Dr. Ebersole testified that two events is considered the standard threshold for a clinical diagnosis of possible seizure disorder. (Trial Tr. 751.) Dr. Ebersole testified that a patient's history, i.e., his subjective complaint, is very important in diagnosing seizure disorder because it is an intermittent disorder, meaning that a person is completely normal between seizures. (Trial Tr. 732, 750.) According to Dr. Ebersole, history encompasses past medical history, family history, and the patient's past history in terms of the characteristics of the seizures. (Trial Tr. 732–33.)

229. Dr. Ebersole opined, to a reasonable degree of medical certainty, that Solebo did not have seizure disorder. (Trial Tr. 735.) Dr. Ebersole first based his opinion on the fact that Solebo had normal EEGs and CT scans. (Trial Tr. 735.) Dr. Ebersole also based his opinion on the fact that Solebo did not have a history of seizure disorder prior to his stay at Kankakee, and in Dr. Ebersole's words, "why would he all of a sudden develop seizures de novo in Kankakee without any past history?" (Trial Tr. 736.) On cross-examination, however, Dr. Ebersole conceded that a patient can have a normal EEGs and CT scans and still suffer from seizure disorder, (Trial Tr. 748, 752), and that at some point a patient with seizure disorder has to have their first episode, and that can be at age 7, 23, and even age 50 or 60. (Trial Tr. 752–53.) Dr. Ebersole also testified that there were no clear descriptions of the episodes in Solebo's medical records and some "sketchy statements by cellmates that there was some shaking." (Trial Tr. 736.) According to Dr. Ebersole, it was therefore difficult to say that this was a seizure and not a different type of episode resulting in loss of consciousness. (Trial Tr. 736.)

230. On cross-examination, Dr. Ebersole also testified that there were only two

ways to diagnose a person with seizure disorder: (1) through an actual recording of seizure activity taken during a long-term EEG; and (2) by a physician witnessing a seizure. (Trial Tr. 750.) With respect to the first basis, Dr. Ebersole testified that a long-term EEG involves monitoring a patient from several days to over a week, usually off medications, to see if there are any brainwave abnormalities and to see if a seizure can be induced and recorded. (Trial Tr. 749.) Nonetheless, only if a seizure is recorded will a long-term EEG definitively show whether someone has seizure disorder. (Trial Tr. 749.) In addition, Dr. Ebersole did not have any knowledge of a long-term EEG ever being performed in a prison. (Trial Tr. 750.)

231. With respect to the second basis, Dr. Ebersole was adamant that only the eyewitness account of a physician was a sufficient basis on which to base a diagnosis of seizure disorder. (Trial Tr. 750–51.) When pressed about whether a diagnosis of seizure disorder could be made on the basis of a nurse witnessing a person undergo a seizure five times, Dr. Ebersole testified that "[i]t would depend on the training of the nurse." [8] In other words, where a licensed nurse observes a person having multiple seizures, such history is not enough for Dr. Ebersole to conclude that the person has seizure disorder. According to Dr. Ebersole, the word of a

cellmate or layperson was also not good enough. (Trial Tr. 751.)

232. Because Dr. Ebersole concluded that Solebo did not have seizure disorder, he also opined, to a reasonable degree of medical certainty, that the MCC Physicians unnecessarily prescribed Solebo anti-seizure medication. (Trial Tr. 753.) In addition, Dr. Ebersole opined that because Solebo did not need anti-seizure medication, it did not make a difference if Solebo missed taking his prescribed doses of Dilantin. (Trial Tr. 753.) Finally, Dr. Ebersole gave his opinion as to whether it was necessary to obtain a blood draw in February 2007 to test Solebo's Dilantin level. (Trial Tr. 737.) According to Dr. Ebersole, because Solebo did not have any episodes of loss of consciousness while he was at the MCC, there was no clinical reason that the Dilantin level had to be redone when he had a level of 11 µ/ml in December 2006. (737–38.)

### 2. Testimony on cause of death

233. At trial, Dr. Ebersole also testified as to cause of death. Dr. Ebersole first testified that the risk of death from a seizure is infinitesimal. (Trial Tr. 739.) Dr. Ebersole next opined, to a reasonable degree of medical certainty, that Solebo did not die from SUDEP. (Trial Tr. 741.) The basis for his opinion was that Solebo did not fit the picture of a person who is at risk of dying from SUDEP, insofar that he was not an intractable epileptic. (Trial Tr.

---

8. The trial transcript reads:
 Q: You believe that recording seizure activity in that long-term EEG or a doctor actually witnessing a seizure is the only way to definitively make a diagnosis of epilepsy. Is that true?
 Answer: Correct.
 Question: So if the nurse sees someone having a seizure five times, you would still consider that possible seizure disorder and not an actual seizure disorder or epilepsy, is that correct?

 Answer: It would depend on the training of the nurse.
 Question: But I think you indicated in your previous testimony that the word of a cellmate or a layperson is not good enough. Is that correct?
 Answer: It's not good enough. These people aren't trained to differentiate seizures from other episodes of loss of consciousness.
 (Trial Tr. 750–51.)

741.) Dr. Ebersole also found it significant that Solebo was not alone when he died and, according to Dr. Ebersole, most cases of SUDEP occur when a person is sleeping alone. (Trial Tr. 741–42.) Dr. Ebersole explained that SUDEP is associated with a grand mal convulsive seizure which involves lots of shaking and noise and therefore, in his view, it would be difficult for somebody on the bunk above a person who is convulsing not to wake up and notice this. (Trial Tr. 742.) Dr. Ebersole also testified that there was no evidence from the autopsy that supported a diagnosis of seizure disorder or SUDEP. (Trial Tr. 742.) According to Dr. Ebersole, such evidence would include a finding of a structural abnormality in Solebo's brain. (Trial Tr. 743.) In addition, Dr. Ebersole testified that he personally felt that Solebo did not have seizure disorder, "so he couldn't have died of SUDEP." (Trial Tr. 745.) Therefore, Dr. Ebersole opined that the only other probable cause of death for Solebo was cardiopulmonary compromise of some sort. (Trial Tr. 745.) The basis for his opinion that Solebo had a cardiac event was that Solebo's autopsy had the abnormal finding of an enlarged heart, i.e., cardiomegaly. (Trial Tr. 746.) Dr. Ebersole is neither a cardiologist or pathologist, and this Court accordingly does not credit his opinion on Habib's cause of death.

### 3. Dr. Ebersole's testimony on standard of care

234. Dr. Ebersole testified that it is the standard practice to obtain blood levels periodically if a patient is doing well and to obtain blood levels more often if a patient is doing poorly. (Trial Tr. 737.) Specifically, he testified that it is standard practice to obtain a blood level once a year or, at most, twice a year, in those patients who are not having seizures. (Trial Tr. 737.) Dr. Ebersole also testified that if a person is having seizures while they are receiving a reasonable dose of medication, then it is standard practice to obtain a blood level right away. (Trial Tr. 737.)

235. Dr. Ebersole testified that standard practice does not require physicians to warn a patient that he will die if he does not take his anti-convulsant medications. (Trial Tr. 744.) Dr. Ebersole testified that the main reason for this is that the likelihood of dying is so rare that a warning is not indicated and that such a warning would tend to scare patients more man anything else. (Trial Tr. 744.)

## VII. Damages Testimony

236. Solebo was born in Nigeria to Nigerian parents and was a Nigerian citizen. (Damages Hr'g Stip. ¶ 5.) He immigrated to the United States with his mother when he was five years old. (Def.'s Ex. 22 at 2; see also Damages Hr'g Stip. ¶ 5.) Solebo was not a citizen of the United States and did not have a green card. (Damages Hr'g Stip. ¶ 5.) Although Plaintiff did not know that Solebo was in the United States illegally until after she married him, (June 4, 2012 Tr. 33), she testified that they had long-term plans to move to Nigeria. (June 4, 2012 Tr. 36.)

237. Solebo attended school through the 12th grade and received a diploma. (Def.'s Ex. 22 at 2.) Up until the day of his arrest, he was enrolled in courses at Harold Washington College. (Def.'s Ex. 22 at 2; see also June 4, 2012 Tr. 9, 26.) Plaintiff testified that he was studying nursing. (June 4, 2012 Tr. 9–10.)

238. Plaintiff met Solebo in the Fall of 2003, and the two became friends. (June 4, 2012 Tr. 9, 25.) Plaintiff and Solebo were friends for about one year before they began to date; they dated for approximately one year before they married in a civil ceremony on October 4, 2005. (June 4, 2012 Tr. 2, 9, 25.) At the time of their

marriage, Plaintiff was 20 years old and Solebo was 22 years old. (June 4, 2012 Tr. 9.) Plaintiff described the day as a very happy day for her because she was marrying her best friend. (June 4, 2012 Tr. 2.) Plaintiff explained that Solebo was her best friend because he genuinely wanted the best for her. (June 4, 2012 Tr. 11.) Solebo listened to her and gave her unbiased opinions and she "just genuinely trusted any and everything that he said." (June 4, 2012 Tr. 11.)

239. Prior to their marriage, they lived separate and apart from one another. (June 4, 2012 Tr. 10.) After they married, they shared an apartment with Solebo's mother. (June 4, 2012 Tr. 10, 25–26.) Prior to their marriage, Solebo worked with his mother in home health care for two months. (June 4, 2012 Tr. 26.) Other than this job, Plaintiff testified that she was not aware of any other paid employment positions that Solebo had held. (June 4, 2012 Tr. 26.) Plaintiff also testified that Solebo's mother paid the rent on the apartment that all three shared and that Solebo's mother supported him financially. (June 4, 2012 Tr. 26.)

240. While they were newlywed, between October 2005 and January 2006, Plaintiff testified that she and Solebo were "happy, living together, still getting to know one another in a married sense, living with one another." (June 4, 2012 Tr. 10–11.) She described their relationship as follows: "Excellent. I loved him. We loved each other. I think it was a pretty good relationship." (June 4, 2012 Tr. 11.) During this time period, she and Solebo spent time together by going out to eat, going to the movies or the park, or taking walks. (June 4, 2012 Tr. 11.) Plaintiff and Solebo discussed having children, which they both wanted to do. (June 4, 2012 Tr. 11.) Solebo wanted to have at least five children. (June 4, 2012 Tr. 11.)

241. On cross-examination, Plaintiff testified that less than a month into her marriage, on November 2, 2005, when she was 20 years old, she called the Chicago Police Department to the apartment she shared with Solebo after they had a fight. (June 4, 2012 Tr. 29, 35.) Plaintiff told the responding police officer that Solebo had punched her in me face, and Solebo was arrested that day. (June 4, 2012 Tr. 29.) As a result of this incident, Plaintiff signed a criminal complaint [9] charging Solebo with domestic battery. (June 4, 2012 Tr. 29–31; Def.'s Ex. 6, Misdemeanor Compl. at 668.) Plaintiff's signature appears under a sentence that reads, "The complainant, being first duly sworn on oath, deposes and says that he/she read the foregoing complaint by him/her subscribed and that the same is true." (Def.'s Ex. 6, Misdemeanor Compl. at 668.) At trial, however, Plaintiff testified that Solebo did not in fact punch her in the face and that she had lied to the responding police officer on the day of the incident. (June 4, 2012 Tr. 31.) On redirect examination, Plaintiff testified that she and Solebo were watching television when they got into an argument and he broke her phone. (June 4, 2012 Tr. 34.) Plaintiff called the police to retaliate against him. (June 4, 2012 Tr. 34.) Plaintiff acknowledged that she had made a mistake, but testified that it was the only way she knew to get back at Solebo at the time because she was "young" and "stupid." (June 4, 2012 Tr. 34.) Plaintiff also testified that Solebo never struck her. (June 4, 2012 Tr. 34.) After the incident, they got Plaintiff a new phone and made up, and the incident was forgotten. (June 4, 2012 Tr. 35.)

**9.** Although the Court admitted the criminal complaint that was signed by Plaintiff into evidence, it excluded the arrest report. (June 4, 2012 Tr. 39.)

242. At the end of November 2005, Plaintiff began to live with her father on a part-time basis. (June 4, 2012 Tr. 32.) According to Plaintiff, she stayed with her father or other family members after she was married for convenience or safety's sake, but it did not have anything to do with her relationship with Solebo. (June 4, 2012 Tr. 35.) Plaintiff testified that there was nothing unusual with her staying at her father's once in a while. (June 4, 2012 Tr. 36.)

243. Plaintiff and Solebo were living together at the time of Solebo's arrest. (June 4, 2012 Tr. 12.) Plaintiff testified that Solebo did not take any prescription medications at any point in time during which she knew him. (June 4, 2012 Tr. 12.) Plaintiff also testified that during their marriage and before Solebo's arrest. Solebo did not have any health issues or problems, nor was he under the care of any doctor, to her knowledge. (June 4, 2012 Tr. 12.)

244. Solebo was arrested on January 25, 2006, during an undercover investigation in which he delivered heroin to an undercover officer. (Stip. Ex., Arrest and Interview of Habib Solebo 01/25/06 at 7; Damages Hr'g Stip. ¶¶ 3–4; Def.'s Ex. 18, Photos 6, 9.) At the time of his death, Solebo was awaiting trial on charges of conspiracy to distribute and to possess heroin, distribution of heroin, and possession with intent to distribute and distribution of heroin. (Def.'s Ex. 8, Indictment at 1–3, *United States v. Solebo and Mustapher*, No. 06 CR 61 (N.D.Ill. Feb. 23, 2006).) Plaintiff testified that she did not realize Solebo was dealing in heroin before he was arrested and that she was surprised about the basis for his arrest. (June 4, 2012 Tr. 33.)

245. On March 1, 2006, Special Agent Robert Nicodemus lodged an Immigration Detainer–Notice of Action ("Detainer") with the MCC. (Def.'s Ex. 2 at 469.) The Detainer notified the MCC that the Immigration and Naturalization Service ("INS") had initiated an investigation to determine whether Solebo was subject to removal from the United States. (*Id.*) The Detainer required that the MCC detain Solebo for 48 hours to allow adequate time for the INS to assume custody over him. (*Id.*) The INS requested that the MCC notify the Department of Homeland Security of Solebo's release in advance or in the event of his death or transfer to another institution. (*Id.*)

246. Shortly after Solebo was arrested, Plaintiff learned that she was pregnant. (June 4, 2012 Tr. 12.) Plaintiff told Solebo that she was pregnant, and they were both happy with this news. (June 4, 2012 Tr. 13.) Plaintiff testified that there was never any doubt that she would have the baby and continue her marriage with Solebo. (June 4, 2012 Tr. 12.)

247. Plaintiff testified that she visited Solebo in prison every available visiting day that she could make during the length of his incarceration. (June 4, 2012 Tr. 13–14.) At Kankakee, visits were every other week, so Plaintiff saw Solebo every two weeks. (June 4, 2012 Tr. 14.) The main topic of conversation during their visits was her pregnancy. (June 4, 2012 Tr. 14.) While Solebo was incarcerated at Kankakee, Plaintiff spoke to Solebo on the telephone if not every day, then every other day. (June 4, 2012 Tr. 14.)

248. After Solebo was transferred to the MCC, Plaintiff visited him every visiting day she could and spoke to Solebo on the telephone if not every day, then every other day. (June 4, 2012 Tr. 15.) At the MCC, visits occurred every week, but every other week there were two visiting days. (June 4, 2012 Tr. 15.) Plaintiff did not visit if she was sick due to her pregnancy and she did not visit immediately

after Jadesola's birth. (June 4, 2012 Tr. 15.) Solebo met Jadesola within a week of her birth and was very happy to see her. (June 4, 2012 Tr. 16.) Over the following months, Plaintiff and Jadesola continued to visit Solebo. (June 4, 2012 Tr. 16.)

249. Solebo selected their daughter's name, Jadesola, which means with blessings. (June 4, 2012 Tr. 16–17.) Plaintiff testified that Solebo selected that name because he felt he was very blessed to have his first daughter. (June 4, 2012 Tr. 17.) Plaintiff spoke to Solebo right after giving birth and before completing their daughter's birth certificate. (June 4, 2012 Tr. 16.) Their daughter's middle name, Yurianna, is derived from Solebo's middle name, which is Olayuri. (June 4, 2012 Tr. 16.) Solebo did not have any other children, to Plaintiff's knowledge. (June 4, 2012 Tr. 17.) During the first few months of Jadesola's life, Plaintiff took her daughter to visit Solebo every visiting day that Plaintiff herself could make. (June 4, 2012 Tr. 17.) When Plaintiff could not make a visit, Solebo's mother took Jadesola to visit Solebo. (June 4, 2012 Tr. 17.)

250. On May 1, 2007, the MCC Warden told Plaintiff over the phone that Solebo had died. (June 4, 2012 Tr. 17.) Jadesola was six months old at the time of Solebo's death. (June 4, 2012 Tr. 18.) At the time of Solebo's death, Plaintiff was not employed and was living with Solebo's mother. (June 4, 2012 Tr. 18.)

251. When asked to describe how Solebo's death has affected her, Plaintiff testified that she sometimes feels like a failure and like she has been cheated. (June 4, 2012 Tr. 18.) On some days, Plaintiff feels as if she can make it through and that everything is going to be okay, but on other days, she cannot get out of bed and function. (June 4, 2012 Tr. 18.) Plaintiff also testified that she has a hard time dealing with people because she feels like

anybody can be taken away from her. (June 4, 2012 Tr. 18.) Plaintiff always thought that she would have a long marriage with children, and in her words, "to have that taken away is just—it's hard to face every day." (June 4, 2012 Tr. 18.) Plaintiff did not intend to be a single parent when she married Solebo. (June 4, 2012 Tr. 18.)

252. After Solebo passed away, Plaintiff could not look at her daughter for a period of time "[b]ecause she looked so much like him that it was almost like looking at a ghost every day." (June 4, 2012 Tr. 21.) Plaintiff testified that it was hard for her to deal with emotionally. (June 4, 2012 Tr. 21–22.) At times, she could not look at her daughter, could not hold her, and could not do anything for her because she looked like him. (June 4, 2012 Tr. 21–22.) Plaintiff relied heavily on the help of her mother as well as Solebo's mother during this time. (June 4, 2012 Tr. 22.)

253. According to Plaintiff, it took about two years for her to feel like her life was getting back to normal. (June 4, 2012 Tr. 22.) On cross-examination, Plaintiff testified that she saw a psychiatrist to treat her emotional distress at the Erie Family Health Facility. (June 4, 2012 Tr. 27.) Although she was prescribed medication, she refused it. (June 4, 2012 Tr. 27.) At her deposition, however, Plaintiff testified that she had not sought medical treatment for depression, that she had not seen a psychiatrist because of the lengthy waiting period, and that she had not been prescribed any medications. (June 4, 2012 Tr. 27–28.)

254. Plaintiff testified that she has explained to her daughter that her father is in heaven. (June 4, 2012 Tr. 22.) Her daughter talks to her father every night when she says her prayers. (June 4, 2012 Tr. 22.) Plaintiff testified that her daugh-

ter does not remember visiting her father, but that she talks about it with her so much that her daughter minks she remembers. (June 4, 2012 Tr. 23.) Her daughter is inquisitive and asks Plaintiff questions about her father such as whether he is going to come back from heaven, how they met, how long they lived together, and how long she was in Plaintiff's stomach before Solebo passed away. (June 4, 2012 Tr. 23.) Her daughter wants to know everything about her father. (June 4, 2012 Tr. 23.) Plaintiff testified that her daughter is barely beginning to grasp her father's death, as evidenced by the questions she asks, such as why her dad cannot pick her up from school or why he cannot come down from heaven to join the family for holidays. (June 4, 2012 Tr. 23.)

255. Plaintiff maintains a close relationship with Solebo's mother and intends to continue doing so. (June 4, 2012 Tr. 24–25.) Plaintiff's daughter has a close relationship with Plaintiff's parents and Solebo's mother. (June 4, 2012 Tr. 24.) For example, Plaintiff's parents and Solebo's mother attended Jadesola's recent graduation. (June 4, 2012 Tr. 24.)

256. At the time of trial, Plaintiff was employed full-time as a Customer Account Executive at a call center for Comcast. (June 4, 2012 Tr. 6–7.) Plaintiff did not have any plans to remarry at the time of trial and she plans to continue working. (June 4, 2012 Tr. 25.) Plaintiff also testified that no one currently lives with her and her daughter. (June 4, 2012 Tr. 25.) Plaintiff testified that her daughter, Jadesola, lives with her, that she takes care of her, and that Jadesola is about to begin Kindergarten. (June 4, 2012 Tr. 6.)

257. Dr. Holtzman testified that the survival rate of patients newly diagnosed with seizure disorder, such as Solebo, is lower as compared to people who do not have seizures. (Trial Tr. 256.) As those patients live longer, however, their mortality rate is approximately the same as people who do not have seizures. (Trial Tr. 256.) Dr. Holtzman testified, to a reasonable degree of medical certainty, that Solebo's life expectancy was approximately 48 years. (Trial Tr. 256.) In Dr. Holtzman's opinion, Solebo was in good health and he did not suffer from sustained hypertension. (Trial Tr. 287.)

258. Dr. Curlin also testified as to life expectancy. Dr. Curlin testified that Solebo's life expectancy would be significantly lower than the average person his age. (Trial Tr. 653.) The first basis for Dr. Curlin's opinion was the fact that Solebo had HCM, which carries with it an increased risk of death, (Trial Tr. 653), and which over time progresses to congestive heart failure and eventually to end-stage heart failure, (Trial Tr. 653). The second basis for Dr. Curlin's opinion was that Solebo was morbidly obese, which is associated with an increased risk of death between two and twelve times that of the normal population. (Trial Tr. 653.) Dr. Curlin also opined that Solebo had a history of smoking. (Trial Tr. 653.) Assuming that Solebo had seizure disorder, Dr. Curlin testified that Solebo would not be able to reduce his susceptibility to SUDEP by taking epileptic drugs. (Trial Tr. 654.)

259. Finally, photographs were admitted and received into evidence including a photograph of Solebo and Plaintiff eating out at a dinner, and a photograph of them with their family members on their wedding day. (Pl.'s Ex. P.) Photographs of their daughter at about six months of age, age three, and age five were also admitted and received into evidence. (June 4, 2012 Tr. 19–21; Pl.'s Ex. Z.)

## CONCLUSIONS OF LAW

### I. Legal Standards

1. Plaintiff brings this action against the United States pursuant to the

FTCA, 28 U.S.C. §§ 1346(b), 2671 *et seq.* The FTCA "was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States,* 369 U.S. 1, 6, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *accord Midwest Knitting Mills, Inc. v. United States,* 950 F.2d 1295, 1296–97 (7th Cir. 1991) (The FTCA "effects a limited waiver of sovereign immunity for the United States."). The FTCA provides a remedy for "personal injury or death caused by the negligent or wrongful act or omission" of Government employees while acting within the scope of their employment. 28 U.S.C. § 1346(b)(1). The Act imposes liability "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Morisch v. United States,* 653 F.3d 522, 530 (7th Cir.2011) (quoting 28 U.S.C. § 1346(b)(1) (internal quotation marks omitted)); *accord Massey v. United States,* 312 F.3d 272, 280 (7th Cir.2002). In other words, "the FTCA incorporates the substantive law of the state where the tortious act or omission occurred." *Midwest Knitting Mills, Inc.,* 950 F.2d at 1297. In this instance, Solebo died while in custody at the MCC, which is located in Chicago, Illinois. Thus, the cause of action arose in Illinois, and Illinois State law governs.

■ 2. As an initial matter, this Court notes that prior to bringing an action pursuant to the FTCA, a plaintiff must have exhausted her administrative remedies. Specifically, a plaintiff "shall have first presented the claim to the appropriate Federal agency and [the plaintiff's] claim shall have been finally denied by the agency in writing . . . ." 28 U.S.C. § 2675(a).

The Federal agency's failure "to make final disposition of a claim within six months after it is filed" is considered a final denial of the claim. *Id.* Prior to filing her suit, Plaintiff filed a Claim for Damage, Injury, or Death with the MCC. (R. 101, Fifth Am. Compl. ¶ 22.) It is undisputed that the MCC failed to make a final disposition of Plaintiff's claim within six months, and therefore its failure is deemed a final denial of her claim. *See* 28 U.S.C. § 2675. Accordingly, Plaintiff exhausted her administrative remedies as required by the FTCA.

3. Plaintiff contends that Solebo's death was caused by the negligent and wrongful acts and omissions of the MCC's physicians, staff, supervisors, employees, agents and apparent agents, including but not limited to Dr. Hoffman. (R. 1, Fifth Am. Compl. at 2–8.) Plaintiff further contends that if the United States were a private person it would be liable under the Illinois Wrongful Death Act for Solebo's death because of the negligent acts of the MCC's employees, and it is therefore liable under the FTCA. (*Id.* at 1–2, 10–11.)

■ 4. The Illinois Wrongful Death Act provides a cause of action, "[w]henever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof." 740 Ill. Comp. Stat. 180/1; *Williams v. Manchester,* 228 Ill.2d 404, 320 Ill.Dec. 784, 888 N.E.2d 1, 10 (2008) ("An injury resulting from the wrongful act, neglect, or default of another gives the victim, if she survives the injury, a right of action; if the victim dies, the [Wrongful Death] Act transfers the right of action to the victim's personal representative."). "A wrongful death action covers the time after death and addresses the injury suffered by the next of

kin due to the loss of the deceased rather than the injuries personally suffered by the deceased prior to death." *Wyness v. Armstrong World Indus., Inc.,* 131 Ill.2d 403, 137 Ill.Dec. 623, 546 N.E.2d 568, 571 (1989). The action allows a surviving spouse and the next of kin "to recover damages for their own loss based on the wrongful actions of another," and "is premised on the deceased's potential, at the time of death, to initiate an action for injury." *Id.,* 137 Ill.Dec. 623, 546 N.E.2d at 571–72 (citing *Biddy v. Blue Bird Air Serv.,* 374 Ill. 506, 30 N.E.2d 14, 18 (1940); *Mooney v. City of Chi.,* 239 Ill. 414, 88 N.E. 194, 196 (1909)); *see also Carter v. SSC Odin Operating Co.,* 364 Ill.Dec. 66, 976 N.E.2d 344, 354 (2012) (noting that a wrongful death action is brought for the benefit of the surviving spouse and next of kin who are the true parties in interest). Because the "action is derived from the decedent's cause of action, and is limited to what the decedent's cause of action against the defendant would have been had the decedent lived," the Illinois Supreme Court has said that the Illinois Wrongful Death Act "incorporates into the statutory right of action the familiar concepts of tort liability,—negligence, contributory negligence, and the like." *Williams,* 320 Ill. Dec. 784, 888 N.E.2d at 12 (quoting *Welch v. Davis,* 410 Ill. 130, 101 N.E.2d 547, 548 (1951)) (internal quotation marks omitted). Here, Plaintiff bases her wrongful death action on the alleged medical negligence of the MCC personnel in caring for Solebo. (R. 101, Fifth Am. Compl. at 2–8.) In addition, Plaintiff's complaint contains allegations of negligence based on the failure to counsel Solebo about the risks of not taking medication that he was prescribed. (R. 101, Fifth Am. Compl. at 5.)

5. Under Illinois law, to prevail in a medical negligence case,[10] a plaintiff must establish (1) the proper standard of care against which a physician's conduct is measured, (2) a negligent failure to comply with the applicable standard of care, and (3) a resulting injury proximately caused by the physician's lack of skill or care. *Sullivan v. Edward Hosp.,* 209 Ill.2d 100, 282 Ill.Dec. 348, 806 N.E.2d 645, 653 (2004) (identifying elements of "a negligence medical malpractice case"); *Neade v. Portes,* 193 Ill.2d 433, 250 Ill.Dec. 733, 739 N.E.2d 496, 502 (2000) (listing elements of an "action for medical negligence"); *Purtill v. Hess,* 111 Ill.2d 229, 95 Ill.Dec. 305, 489 N.E.2d 867, 872 (1986) (same). Generally, the plaintiff bears the burden of proving all three elements through the testimony of medical experts. *Wilbourn v. Cavalenes,* 398 Ill.App.3d 837, 338 Ill.Dec. 77, 923 N.E.2d 937, 949 (1st Dist.2010); *Bergman v. Kelsey,* 375 Ill. App.3d 612, 313 Ill.Dec. 862, 873 N.E.2d 486, 500 (1st Dist.2007) ("A plaintiff must generally prove the elements of a medical negligence cause of action through medical expert testimony.") (citing *Knauerhaze v. Nelson,* 361 Ill.App.3d 538, 296 Ill.Dec. 889, 836 N.E.2d 640, 652 (1st Dist.2005)); *cf. Purtill,* 95 Ill.Dec. 305, 489 N.E.2d at 872 ("Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard."); *see also Wipf v. Kowalski,* 519 F.3d 380, 384 (7th Cir.2008) ("Generally, these elements must be established through expert testimony."). The Seventh Circuit has held that Illinois' rule that a plaintiff must present

---

**10.** Under Illinois law, medical negligence is the same cause of action as medical malpractice, *Wipf v. Kowalski,* 519 F.3d 380, 384 (7th Cir.2008) (citing *Jinkins v. Evangelical Hosps. Corp.,* 336 Ill.App.3d 377, 270 Ill.Dec. 548, 783 N.E.2d 123, 126–27 (2002)).

expert testimony to establish medical negligence is not a procedural rule governed by the federal law of procedure and evidence, but rather is substantive and is therefore "part of the Illinois law of medical malpractice incorporated into the federal law of [FTCA actions] by 28 U.S.C. §§ 1346(b) and 2674." *Murrey v. United States*, 73 F.3d 1448, 1456 (7th Cir.1996); *accord Gipson v. United States*, 631 F.3d 448, 452 (7th Cir.2011) (discussing the holding in *Murrey*, 73 F.3d at 1456). Thus, Illinois' rule requiring a plaintiff to present expert testimony is binding on this Court,

6. In a medical negligence action that raises a lack of informed consent, "[t]he elements of the informed consent action parallel those of an ordinary malpractice claim." *Roberts v. Patel*, 620 F.Supp. 323, 325 (N.D.Ill.1985). A plaintiff must establish that the physician had a duty to disclose material risks, that the physician failed to disclose such risks, that as a direct and proximate result of the physician's failure to disclose, the patient consented to treatment she otherwise would not have consented to, and that the plaintiff was injured by the treatment. *Coryell v. Smith*, 274 Ill.App.3d 543, 210 Ill.Dec. 855, 653 N.E.2d 1317, 1319 (3d Dist.1995) (citing *Roberts*, 620 F.Supp. at 325.) The purpose behind the doctrine of informed consent "is to afford the patient the ability to make an informed, intelligent decision regarding medical treatment he is to receive." *Roberts*, 620 F.Supp. at 325.

7. Plaintiff contends that the MCC committed no fewer than seventeen wrongful acts or omissions, including: failing to provide Solebo with proper and adequate medical attention; failing to properly and adequately counsel Solebo about the risks caused by a failure to take his prescribed Dilantin; failing to recognize Solebo's non-therapeutic levels of Dilantin; failing to monitor Solebo's condition; failing to follow MCC policies, procedures, rules, and regulations for administering medication to Solebo; and failing to involuntarily administer Dilantin to Solebo. (R. 101, Fifth Am. Compl. at 5–7.)

8. During closing arguments, the Government argued that there were five reasons why Plaintiff had not met her burden of proof. (Trial Tr. 823–24.) According to the Government, the first issue that negates Plaintiffs claims is whether Solebo had seizure disorder. (*Id.*) The second issue is whether Solebo's death was caused by his seizure disorder; the third issue is whether his failure to take his medications was the reason he died of seizure disorder. (*Id.*) The fourth issue is whether the BOP was responsible for Solebo's failure to take his medication. (*Id.*) And, the fifth issue is whether Solebo is more than 50% at fault and therefore barred from recovery under Illinois' comparative negligence laws. (*Id.*) This Court addresses each issue in turn.

## II. Whether Solebo had seizure disorder

9. The parties have presented this Court with a "battle of the experts" on the issue of whether Solebo had seizure disorder. Plaintiff offered the testimony of one expert witness, Dr. Holtzman, who opined that Solebo did suffer from a seizure disorder. (Trial Tr. 225–27.) On the other hand, the Government offered the testimony of two expert witnesses, Dr. Curlin and Dr. Ebersole, who opined that Solebo did not suffer from seizure disorder. (Trial Tr. 572, 735.) In the case of dueling experts, the fact finder must "determine what weight and credibility to give the testimony of each expert and physician." *Gicla v. United States*, 572 F.3d 407, 414 (7th Cir.2009) (affirming district court's factual findings and its credibility assessments where they were well-sup-

ported by the record and concluding that the court had not committed an error); *accord Morisch*, 653 F.3d at 529 ("In a case of dueling experts, such as this one, 'it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony.'") (quoting *Wipf*, 519 F.3d at 385; citing *Gicla*, 572 F.3d at 414); *Livermore v. Amax Coal Co.*, 297 F.3d 668, 672 (7th Cir.2002) (where an ALJ gave more weight to the opinions of experts who were more qualified and whose opinions were more specific and well-supported, the ALJ's finding was held to be supported by substantial evidence upon review); *see also Campbell v. United States*, 904 F.2d 1188, 1193 (7th Cir.1990) ("[T]he trier of fact is to determine the weight to be given to the testimony of expert medical witnesses, and [the Seventh circuit] will defer to the credibility assessments made by the trier of fact.") (internal quotation marks omitted) (quoting *Payne v. United States*, 711 F.2d 73, 76 (7th Cir.1983)). This is because the "trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony." *Morisch*, 653 F.3d at 529 (quoting *Spurgin–Dienst v. United States*, 359 F.3d 451, 453 (7th Cir.2004) (internal quotation marks omitted)).

10. This Court concludes that all of the evidence and testimony presented at trial establishes that it was more probable than not that Solebo had seizure disorder. In reaching this result this Court finds Dr. Holtzman's testimony to be overwhelmingly credible and credits his expert opinion that Solebo had seizure disorder. Although Dr. Holtzman has not followed a patient throughout the course of his treatment for seizure disorder, he testified that he has treated the continuum of problems presented by seizure disorder patients. Dr. Holtzman's testimony was clear, and he supported his opinions with detailed explanations that were reasonable. This Court also considers Dr. Jones' testimony that Solebo died from seizure disorder. This Court finds her testimony to be fully credible. Although Dr. Jones was not called as an expert witness, she was subpoenaed to testify at trial and was therefore the only objective medical witness who testified. In addition, despite this Court's rulings that would have allowed the Government's designated pathologist to testify, (Trial Tr. 614–15), the Government elected not to call its designated pathologist at trial. Thus, Dr. Jones was the only pathologist to testify at trial. On the whole, this Court finds that Dr. Jones was the most credible medical witness, and that Dr. Holtzman was the second most credible medical witness.

11. As a preliminary matter, all three experts agreed that a patient's history, as provided by a patient to a physician, is very important in diagnosing seizure disorder. (Trial Tr. 219–20, 663, 750.) Solebo's medical history indicates that his first seizure occurred on February 17, 2006, and that he was treated in an emergency room for this episode. Following Solebo's visit to the emergency room, Dr. Long examined Solebo and described his assessment at that time as loss of consciousness accompanied with shaking activity. Dr. Long's medical judgment was that Solebo had experienced a seizure as his notes clearly instruct that if Solebo had further seizures, empiric Dilantin should be commenced. Solebo's second seizure occurred on May 24, 2006. Solebo reported to a Kankakee physician assistant that he woke up on the floor and that his cellmate told him that he was shaking. Solebo immediately requested that he be put back on Dilantin. Dr. Holtzman opined, to a reasonable degree of medical certainty, that the February 17 and May 24 episodes at Kankakee were reliable evidence by which

a physician could diagnose seizure disorder in Solebo. (Trial Tr. 271–72, 276, 318.)

12. Significantly, the Kankakee medical records document that both episodes were witnessed by Solebo's cellmates. Dr. Holtzman testified that anyone can be an observer, and that for a diagnosis of seizure disorder to be valid, a physician does not need to witness a seizure. Dr. Curlin agreed that everyone is qualified to report what they see. Notably, Dr. Hoffman testified that a primary care doctor generally diagnoses seizure disorder by taking the history from the patient and an observer, or both. (Trial Tr. 443.) Dr. Hoffman also testified that it absolutely does not have to be a physician who witnesses a seizure, (Trial Tr. 442–43), which is entirely consistent with Dr. Holtzman's testimony. Again, this Court finds Dr. Holtzman's testimony overwhelmingly credible.

13. By contrast, Dr. Ebersole testified that a physician can only diagnose seizure disorder if the physician witnesses the episode. When pressed on this testimony, Dr. Ebersole was adamant that even where a licensed nurse observes a person having multiple seizures, such observations are not enough for a physician to conclude that the person has seizure disorder. This testimony is incredible and contrary to Dr. Holtzman's testimony, which this Court fully credits, and also contrary to Dr. Hoffman's testimony who attested to the fact that it absolutely does not have to be a physician who witnesses a patient having a seizure in order to diagnose a patient with seizure disorder. (Trial Tr. 442–43.) In Dr. Ebersole's view, unless there is a long-term EEG that records a seizure or a physician or appropriately trained nurse is able to witness seizures in a person, there can be no valid diagnosis of seizure disorder. This testimony is simply not worthy of credence. Accordingly, this Court dis-

credits Dr. Ebersole's testimony as to how to diagnose seizure disorder.

14. Between May 2006 and April 2007, Solebo took Dilantin and during that time, he did not have another seizure. As Dr. Jones noted, Solebo's seizure-like activity was not occurring when he was taking Dilantin and was in the therapeutic range. In late April 2007, Solebo missed successive doses of Dilantin. Dr. Jones' testimony was unequivocal that, in light of her findings at autopsy, Solebo had a third and fatal seizure on May 1, 2007. (Trial Tr. 383.) Solebo's autopsy showed that he had a bite mark on the left tip of his tongue, cerebral anoxia, and cerebral edema, all of which are consistent with having a fatal seizure. On cross-examination, Dr. Jones's testimony was unshaken; she testified that the anoxic changes and cerebral edema she found in Solebo's brain are more likely to occur in a true seizure than in a seizure-like episode that is precipitated by a cardiac arrhythmia. Because Solebo experienced two or more unprovoked seizures 24 hours apart, this Court concludes that Solebo had seizure disorder.

15. This Court finds the testimony of Dr. Curlin and Dr. Ebersole incredible and unreliable as both of them were significantly impeached during trial. Dr. Curlin's testimony is unreliable for a number of reasons. On cross-examination, Dr. Curlin testified that once a person has two episodes that a physician "ha[s] a *reasonable degree of certainty were seizures,* then it is appropriate to start treating for a seizure disorder." (Trial Tr. 664) (emphasis added). Dr. Curlin also testified that it was reasonable for the Kankakee physicians to treat Solebo for a possible seizure disorder. Nevertheless, Dr. Curlin was not willing to concede that Solebo had two documented seizures at Kankakee. Dr. Curlin's testimony is contradictory. If it was reasonable for the Kankakee physi-

cians to treat Solebo for seizure disorder, they must had a reasonable degree of certainty that Solebo's two episodes were indeed seizures and not merely "possible seizures."

16. Dr. Curlin also testified that after Solebo was transferred to the MCC, the MCC Physicians did not have a basis on which to diagnose Solebo with seizure disorder because "all they had was his report that ... he had a seizure disorder, and they knew he was taking Dilantin." (Trial Tr. 583.) Although Dr. Curlin's testimony that the MCC Physicians did not have Solebo's Kankakee medical records is technically accurate, it overlooks the fact that not a single MCC employee made any attempt to obtain Solebo's Kankakee medical records, which could have been useful in definitively diagnosing Solebo with seizure disorder while he was at the MCC. Dr. Curlin's testimony on this point also discounts the fact that when Solebo presented to the MCC, he was taking Dilantin, an anti-seizure medication requiring a prescription and not merely an over-the-counter drug like Tylenol. As Dr. Nowakowski testified, she had never written a prescription for a controlled substance, such as Dilantin, when it was not medically necessary for a patient. (Trial Tr. 526.) Dr. Curlin's statement is also at odds with his testimony that a patient's history, as provided by the patient, is very important to the patient's diagnosis. (Trial Tr. 663.)

17. In addition, there is a significant fit problem that exists with regard to both of the Government's experts, but more so with Dr. Curlin. Dr. Curlin is a general internal medicine practitioner whose area of expertise is in medical ethics and hospice issues and not in the treatment of seizure disorders. Despite the fact that he

is neither a cardiologist or pathologist, and despite his limited training in treating and diagnosing HCM, Dr. Curlin offered his speculative and unreliable opinion that Solebo died of HCM. He offered this opinion despite the fact that nothing in Solebo's medical records mentioned anything about a heart-related illness. In Dr. Curlin's own words, the basis for his opinion as to cause of death was simply, "it's the math," (Trial Tr. 684), because the statistical studies he relied upon reflect that HCM poses a higher risk of death than SUDEP. While this Court understands Dr. Curlin's testimony about the statistical studies, this Court ultimately looks at what happened to Solebo on the basis of the evidence in the record and the expert testimony. This Court concludes that Solebo was on the outer edges of a bell curve because he was a person who suffered from seizure disorder who also happened to have cardiomegaly, and his death was ultimately caused by the rare combination of seizure disorder and his cardiomegaly.

18. Dr. Ebersole's testimony is not credible because of his failure to appropriately consider Solebo's medical history and because, as discussed above, his standards for making a valid diagnosis of epilepsy or seizure disorder are incredible. Ultimately, his testimony begins from the premise that Solebo did not have seizure disorder. In addition, Dr. Ebersole's testimony as to cause of death was contrary to what he said at his deposition, and he was therefore the victim of a critical impeachment on cross-examination. When asked at his deposition whether he was able to provide an opinion on Solebo's cause of death, to a reasonable degree of medical certainty, Dr. Ebersole answered unequivocally, "no." [11]

---

11. Dr. Ebersole's deposition testimony, as read into the trial transcript, reads as follows:

Question: So you are—so are you able to tell me to a reasonable degree of medical certainty more probably true than not true

(Trial Tr. 754–55.) Although the Government tried to rehabilitate Dr. Ebersole on redirect examination, this Court finds that this is a classic impeachment, which leaves Dr. Ebersole's trial testimony with fundamental problems.

19. Finally, this Court asked Dr. Ebersole whether it was appropriate to interpret Solebo's medical records as demonstrating that Solebo's seizures were controlled when he was on Dilantin, but when he stopped taking Dilantin he experienced seizures; and ultimately in April 2007, when Solebo failed to take Dilantin for four continuous days, he subsequently died on May 1. (Trial Tr. 762.) Dr. Ebersole testified that if he thought Solebo had seizure disorder, then such a reading of the medical records was "right on." (Trial Tr. 762.) Nonetheless, Dr. Ebersole testified that he did not believe that Solebo had seizure disorder and that it was simply coincidental that after four days of not taking his medication, Solebo's heart condition suddenly presented itself on May 1, and that just happened to be the day that Solebo died. (Trial Tr. 763.) This testimony is incredible because once this Court credits Dr. Holtzman's and Dr. Jones' testimonies, all the evidence in the record establishes by a preponderance of the evidence that Solebo had seizure disorder.

what Mr. Solebo's cause of death actually was?
Answer: No.
(Trial Tr. 754–55.)

**12.** Were this an ordinary negligence case, as opposed to a medical negligence case, 18 U.S.C. § 4042 would establish a statutory duty of care owed by the MCC to Solebo. *United States v. Muniz,* 374 U.S. 150, 165, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) ("[T]he duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule.");

## III. Whether the MCC was negligent in treating Solebo's seizure disorder

### A. Standard of Care

20. Having concluded that Solebo suffered from seizure disorder, this Court turns to the standard of care for treating seizure disorder.[12] In medical negligence cases, "the standard of care is the relevant inquiry by which we judge a physician's actions." *Neade,* 250 Ill.Dec. 733, 739 N.E.2d at 502. To establish the standard of care required in a particular set of circumstances, a plaintiff must present expert medical testimony unless the physician's negligence is grossly apparent or the treatment lies within the common knowledge of a layperson. *Purtill,* 95 Ill. Dec. 305, 489 N.E.2d at 872; *accord Hardnick v. United States,* No. 07 C 1330, 2009 WL 1810106, at *7 (N.D.Ill. July 1, 2009) (Dow, J.). Under a standard of care analysis, a defendant physician "will be held to 'the reasonable skill which a physician in good standing in the community would use in a similar case.'" *Neade,* 250 Ill.Dec. 733, 739 N.E.2d at 502 (quoting *Newell v. Corres,* 125 Ill.App.3d 1087, 81 Ill.Dec. 283, 466 N.E.2d 1085, 1089 (1984)); *accord Purtill,* 95 Ill.Dec. 305, 489 N.E.2d at 872 (stating that the standard of care against which a defendant's conduct is measured is "that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would

*Parrott v. United States,* 536 F.3d 629, 637 (7th Cir.2008) ("[Section] 4042 describes a duty of care for persons in federal custody.") Under § 4402, the BOP has the duty, *inter alia,* to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; [and] ... the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2, 3).

bring to a similar case under similar circumstances"). "If a physician deviates from the standard of care and that deviation proximately causes injury to a patient, the physician is liable for damages caused by his medical negligence." *Neade,* 250 Ill.Dec. 733, 739 N.E.2d at 502; *accord Hardnick,* 2009 WL 1810106, at *7 ("To prevail, a medical malpractice plaintiff must show that the doctor failed to do something that a reasonably careful physician would do, or did something that a reasonably careful physician would not have done, under circumstances similar to those shown by the evidence in the case.").

21. When testifying physicians present only conflicting opinions as to what the correct technique should have been, "the Illinois Supreme Court has held that 'the plaintiff has failed to present sufficient evidence of a standard of care in the medical community to submit the case to the [trier of fact].'" *Donais v. United States,* 232 F.3d 595, 599–600 (7th Cir.2000) (citing *Walski v. Tiesenga,* 72 Ill.2d 249, 21 Ill. Dec. 201, 381 N.E.2d 279, 285 (1978)) (affirming judgment for defendant and concluding that "[b]ecause of the uncertainty of both expert witnesses in determining the applicable standard of care, [plaintiff] failed to establish a prima facie case"). "It is insufficient for plaintiff to establish a *prima facie* case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science." *Walski,* 21 Ill.Dec. 201, 381 N.E.2d at 285 (affirming directed verdict for defendants where plaintiff's medical expert only testified that he would have acted differently and failed to testify that there was a generally accepted medical standard of care that defendant failed to follow).

22. Furthermore, to establish the standard of care in a medical negligence action that raises the issue of lack of informed consent, a plaintiff must establish that prior to administering medical treatment, the physician should have informed the patient of the "diagnosis, the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Coryell,* 210 Ill.Dec. 855, 653 N.E.2d at 1321 (quoting *Roberts,* 620 F.Supp. at 325) (internal quotation marks omitted).

23. Here, again, the parties have presented this Court with a "battle of the experts." In the case of dueling experts, the fact finder must "determine what weight and credibility to give the testimony of each expert and physician." *Gicla,* 572 F.3d at 414; *see also Campbell,* 904 F.2d at 1192 ("[T]he trier of fact is to determine the weight to be given to the testimony of expert medical witnesses, and [the Seventh Circuit] will defer to the credibility assessments made by the trier of fact." (quoting *Payne,* 711 F.2d at 76) (internal quotation marks omitted)). On the whole, this Court finds Dr. Holtzman's testimony to be the most reliable, except for his testimony that the MCC Physicians should have forcibly or involuntarily administered Dilantin to Solebo. On the latter point, this Court finds that Dr. Curlin's testimony on whether a physician should force medication is credible.

24. Based on a review of the expert testimony and the evidence in this case, this Court concludes that the standard of care for treating Solebo's seizure disorder required MCC medical personnel, including the Physicians and physician assistants, to examine Solebo on a monthly basis. As Dr. Holtzman explained, shortly after arriving at the MCC in October 2006, Solebo's care level at the MCC was elevated from a Care Level 1 to a Care Level 3, signifying that Solebo required care for an

unstable, complex, and chronic condition and required examinations on a daily to monthly basis. Dr. Holtzman's testimony is not simply testimony that he would have acted differently than MCC medical personnel, nor is it inconsistent with the testimony of Dr. Curlin, who testified that the frequency of visits could range from once a month to once every six months, and conceded that the appropriate frequency of visits is highly variable.

25. The standard of care also required MCC medical personnel, including the Physicians and physician assistants, to review Solebo's medical records, including his MARs. The standard of care further required MCC medical personnel, including the Physicians and physician assistants, to draw Solebo's blood for the purpose of monitoring the level of anti-seizure medication in his blood and to obtain the corresponding laboratory results. Dr. Holtzman's testimony on these points was not disputed.

26. Most importantly, the standard of care required MCC medical personnel, including the Physicians and physician assistants, to inform Solebo about the risks and benefits of taking and not taking Dilantin and to counsel Solebo about his medication. It is axiomatic that "[b]efore one can make a reasoned decision regarding medication, it is first necessary to be informed about the risks and benefits of the proposed course of medication." *In re Christopher P.*, 342 Ill.App.3d 336, 276 Ill. Dec. 970, 795 N.E.2d 323 (5th Dist.2003) (quoting *In re Edward,* 298 Ill.App.3d 162, 232 Ill.Dec. 348, 698 N.E.2d 186, 188 (2d Dist.1998) (internal quotation marks omitted)). Both Dr. Holtzman and Dr. Curlin testified about the concept of informed consent and the need to counsel a patient when he stops taking his prescribed medication. Informed consent requires a physician to meet with a patient and inform him about the realistic risks associated with not taking his medication. Indeed, even Dr. Curlin testified that a physician should provide patients with the information they need to understand the benefits of the medication they are prescribed, the purpose for which the medication is being prescribed, the risks involved in taking the medication, and that the patient is free to say yes or no. Because seizure disorder carries with it a risk of injury and death, a physician should also inform a patient who is taking anti-epileptic medication about these risks. Here, the standard of care required MCC medical personnel, including the Physicians and physician assistants, to meet with Solebo, ask him why he was not taking his medication and inform him of the realistic risks associated with not taking his prescribed Dilantin. Those risks included the risk of future seizures, which in turn carry with them a risk of great bodily injury and death. Thus, the standard of care required MCC medical personnel to inform Solebo that if he did not take his anti-seizure medication, he could be injured or he could die. Finally, the standard of care also required MCC medical personnel to inquire into the reasons that Solebo stopped taking his medication.

**B. Breach of the standard of care**

27. Once the standard of care has been established, a plaintiff must then show that, "judged in the light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff." *Walski,* 21 Ill.Dec. 201, 381 N.E.2d at 282 (citing *Borowski v. Von Solbrig,* 60 Ill.2d 418, 328 N.E.2d 301, 305 (1975)). To establish that a physician breached the standard of care, the plaintiff must show, through expert testimony, that an injury occurred and that such an injury "does not

ordinarily occur in the normal course of events without negligence." *Lawrence v. Rubio*, 85 Ill.App.3d 472, 40 Ill.Dec. 743, 406 N.E.2d 946, 951 (5th Dist.1980) (citing *Sanders v. Frost*, 112 Ill.App.2d 234, 251 N.E.2d 105, 107 (5th Dist.1969)). "Mere proof that the defendant doctor made a mistake or that his treatment harmed plaintiff is no evidence of lack of skill or negligence." *Id.* (citing *Sanders*, 251 N.E.2d at 107); *Gray v. United States*, No. 08–cv–116–JPG, 2010 WL 1540117, at *3 (N.D.Ill. Apr. 11, 2010) ("[I]t is not enough to show that the physician made a mistake or that the plaintiff suffered harm because of the physician's mistake.") (citing *Lawrence*, 40 Ill.Dec. 743, 406 N.E.2d at 951). The question of whether a physician deviated from the standard of care is a fact-specific inquiry in which case law provides little guidance. *Liebig–Grigsby v. United States*, No. 00 C 4922, 2003 WL 1090272, at *11 (N.D.Ill. Mar. 11, 2003); *Borowski*, 328 N.E.2d at 305.

28. Based on a review of the expert testimony and the evidence in this case, this Court concludes that the MCC breached the appropriate standard of care for treating Solebo's seizure disorder. Again, the standard of care required MCC medical personnel, including the MCC Physicians and physician assistants, to examine Solebo on a monthly basis. As Dr. Holtzman testified, however, such evaluations were not conducted, and the MCC therefore breached the standard of care. (Trial Tr. 245–46.) When Solebo first presented to the MCC, Physician Assistant Aruiza ordered that Solebo be seen in the Neurology CCC for his seizure disorder by September 18, 2006. Nevertheless, the first time Solebo was seen in the Neurology CCC was over three months after he initially arrived at the MCC, on November 30, 2006. Solebo's last visit to the Neurology CCC was in February 2007. The record is clear that although Dr. Nowakowski was the Acting Clinical Director and the only physician on the MCC's premises after mid-March 2007, she never saw or examined Solebo and she never rendered any medical treatment to Solebo. (Trial Tr. 484). Had Solebo been examined, Dr. Holtzman testified that the MCC Physicians could have spoken to him to find out whether he was taking his medication and why he was not taking his medication on a consistent basis. (Trial Tr. 244–46.) The MCC Physicians failed to do so, however, and they were therefore not aware that Solebo was not compliant with his medication.

29. The standard of care also required MCC medical personnel to review Solebo's medical records. The evidence is clear that the MCC personnel failed to make any efforts to retrieve Solebo's Kankakee medical records while they were treating Solebo. These records are absolutely vital. Solebo presented to the MCC with a history of seizure disorder and a prescription for Dilantin, an anti-seizure medication. Yet the MCC Physicians and physician assistants who treated Solebo failed to submit a request for these records. *See Hardnick*, 2009 WL 1810106, at *10 (concluding that where the standard of care required a reasonably careful physician to undertake a more careful assessment than typical during the decedent's examination, the physician deviated from the standard of care in failing to attempt to access decedent's readily available medical records from prior emergency room visit). Instead, the MCC medical personnel simply continued Solebo's prescription for Dilantin, and in fact, Dr. Hoffman later increased the dosage that Solebo was prescribed. If Dr. Hoffman had any suspicions about Solebo's medical history, he could have easily requested the Kankakee medical records from Kankakee; yet he did not attempt to do so.

30. The evidence is also undisputed that the MCC Physicians were derelict in their duty to review the medical records they actually possessed, specifically the MARs, and to then meet with Solebo in light of the information they derived from those MARs. Although the MARs were kept on the medication cart during the month and were available for the MCC Physicians to review, they consistently failed to do so. An MCC Physician never reviewed Solebo's MARs for December 2006, January 2007, and February 2007. While Dr. Nowakowski eventually reviewed the MAR from March 2007, she did so several weeks after Solebo had a period in which he missed multiple doses of his medication. Most importantly, an MCC Physician never reviewed the critical MAR for April 2007. Because Dr. Nowakowski failed to review Solebo's April 2007 MAR, she was never aware, prior to Solebo's death, that Solebo had missed nearly half of his doses of Dilantin in April 2007. Furthermore, no one informed Dr. Nowakowski that Solebo had missed multiple doses of his medication despite the fact that the Physicians were supposed to conduct daily meetings twice a day to discuss matters such as an inmate missing his medication. Dr. Nowakowski did not recall having any discussions with the physician assistants or any other MCC personnel about Solebo missing his medication in February 2007, March 2007, or April 2007. Similarly, Dr. Hoffman did not recall having such discussions in February 2007. Had Dr. Nowakowski known that Solebo was not taking his medication, she then should have consulted Solebo about the risks and benefits of taking and not taking his medication. Dr. Holtzman testified that a reasonable physician would consult a patient about the risks of not taking his anti-seizure medication because the risk of not taking the medication could be fatal. (Trial Tr. 248–49.) Dr. Holtzman opined that

not only did Solebo not receive a proper consultation by the MCC Physicians or staff, including the MCC physician assistants, about the risks and benefits of taking Dilantin, he simply never had such a consultation. (Trial Tr. 327.)

31. Furthermore, there was a complete disregard of the MCC's written policies. Despite internal policies dictating that inmates were supposed to sign Refusal Forms when refusing medication, which in turn were supposed to be placed in their medical charts, Dr. Nowakowski admitted at trial that the Refusal Forms were not used for medication refusal. Nor were the incident report forms used when an inmate refused to report to the pill line, as the A & O Handbook warned new inmates. Had the Refusal Forms been completed, there would have been a record in Solebo's medical chart documenting his missed medication on a day-to-day basis. And, as Dr. Nowakowski admitted at trial, had the Refusal Forms or incident reports been included in the inmates' medical charts, it would have been easy to track whether a patient missed his medications.

32. The standard of care also required the MCC personnel to monitor the Dilantin level in Solebo's blood by obtaining blood draws and following up on the corresponding laboratory results. The MCC breached the standard of care when it failed to obtain the laboratory results of Solebo's blood draw from February 1, 2007. (Trial Tr. 247.) On December 26, 2006, Dr. Hoffman ordered that Solebo's Dilantin levels be monitored via blood draws. Although Dr. Hoffman ordered this laboratory test, a blood draw pursuant to Dr. Hoffman's order was never performed. In December 2006, Dr. Nowakowski also ordered a laboratory test, and a blood draw to fulfill this order was obtained on February 1, 2007. Unfortunately, the blood sample was placed in the

wrong type of tube prior to being shipped to the Rochester Lab. The Rochester Lab informed the MCC of the problem with the blood specimen via the February 3 Report; however, an MCC Physician never saw the February 3 Report prior to Solebo's death because it had been placed in a file cabinet, rather than in Solebo's medical chart. Although Dr. Hoffman met with Solebo in the Neurology CCC on February 12, 2007, and was aware that the MCC had not yet received the laboratory results for Solebo's February 1, 2007 blood draw, he did not follow up to try to obtain the laboratory results nor attempt to order a STAT lab. Indeed, no one at the MCC made any effort to ascertain the status of the results of that blood draw. Thus, as Dr. Holtzman pointed out, the last Dilantin level that the MCC medical personnel obtained for Solebo was from December 2006, when his level was 11 $\mu$/ml. (Trial Tr. 247.) Dr. Holtzman testified that a Dilantin level obtained by a blood draw between December 2006 and May 1, 2007, would have revealed whether or not Solebo's Dilantin level was therapeutic and, most importantly, whether he was compliant with his medication in case the doctors were not reviewing the MARs. (Trial Tr. 248.)

33. Dr. Holtzman testified, to a reasonable degree of medical certainty, that Solebo's Dilantin level became subtherapeutic in April 2007 because of Solebo's failure to take his Dilantin. (Trial Tr. 253–54.) According to Dr. Holtzman, had a blood draw been taken in April that revealed a subtherapeutic or zero $\mu$/ml level of Dilantin, the standard of care required the MCC Physicians to counsel Solebo about why his levels were zero $\mu$/ml and to institute treatment urgently. (Trial Tr. 254.) Thus, MCC medical personnel, including the Physicians and physician assistants, breached the standard of care in obtaining blood draws from Solebo and following up on the corresponding laboratory results in order to monitor his Dilantin level.

34. Finally, the standard of care also required the MCC Physicians to talk to Solebo about his medication, to ask him why he was not taking his medication, and to counsel him about his noncompliance. (Trial Tr. 243–46.) This Court concludes that the MCC breached the standard of care in treating Solebo's seizure disorder by failing to inform Solebo of the risks associated with his failure to take his anti-seizure medication. There is absolutely no evidence that anyone at the MCC had any discussions with Solebo during critical time periods to inform him of the importance of taking his medication and the risks he was taking by not doing so. In short, the MCC personnel simply failed to disclose to Solebo any risks associated with failing to take his Dilantin. Dr. Holtzman pointed out that no one ever counseled Solebo to ask him why he was starting to miss more doses of his medication, (Trial Tr. 248), and that there are no records of any sort of discussion that the MCC personnel had with Solebo regarding the risks or benefits of taking his medication, (Trial Tr. 325). After Solebo's visit with Dr. Hoffman on February 12, 2007, Solebo was never counseled and there were no other scheduled visits with Solebo. It is undisputed that Dr. Hoffman and Dr. Nowakowski were not physically present at the MCC during critical time periods in April 2007, and thus a physician was not available to speak with Solebo. Dr. Hoffman did not make himself available over the telephone while he was out; while Dr. Nowakowski testified that she made herself available by telephone, there is no testimony in the record that anyone at the MCC ever called her to inform her that Solebo was not taking his Dilantin. And, as Dr. Nowakowski conceded, nothing in Solebo's medical charts in March 2007, April 2007, or on May 1, 2007 documented any discussions

with Solebo regarding taking his medication. (Trial Tr. 519–20.) Indeed, Dr. Nowakowski did not recall having any discussions with Solebo in February, March, or April 2007 regarding the importance of taking his medication. (Trial Tr. 519.) Nor did she recall any discussions with the physician assistants, or with anyone who worked on the pill line, regarding Solebo missing doses of medication in February, March, or April 2007. (Trial Tr. 519–20.)

35. As Dr. Holtzman testified, through monthly examinations, a review of Solebo's medical records, and through the blood draws, the MCC personnel knew or should have known that Solebo was becoming nontherapeutic in terms of his Dilantin intake. (Trial Tr. 248.) All of these failures were negligent—not mere mistakes—and they ultimately led to Solebo's fatal seizure on May 1, 2007.

## C. Proximate cause

36. This Court must next inquire into whether the Government's breaches of the standard of care proximately caused the injury for which Plaintiff seeks damages. In Illinois, proximate cause is defined as "a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury." Ill. Pattern Jury Instr. Civ. 15.01. Under Illinois law, the question of whether a physician's conduct was a proximate cause of the plaintiff's injuries is a question of fact for the trier of fact to decide. *Campbell,* 904 F.2d at 1193 (citing *Borowski,* 328 N.E.2d at 305; *Kaplan v. Berger,* 184 Ill. App.3d 224, 132 Ill.Dec. 461, 539 N.E.2d 1267, 1273 (2d Dist.1989)). "[O]nly rarely are the facts so clear that the court can resolve the issue as a matter of law." *Palay v. United States,* 349 F.3d 418, 432–33

(7th Cir.2003) (citing *Shick v. Ill. Dep't of Human Servs.,* 307 F.3d 605, 615 (7th Cir.2002); *First Springfield Bank & Trust v. Galman,* 188 Ill.2d 252, 242 Ill.Dec. 113, 720 N.E.2d 1068, 1071 (1999); *Felty v. New Berlin Transit, Inc.,* 71 Ill.2d 126, 15 Ill.Dec. 768, 374 N.E.2d 203, 205 (1978)). Proximate cause "must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Morisch,* 653 F.3d at 531 (quoting *Johnson v. Loyola Univ. Med. Ctr.,* 384 Ill.App.3d 115, 323 Ill.Dec. 253, 893 N.E.2d 267, 272 (1st Dist.2008) (internal quotation marks omitted)); *see also Walton v. Dirkes,* 388 Ill.App.3d 58, 327 Ill.Dec. 921, 903 N.E.2d 18, 20 (1st Dist.2009). Proximate cause is not established where the "the injury would have occurred even in the absence of that act [or] omission." *Hardnick,* 2009 WL 1810106, at *11 (citing *Campbell,* 904 F.2d at 1193–94). Rather, "[a] plaintiff must establish that it is more probably true than not true that the defendant's negligence was a proximate cause of the injury." *Johnson,* 323 Ill.Dec. 253, 893 N.E.2d at 272 (citing *Borowski,* 328 N.E.2d at 305); *see also Hardnick,* 2009 WL 1810106, at *11 ("Plaintiff must show by a preponderance of the evidence that Defendant's failure to comply with the applicable standard of care caused or contributed to the injury giving rise to Plaintiff's cause of action.") (citing *Wise v. St. Mary's Hosp.,* 64 Ill. App.3d 587, 21 Ill.Dec. 482, 381 N.E.2d 809, 811–12 (5th Dist. Dist.1978); *Kasongo v. United States,* 523 F.Supp.2d 759, 802 (N.D.Ill.2007) (defining causation inquiry as whether "the defendant's breach of the applicable standard of care more probably than not caused [the plaintiff's] injury")).

37. To establish proximate cause, the plaintiff must show cause in fact and legal cause. *Bergman,* 313 Ill.Dec.

862, 873 N.E.2d at 500 (citing *Hooper v. Cnty. of Cook*, 366 Ill.App.3d 1, 303 Ill.Dec. 476, 851 N.E.2d 663 (2006)); *see also Palay*, 349 F.3d at 432 ("Under Illinois law, proximate cause consists of two elements: cause in fact and legal cause.") (citing *Evans v. Shannon*, 201 Ill.2d 424, 267 Ill.Dec. 533, 776 N.E.2d 1184, 1190 (2002)). The Illinois Supreme Court has stated that "[c]lause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage." *Evans*, 267 Ill.Dec. 533, 776 N.E.2d at 1190 (quoting *Galman*, 242 Ill.Dec. 113, 720 N.E.2d at 1072) (internal quotation marks omitted). If a defendant's negligent conduct "is a material element and a substantial factor in bringing about the injury," then cause in fact is established. *Id.* Further, "a defendant's conduct is a material element and a substantial factor in bringing about an injury if, absent that conduct, the injury would not have occurred." *Id.* Thus, in deciding whether cause in fact exists, this Court must first ask "whether the injury would have occurred absent the defendant's conduct.'" *City of Chi. v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 290 Ill. Dec. 525, 821 N.E.2d 1099, 1127 (2004) (citing *Lee v. Chi. Transit Authority*, 152 Ill.2d 432, 178 Ill.Dec. 699, 605 N.E.2d 493, 502–03 (1992)). When multiple factors may have combined to cause the injury, the inquiry remains the same, and this Court asks "whether the defendant's conduct was a material element and a substantial factor in bringing about the injury." *Id.* (citing *Lee*, 178 Ill.Dec. 699, 605 N.E.2d at 503). Furthermore, cause in fact may be established through a "lost chance" or "loss of chance" theory whereby the defendant's negligent conduct "deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of the treatment or increased the risk of an unfavorable outcome to the plaintiff." *Holton v. Mem'l Hosp.*, 176 Ill.2d 95, 223 Ill.Dec. 429, 679 N.E.2d 1202, 1209 (1997); *Scardina v. Nam*, 333 Ill. App.3d 260, 266 Ill.Dec. 454, 775 N.E.2d 16, 24 (1st Dist.2002) (noting that the loss of chance "doctrine is not a separate theory of recovery but, rather, a concept that factors into the proximate cause analysis"); *Lambie v. Schneider*, 305 Ill.App.3d 421, 239 Ill.Dec. 72, 713 N.E.2d 603, 609 (4th Dist.1999) ("While the 'lost chance' doctrine eliminates a problem of demonstrating 'cause in fact,' it does not eliminate the requirement that the plaintiff prove defendant's conduct was the legal cause of his injury.") (citing *Holton*, 223 Ill.Dec. 429, 679 N.E.2d at 1213).

38. Legal cause, by contrast, "presents a question of foreseeability." *Bergman*, 313 Ill.Dec. 862, 873 N.E.2d at 500; *Palay*, 349 F.3d at 432. To establish legal cause, a plaintiff must demonstrate that "an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." *Bergman*, 313 Ill.Dec. 862, 873 N.E.2d at 500 (citing *Knauerhaze*, 296 Ill. Dec. 889, 836 N.E.2d at 651–52); *Morisch*, 653 F.3d at 531. "Under Illinois law, so long as the defendant could have foreseen that his negligence would result in some type of injury, the precise nature or method of injury need not have been foreseeable." *Palay*, 349 F.3d at 434 (citing *Enis v. Ba–Call Bldg. Corp.*, 639 F.2d 359, 362 (7th Cir.1980); *Neering v. Ill. Central R.R. Co.*, 383 Ill. 366, 50 N.E.2d 497, 503 (1943); *Colonial Inn Motor Lodge, Inc. v. Gay*, 288 Ill.App.3d 32, 223 Ill.Dec. 674, 680 N.E.2d 407, 413 (2d Dist.1997)).

39. Furthermore, to establish proximate cause in a medical negligence action that raises the issue of lack of informed consent, expert testimony is not required. *See Coryell*, 210 Ill.Dec. 855,

653 N.E.2d at 1321 ("[W]hat is required to prove the element of proximate causation in an action based upon a physician's failure to disclose differs significantly from what is required to prove that same element in an 'ordinary' malpractice action."); *but see Mansmith v. Hameeduddin*, 369 Ill.App.3d 417, 307 Ill.Dec. 741, 860 N.E.2d 395, 411 (1st Dist.2006) (disagreeing with statement in *Coryell* that a plaintiff in an informed consent case is not required to present expert testimony to establish proximate cause). Instead, in assessing whether proximate cause exists, Illinois courts employ an objective standard, i.e., what a prudent person in the plaintiff's position would have decided if the plaintiff had been adequately informed. *Taylor v. Cnty. of Cook*, 354 Ill.Dec. 97, 957 N.E.2d 413, 433 (1st Dist.2011); *Smith v. Marvin*, 377 Ill.App.3d 562, 317 Ill.Dec. 31, 880 N.E.2d 1023, 1031 (3d Dist.2008); *Guebard v. Jabaay*, 117 Ill.App.3d 1, 72 Ill.Dec. 498, 452 N.E.2d 751, 757 (2d Dist.1983); *see also Coryell*, 210 Ill.Dec. 855, 653 N.E.2d at 1320 (noting that the appropriate question is: "Would a reasonably prudent person in the plaintiff's position, after being properly informed, have nonetheless proceeded with the proposed treatment?"). Whether "any alleged undisclosed information would have altered the plaintiff's decision to undergo the proposed treatment had it been disclosed" is a question of fact for the trier of fact to determine. *Coryell*, 210 Ill.Dec. 855, 653 N.E.2d at 1321; *Smith*, 317 Ill.Dec. 31, 880 N.E.2d at 1031; *see also Guebard*, 72 Ill.Dec. 498, 452 N.E.2d at 758 (If disclosure would have caused a reasonable person in the position of the patient to refuse the medical treatment, then a causal connection is shown.).

40. This Court concludes that as a result of the MCC personnel's failures and breaches of the standard of care in treating Solebo's seizure disorder, the MCC personnel proximately caused Solebo's injury and death on May 1, 2007. Dr. Holtzman opined, to a reasonable degree of medical certainty, that Solebo had a fatal seizure because the MCC, through its employees, failed to provide him with timely and adequate medical care for his seizure disorder.

41. Dr. Holtzman's testimony establishes that the MCC's failures were substantial factors in bringing about Solebo's fatal seizure on May 1, 2007. As Dr. Holtzman explained, the MCC personnel should have known that Solebo's Dilantin level was becoming nontherapeutic through monthly examinations, a review of his medical records, and regular blood draws. As a result of the MCC personnel's failure to adhere to the standard of care, however, they were simply unaware that Solebo was not compliant with taking his anti-seizure medication and that his Dilantin level was therefore approaching a nontherapeutic level. Dr. Holtzman also testified that Solebo was definitely subtherapeutic at the end of April, and a blood draw conducted around that time would have revealed this. Because the MCC Physicians did not know that Solebo was noncompliant, however, it was impossible for them to counsel Solebo about the importance of taking his medication or about the risks of failing to do so—they therefore failed to counsel him. Dr. Holtzman further opined, on the basis of his review of the records in this case, that Solebo would have taken his anti-seizure medication had he received appropriate counseling. Furthermore, Dr. Holtzman opined that Solebo's failure to take his medication increased his risk of death from a seizure, and had Solebo received his medication during the last few days of April, he would not have died from a fatal seizure on May 1, 2007. Dr. Holtzman's testimony establishes that the MCC's failures were substantial factors in bringing

about Solebo's fatal seizure. Dr. Holtzman's testimony also establishes that it was foreseeable to the MCC personnel that a patient who was not taking his medication was more likely to have a seizure than a patient who was taking his anti-seizure medication. As Dr. Holtzman explained, anti-seizure medication like Dilantin substantially reduces a person's risk of having a seizure and of dying from a seizure.

42. In sum, Dr. Holtzman's testimony that the MCC personnel's negligent failures lessened the effectiveness of Solebo's treatment for seizure disorder and increased his risk of harm sufficiently establishes a causal connection to establish proximate cause. Illinois courts have held similar expert testimony sufficient to establish proximate cause in past medical negligence cases. For example, in *Walton*, 327 Ill.Dec. 921, 903 N.E.2d at 26–27, the plaintiff's expert testified that the defendant's failure to order a blood count test resulted in a delayed diagnosis of leukemia and lessened the effectiveness of the treatment the decedent received. The plaintiff's expert further testified that had a complete blood count been performed, the blood count would have been abnormal, and that upon the finding of an abnormal blood count, he would have received specific treatments that would have prolonged the decedent's life. *Id.*, 327 Ill.Dec. 921, 903 N.E.2d at 23–24. The *Walton* court found that the expert testimony regarding how a diagnosis and treatment would have resulted from a complete blood count provided a sufficient causal connection to establish proximate cause. *Id.*, 327 Ill.Dec. 921, 903 N.E.2d at 27. Similarly, in *Johnson v. Loyola University Medical Center*, 323 Ill.Dec. 253, 893 N.E.2d at 268–69, the decedent was transported to a hospital where he was initially monitored after he suffered a cardiac arrest. A few days later, the decedent was moved to a floor

where he was not subject to continuous monitoring, and he subsequently suffered a second cardiac arrest that caused irreversible brain damage; he subsequently died. *Id.* An Illinois appellate court reversed the trial court's grant of judgment notwithstanding the verdict to the defendants where the plaintiff's expert presented testimony that the defendants' failure to monitor the decedent was the proximate cause of his injuries. *Id.*, 323 Ill.Dec. 253, 893 N.E.2d at 272. Specifically, the plaintiff's expert had testified that with adequate monitoring, hospital staff would have intervened earlier than they did, and had they done so the decedent would not have suffered the irreversible brain damage that ultimately led to his death. *Id.*, 323 Ill.Dec. 253, 893 N.E.2d at 272–73. In addition, in *Liebig–Grigsby v. United States*, No. 00 C 4922, 2003 WL 1090272, at *13 (N.D.Ill. Mar. 11, 2003), a medical negligence case brought under the FTCA, the court applied the lost chance doctrine and found that the plaintiff had established proximate cause where the plaintiff's physicians "failed to comprehensively treat and assess [the plaintiff's] condition" and as a result failed to consider the appropriate treatment. In *Liebig–Grigsby*, 2003 WL 1090272, at *13, had the physicians met the standard of care they would have advised the plaintiff to have a surgery that would have given plaintiff a good chance of avoiding her paralysis. Similarly, here, had the MCC personnel complied with the standard of care, they would have been able to counsel Solebo about taking his medication; because they were not even aware that Solebo was not taking his medication as prescribed, however, it was impossible for them to counsel Solebo. Therefore, this Court finds that Dr. Holtzman's testimony establishes that it was more probably true than not true that the MCC personnel's negligent failure to con-

sult Solebo after February 2007, to obtain the results of a blood draw, and to appropriately monitor whether Solebo was taking the prescribed medication to treat his seizure disorder lessened the effectiveness of the medical treatment Solebo received and increased his risk of harm.

43. During closing arguments, the Government argued that it is a fallacy to say that because two things are temporally related, there is a cause-and-effect relationship between them. (Trial Tr. 837.) The Government argued that Solebo's death on May 1, 2007, was simply coincidental with his failure to take his Dilantin as prescribed. (Trial Tr. 838–39.) Contrary to the Government's argument, this Court has not merely relied on the temporal sequence of events to reach its proximate cause finding. As both Dr. Holtzman and Dr. Jones testified, the evidence demonstrates that when Solebo was actually taking his medication, he stopped seizing. In fact, Dr. Curlin conceded on cross-examination that if Solebo had seizure disorder, then not taking his medication in March and April of 2007 could have contributed to him having another seizure. (Trial Tr. 671.) Furthermore, Illinois courts have found tibia where an expert testifies that mere is a causal connection between two events because of their temporal proximity, such testimony is sufficient to establish proximate cause. In *Wartalski v. JSB Construction*, 384 Ill. App.3d 139, 322 Ill.Dec. 875, 892 N.E.2d 122, 129 (1st Dist.2008), an Illinois appellate court specifically recognized that contrary to the defendant's assertions in that case, "a temporal relationship is, in fact, an acceptable basis for an expert's opinion." *See also Valiulis v. Scheffels*, 191 Ill. App.3d 775, 138 Ill.Dec. 668, 547 N.E.2d 1289, 1294, 1298 (2d Dist.1989) (where the plaintiff's expert testified that there was causal relationship between the trauma the plaintiff endured and the onset of his mul-

tiple sclerosis ("MS") symptoms "because of the close proximity in time" between the events, such "testimony was sufficient evidence that the negligence of [the defendant] was the proximate cause of [the plaintiff's] MS."); *but see Hussung v. Patel*, 369 Ill.App.3d 924, 308 Ill.Dec. 347, 861 N.E.2d 678, 685–86 (2d Dist.2007) (finding that there was no factual basis to support an expert physician's conclusions where the plaintiff's treating physicians testified that the relationship between an injection and the plaintiff's subsequent onset of symptoms was speculative). Here, Dr. Holtzman testified, to a reasonable degree of medical certainty, that Solebo's failure to take his medication between April 27 and April 30 increased his risk of death and that if Solebo had received his medication on those dates, he would not have died on May 1. As *Wartalski* and *Valiulis* instruct, such evidence is sufficient to support a finding of proximate cause.

44. Furthermore, while the evidence establishes that Solebo's seizure disorder combined with his cardiomegaly to cause his death, Illinois courts recognize that an injury may have multiple causes. For instance, in *Chambers v. Rush–Presbyterian–St. Luke's*, 155 Ill.App.3d 458, 108 Ill. Dec. 265, 508 N.E.2d 426, 430 (1st Dist. 1987), the appellate court there recognized that "[i]t is fundamental law that in negligence cases, there may be more man one proximate cause of injury and that one is liable for its negligent conduct whether it contributed in whole or in part to the injury as long as proximate cause exists." In *Chambers*, 108 Ill.Dec. 265, 508 N.E.2d at 431, the medical experts disagreed as to whether the decedent's coma or his cancer caused his death. The plaintiff's expert testified that the defendants' negligence was a proximate cause of the decedent's death and that if the decedent's cancer has been treated earlier, he would have had a

good chance of recovering. *Id.*, 108 Ill. Dec. 265, 508 N.E.2d at 431. Under these circumstances, the court held that the trial court properly denied the defendant's motion for a judgment notwithstanding the verdict. *Id.* Thus, although Solebo died as a result of both his seizure disorder and his cardiomegaly, Dr. Holtzman's testimony that the MCC personnel's negligence was a proximate cause of Solebo's fatal seizure is sufficient to sustain the Plaintiff's burden of proof on proximate cause.

45. Where a case involves a lack of informed consent, this Court reiterates that expert testimony is not required to establish proximate cause. *See Coryell,* 210 Ill.Dec. 855, 653 N.E.2d at 1321. Rather, the inquiry is whether a reasonably prudent person in the same position would have altered his decision about the proposed treatment. *Taylor,* 354 Ill.Dec. 97, 957 N.E.2d at 433. Here, this Court finds that a prudent person in Solebo's position would have resumed taking his anti-seizure medication after being fully informed of the risks of not taking that medication. Again, as Dr. Holtzman testified, the risk of not taking one's anti-seizure medication increased the risk of having a seizure, which carries with it a risk of great bodily injury or death. The evidence that Solebo would have complied with taking his medication as prescribed after receiving counseling is conclusively found in the Kankakee records. These records demonstrate that Solebo suffered a second seizure after he stopped taking his medication, and on his own accord he then requested that his Dilantin be resumed. Specifically, Solebo wrote, "I was previously on Dilantin medication and was taken off prescription and believe I may have suffered a seizure because of discontinuation of Dilantin. I want to be put back on the medication Dilantin." (Jt. Ex. 3 at 58.) The evidence establishes that Solebo mistakenly and naively believed

that because he was not suffering any seizures, he would remain seizure-free. Unfortunately for Solebo and his family, that is not what occurred.

46. In sum, Plaintiff has presented expert testimony that establishes, to a reasonable degree of medical certainty, that it is more probably true than not true that the MCC's negligence was a proximate cause of Solebo's fatal seizure on May 1, 2007.

## IV. Comparative negligence

47. Traditionally, under the doctrine of contributory negligence, a plaintiff was barred from recovering for his injuries in a negligence action if any degree of his negligence contributed to the accident. *Alvis v. Ribar,* 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886, 887–88 (1981), abrogated by Ill.Rev.Stat.1991, ch. 110, par. 2–116 (now 735 Ill. Comp. Stat. 5/2–1116), as recognized in *Burke v. 12 Rothschild's Liquor Mart, Inc.,* 148 Ill.2d 429, 170 Ill.Dec. 633, 593 N.E.2d 522, 527 (1992); *Coney v. J.L.G. Indus., Inc.,* 97 Ill.2d 104, 73 Ill. Dec. 337, 454 N.E.2d 197, 200 (1983). In response to the unfairness of that doctrine, the Illinois Supreme Court adopted the doctrine of pure comparative negligence in *Alvis,* 52 Ill.Dec. 23, 421 N.E.2d at 896–98, and explained that the adoption was demanded by contemporary society because it produced "a more just and socially desirable distribution of loss," *id.,* 52 Ill.Dec. 23, 421 N.E.2d at 893. "The system of pure comparative negligence which [the Illinois Supreme Court] adopted in *Alvis* was intended to apportion damages according to the relative fault of the parties." *Burke,* 170 Ill.Dec. 633, 593 N.E.2d at 527. In 1986, however, the Illinois legislature adopted a modified version of comparative negligence. *Id.* Section 2–1116 of the Illinois Code of Civil Procedure, 735 Ill. Comp. Stat. 5/2–1116(c), bars a plaintiff

whose comparative negligence "is more than 50% of the proximate cause of the injury or damage for which recovery is sought" from recovering damages. *Merca v. Rhodes,* 355 Ill.Dec. 642, 960 N.E.2d 85, 95 (1st Dist.2011) (citing *Hobart v. Shin,* 185 Ill.2d 283, 235 Ill.Dec. 724, 705 N.E.2d 907, 910 (1998)). Where a plaintiff's comparative negligence "is not more than 50% of the proximate cause of the injury or damage for which recovery is sought," 735 Ill. Comp. Stat. 5/2–1116(c), a plaintiff is allowed to recover the proportion of damages that are not attributable to her own fault. *Torres v. United States,* 953 F.Supp. 1019, 1025 (N.D.Ill.1997) (applying Illinois law in an FTCA action). "When there is a showing of contributory negligence on behalf of a plaintiff, the trier of fact makes the determination as to the percentage of contributory negligence." *Merca,* 960 N.E.2d at 96 (citing *Johnson v. Colley,* 111 Ill.2d 468, 95 Ill.Dec. 832, 490 N.E.2d 685, 688 (1986)).

■ 48. "A plaintiff is contributorily negligent when he or she acts without the degree of care that a reasonably prudent person would have used for his or her own safety under like circumstances and that action is a proximate cause of his or her injuries or death." *Id.* at 96 (citing *Basham v. Hunt,* 332 Ill.App.3d 980, 266 Ill. Dec. 143, 773 N.E.2d 1213, 1225 (1st Dist. 2002)); *Gill v. Foster,* 157 Ill.2d 304, 193 Ill.Dec. 157, 626 N.E.2d 190, 198 (1993) ("In order to prove contributory negligence, a defendant must show that the plaintiff failed to exercise that degree of care which a reasonably prudent person would have used for his or her own safety under like circumstances.") (citing *Johnson v. Abbott Labs., Inc.,* 238 Ill.App.3d 898, 179 Ill.Dec. 84, 605 N.E.2d 1098, 1104 (2d Dist.1992)); *see also Arroyo v. United States,* 656 F.3d 663, 673 (7th Cir.2011) (Posner, J. concurring) ("[C]ontributory or

comparative negligence is failure to take the care that the average person in the plaintiff's position would have taken.").

■ 49. Comparative negligence is a proper affirmative defense in a medical malpractice case. *Krklus v. Stanley,* 359 Ill.App.3d 471, 295 Ill.Dec. 746, 833 N.E.2d 952, 961 (1st Dist.2005). "Illinois courts have held that comparative negligence applies when the plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it." *Id.,* 295 Ill.Dec. 746, 833 N.E.2d at 960 (quoting *Malanowski v. Jabamoni,* 332 Ill. App.3d 8, 265 Ill.Dec. 596, 772 N.E.2d 967, 973 (1st Dist.2002) (internal quotation marks omitted)). In *Krklus,* defendants introduced evidence that the decedent was negligent in failing to follow his physician's advice to regularly take his blood pressure medication. 295 Ill.Dec. 746, 833 N.E.2d at 961. The decedent's autopsy revealed that the decedent's cause of death was a hemothorax caused by an aortic dissection. *Id.,* 295 Ill.Dec. 746, 833 N.E.2d at 957. Expert testimony established that had the decedent taken his medication, he would not have developed the aortic dissection. *Id.,* 295 Ill.Dec. 746, 833 N.E.2d at 961–62. Under those circumstances, an Illinois appellate court concluded that the decedent's failure to follow his physician's advice to take his medication, coupled with the decedent's act of subsequently misinforming his physician about his compliance, were the types of substantial factors that brought about his harm. *Id.,* 295 Ill.Dec. 746, 833 N.E.2d at 962 (concluding that the trial court did not err in allowing the defendants to introduce evidence in support of their comparative negligence defense or in instructing the jury that it could consider comparative negligence and affirming

the jury verdict in favor of the defendants).

■ 50. Here, this Court concludes that Solebo failed to take his medication as prescribed. As in *Krklus,* this inaction was a substantial factor in bringing about his fatal seizure. Thus, because of Solebo's repeated decisions to not take the medication made available to him by the MCC personnel on a daily basis, Solebo's contributory fault under applicable Illinois law is 33%. (*See* R. 117, Order on Comparative Fault at 1.) Because his decisions were not made on an informed basis, however, the Government bears 67% of the responsibility because the actions and inactions of the MCC personnel were a proximate cause of Solebo's tort damages. (*Id.*)

## V. Damages

51. Lastly, this Court turns to the question of damages. Plaintiff seeks a total of $1,650,000.00 in damages. (R. 93, Proposed Pretrial Order, Ex. M, Pretrial Mem. at 3.) In her pretrial order, Plaintiff stated that she "is making a claim for damages for a loss of consortium, money, loss of society, benefits, money, [sic] goods, services and companionship of [Solebo]," in the amount of $550,000.00. (R. 93, Proposed Pretrial Order, Ex. G, Statement of Damages at 1.) Plaintiff stated that she is also making a Wrongful Death claim on behalf of herself and her daughter "for being deprived of large sums of money and valuable services which [Solebo] would have performed but for his untimely death, as well as suffering loss of society and companionship, loss of money, services, instruction, superintendence of education, benefits and goods, and grief, sorrow and mental suffering as a result as the death of [Solebo]," in the amount of $1,100,000.00. (*Id.*) Thus, Plaintiff seeks a total award of $1,650,000.00. (*Id.*)

■ 52. During closing arguments in the damages phase of the trial, Plaintiff's counsel clarified that Plaintiff seeks $550,000.00 for herself "for wrongful death, loss of consortium, society and companionship and an award in favor of her daughter of $1.1 million," for a total award of $1,650,000.00 after any reduction by this Court. (June 4, 2012 Tr. 46–48.) In other words, Plaintiff's request of $550,000.00 for loss of consortium is not a request that is separate and independent from her request for damages for wrongful death. This Court treats Plaintiff's clarification as a request to modify the pretrial order. *See Gorlikowski v. Tolbert,* 52 F.3d 1439, 1445 (7th Cir.1995) ("[W]here a party requests that jury instructions be modified to remedy a variance between a pretrial order and their trial presentation, that request is properly treated as a motion to modify the pretrial order ... and the trial court's decision is properly reviewed for an abuse of discretion.") (citing *Santiago v. Lykes Bros. S.S. Co., Inc.,* 986 F.2d 423, 427 (11th Cir.1993) (affirming district court's decision to instruct the jury on a theory that was not mentioned in the pretrial order); *Mankey v. Bennett,* 38 F.3d 353, 359 (7th Cir.1994)).

■ 53. Because the purpose of a pretrial order is to clarify the nature of the dispute at issue and inform the parties of precisely what is in controversy, a pretrial order may be modified "only to prevent manifest injustice." *Gorlikowski,* 52 F.3d at 1444 (quoting Fed.R.Civ.P. 16(e)); *see also Harper v. Albert,* 400 F.3d 1052, 1063 (7th Cir.2005) ("In order for a pretrial order to have any value as a procedural mechanism and to protect against the possibility of either of the parties being taken by surprise at trial, the parties must be held to the issues set forth in that order."). When confronted with such a request, a district court must weigh the possible

hardships imposed on the parties and "balance the need for doing justice on the merits between the parties (in spite of errors and oversights of their attorneys) against the need for maintaining orderly and efficient procedural arrangements." *Gorlikowski*, 52 F.3d at 1444 (quoting *Matter of Delagrange*, 820 F.2d 229, 232 (7th Cir.1987)); *see also Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 763 (7th Cir.1999) (instructing district courts to consider factors such as the (1) prejudice or surprise to the nonmoving party; (2) ability of the party to cure the prejudice; (3) extent of the disruption to the orderly and efficient trial of the case or other cases in the court; and (4) bad faith and willfulness in failing to comply with the pretrial order) (citations omitted).

■■■■■ 54. While "[a] cause of action for loss of consortium is a tort action based on an injury to the personal relationship established by the marriage contract," *Brown v. Metzger*, 118 Ill.App.3d 855, 74 Ill.Dec. 405, 455 N.E.2d 834, 837 (2d Dist. 1983), Illinois law also recognizes toss of consortium as an element of damages under the Wrongful Death Act. *Elliott v. Willis*, 92 Ill.2d 530, 65 Ill.Dec. 852, 442 N.E.2d 163, 168 (1982). Thus, in Illinois, "any loss of consortium action by [a] surviving spouse [does] not exist separate and apart from an action under the Wrongful Death Act, but rather [is an] element[ ] for which damages may be recovered in such an action." *Johnson v. Vill. of Libertyville*, 150 Ill.App.3d 971, 104 Ill.Dec. 211, 502 N.E.2d 474, 477 (2d Dist.1986), *overruled on other grounds by Mio v. Alberto-Culver Co.*, 306 Ill.App.3d 822, 239 Ill.Dec. 864, 715 N.E.2d 309, 313 (2d Dist.1999); *see also Nielsen v. United States*, No. 94 C 383, 1995 WL 88796, at \*2 (N.D.Ill. Mar. 1, 1995) ("Illinois law recognizes loss of consortium as an element of damages under the Wrongful Death Act, but not as a

separate cause of action in a wrongful death case.") (internal citations omitted). Because loss of consortium may be recovered in a wrongful death action, it cannot be said that Defendant has been prejudiced or surprised by Plaintiff's request. Therefore, to prevent manifest injustice, this Court allows Plaintiff to modify the pretrial order and construes her request to mean that she seeks $550,000.00 on behalf of herself and $1,100,000.00 on behalf of her daughter on the basis of her wrongful death action.

■■■■■ 55. The purpose of the Illinois Wrongful Death Act is to compensate the surviving spouse and next of kin for the pecuniary losses they may have sustained as a result of the death of the decedent. 740 Ill. Comp. Stat. 180/2 (allowing recovery of damages "for the exclusive benefit of the surviving spouse and next of kin of such deceased person"); *Glenn v. Johnson*, 198 Ill.2d 575, 261 Ill. Dec. 756, 764 N.E.2d 47, 52 (2002); *Elliott*, 65 Ill.Dec. 852, 442 N.E.2d at 168; *Knierim v. Izzo*, 22 Ill.2d 73, 174 N.E.2d 157, 160 (1961) (citations omitted). It is intended to provide the surviving spouse and next of kin "the benefits that would have been received from the continued life of the decedent." *Elliott*, 65 Ill.Dec. 852, 442 N.E.2d at 168. The "phrase 'next of kin,' for purposes of the Wrongful Death Act, are those blood relatives of decedent in existence at decedent's death who would take decedent's property if decedent had died intestate." *In re Estate of Finley*, 151 Ill.2d 95, 176 Ill.Dec. 1, 601 N.E.2d 699, 701 (1992). Thus, a decedent's child is appropriately considered to be the next of kin in Illinois. *Cf. Stephens v. Trinity Med. Ctr.*, 292 Ill.App.3d 165, 226 Ill.Dec. 300, 685 N.E.2d 403, 404 (3d Dist.1997) ("The law of this state is well settled that parents are not found to be the next-of-kin under the [Wrongful Death] Act when the

decedent is survived by a spouse and children.") In this case, Solebo's next of kin is his daughter. Thus, the persons eligible to recover for Solebo's death under the Wrongful Death Act are Plaintiff as his surviving spouse and their daughter as his next of kin.

■ 56. Furthermore, the Illinois Supreme Court has stated that where a widow and minor child seek to recover damages under the Wrongful Death Act, "a presumption of pecuniary loss obtains from that relationship, alone." *Hall v. Gillins*, 13 Ill.2d 26, 147 N.E.2d 352, 355 (1958). While the rebuttable presumption does not necessarily guarantee recovery, it shifts "the burden of coming forward with proof that the damages are minimal or nonexistent onto the party who created the uncertainty surrounding the damages by causing the wrongful death." *Seef v. Sutkus*, 205 Ill.App.3d 312, 150 Ill.Dec. 76, 562 N.E.2d 606, 611 (1st Dist.1990). Thus, there is a presumption that Plaintiff and her daughter, as the widow and minor child of Solebo, respectively, have suffered pecuniary losses as a result of his death.

■ 57. In its current form, the Illinois Wrongful Death Act allows the trier of fact to "give such damages as [the trier of fact] shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such [wrongful] death, including damages for grief, sorrow, and mental suffering, to the surviving spouse and next of kin of such deceased person." 740 Ill. Comp. Stat. 180/2. Prior to 2007, Illinois courts prohibited wrongful death claimants from recovering damages for grief, sorrow, or mental suffering. *See Watson v. S. Shore Nursing & Rehabilitation Ctr.*, 358 Ill.Dec. 721, 965 N.E.2d 1200, 1208 (1st Dist.2012) (in a wrongful death suit where decedent died in 2006, damages for grief and mental anguish resulting from the death were not recovera-

ble); *Turner v. Williams*, 326 Ill.App.3d 541, 260 Ill.Dec. 804, 762 N.E.2d 70, 77 (2d Dist.2001) (noting that while decedent's sons were "entitled to recover for the pecuniary losses incurred as a result of the death, including money, benefits, goods, services, and society ... those damages do not include grief or mental anguish resulting from the death."); *Seef*, 150 Ill.Dec. 76, 562 N.E.2d at 610 (noting that the term "pecuniary" does not "extend to the grief or mental anguish that family members suffer after a wrongful death"); *Elliott*, 65 Ill.Dec. 852, 442 N.E.2d at 167–68 (distinguishing between damages for emotional distress brought on by the decedent's death and damages for the benefits of companionship that a widow would have enjoyed). In 2007, however, the Illinois Legislature amended the Wrongful Death Act to allow recovery for grief, sorrow, and mental suffering of the decedent's lineal next of kin. *See* 2007 Ill. Legis. Serv. P.A. 95–3 (H.B.1798) (West). This amendment only applies to causes of action accruing on or after May 31, 2007. *Id.*; 740 Ill. Comp. Stat. 180/2 ("This Amendatory Act of the 95th General Assembly applies to causes of actions accruing on or after its effective date."). "[I]n an ordinary wrongful death action under the FTCA, the federal rule is that the cause of action accrues upon the date of death." *Warrum v. United States*, 427 F.3d 1048, 1051 (7th Cir.2005) (alterations omitted) (quoting *Fisk v. United States*, 657 F.2d 167, 170 (7th Cir.1981) (internal quotation marks omitted)). Here, Plaintiffs cause of action accrued on May 1, 2007—the date of Solebo's death. Therefore, because her wrongful death action accrued prior to May 31, 2007, neither she nor her daughter may recover damages for their grief, sorrow and mental suffering.

■ 58. In addition, although Plaintiff seeks to recover for loss of money,

benefits, goods, and services as a result of Solebo's death, the evidence presented at trial does not support an award for any economic losses. Plaintiff testified at trial that prior to getting married, Solebo worked with his mother for two months, and she was not aware of any paid employment positions that Solebo had other than that job. Plaintiff also testified that Solebo's mother paid the rent on the apartment the three of them shared. Although Solebo was in school at the time of his arrest, Plaintiff did not present any evidence about the number of credits or courses Solebo had completed towards his nursing degree or about any expected earnings Solebo anticipated upon obtaining his degree. Therefore, this Court focuses its analysis only on whether the evidence supports awards for loss of consortium and society to Plaintiff and her daughter.

■ 59. Plaintiff's request for damages for loss of consortium for herself and damages for loss of society for her daughter are recoverable as "pecuniary losses" in an Illinois Wrongful Death Action. Illinois courts construe the phrase "pecuniary losses" broadly to include loss of companionship, society, and consortium. In *Hall*, the Illinois Supreme Court recognized the broad scope of the phrase "pecuniary injuries," and stated that "deprivation of support as well as deprivation of the companionship, guidance, advice, love and affection" were included in the definition. 147 N.E.2d at 355. The Illinois Supreme Court found additional support for the broad scope of the phrase "pecuniary injures" in earlier cases holding "that in the case of a child the jury may take into account the loss of instruction and moral, physical and intellectual training brought about by the death of the father." *id.* (citing *Goddard v. Enzler*, 222 Ill. 462, 78 N.E. 805, 809 (1906); *Ittner Brick Co. v. Ashby*, 198 Ill. 562, 64 N.E. 1109, 1110

(1902); *Ill. Central R. Co. v. Weldon*, 52 Ill. 290, 294 (Ill.1869)). More recently, in *Elliott*, the Illinois Supreme Court unequivocally stated that pecuniary injuries include loss of consortium for a widowed spouse. 65 Ill.Dec. 852, 442 N.E.2d at 168 (citations omitted).

■ 60. Recognizing that the term "society" eludes precise definition, Illinois courts have looked to the United States Supreme Court's definition of the term for guidance. The Supreme Court defines the term as encompassing " 'a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection.' " *Watson*, 358 Ill.Dec. 721, 965 N.E.2d at 1208 (quoting *Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 584–87, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974)); *see also Hunt v. Chettri*, 158 Ill.App.3d 76, 110 Ill.Dec. 293, 510 N.E.2d 1324, 1326 (5th Dist.1990). Illinois courts have used similar terms to define "society," and have stated that it includes loss of the decedent's "companionship, guidance, advice, love, and affection." *Williams v. Rush-Presbyterian St. Luke's Med. Ctr.*, 387 Ill. App.3d 77, 326 Ill.Dec. 590, 899 N.E.2d 1241, 1246 (1st Dist.2008) (internal quotation marks omitted) (quoting *Bullard v. Barnes*, 102 Ill.2d 505, 82 Ill.Dec. 448, 468 N.E.2d 1228, 1232 (1984)); *see also Singh v. Air Ill., Inc.*, 165 Ill.App.3d 923, 117 Ill.Dec. 501, 520 N.E.2d 852, 858 (1st Dist. 1988) (concluding that an instruction defining the term "society" to mean the "mutual benefits that each family member receives from others['] continued existence, including love, affection, care, attention, companionship, comfort, guidance and protection" reflected a generally accepted definition of the term for purposes of a wrongful death action) (citing *Bullard*, 82 Ill.Dec. 448, 468 N.E.2d at 1232;

*Drake v. Harrison,* 151 Ill.App.3d 1082, 105 Ill.Dec. 66, 503 N.E.2d 1072, 1076 (5th Dist.1987)).

■ 61. Loss of consortium is unique to the marital relationship and encompasses two basic elements of that relationship: "loss of support and loss of society, which includes companionship and sexual intercourse." *Brown v. Metzger,* 104 Ill.2d 30, 83 Ill.Dec. 344, 470 N.E.2d 302, 304 (1984); *see also Malfeo v. Larson,* 208 Ill.App.3d 418, 153 Ill.Dec. 406, 567 N.E.2d 364, 369 (1990) ("[C]onsortium includes loss of a spouse's companionship, happiness, and society."); *Brown v. Metzger,* 118 Ill.App.3d 855, 74 Ill.Dec. 405, 455 N.E.2d 834, 836 (2d Dist.1983) (This loss includes " 'material services, elements of companionship, felicity and sexual intercourse, all welded into a conceptualistic unity.' ") (quoting *Dini v. Naiditch,* 20 Ill.2d 406, 170 N.E.2d 881, 891 (1960)), *aff'd,* 104 Ill.2d 30, 83 Ill.Dec. 344, 470 N.E.2d 302, 306 (1984); *Blagg v. Ill. F.W.D. Truck & Equip. Co.,* 143 Ill.2d 188, 157 Ill.Dec. 456, 572 N.E.2d 920, 924 (1991).

■ 62. Although both loss of consortium and loss of society are incapable of being measured with precision and particularity, a trier of fact must nevertheless place a monetary value on these items. *See Elliott,* 65 Ill.Dec. 852, 442 N.E.2d at 168. To ascertain that value, the Seventh Circuit has instructed that a judge should consider damages awards in similar cases. *Arpin v. United States,* 521 F.3d 769, 776 (7th Cir.2008). In *Arpin,* the Seventh Circuit reversed a $7,000,000.00 award for loss of consortium to the decedent's widow and his children in an FTCA action seeking damages pursuant to the Illinois Wrongful Death Act. *Id.* at 777. In reversing the award, the Seventh Circuit stated that the district court should have considered awards in similar cases, both in Illinois and elsewhere. *Id.* at 776. The

Seventh Circuit recognized that "the Supreme Court of Illinois does not require or even encourage such comparisons," and that in an FTCA action, "the damages rules of the state whose law governs the substantive issues in the case bind the federal court [because] damages law is substantive law." *Id.* at 776. The *Arpin* court pointed out, however, that "whether or not to permit comparison evidence in determining the amount of damages to award in a particular case is a matter of procedure rather than substance." *Id.* The Seventh Circuit also noted that "[t]he policy of permitting such comparison evidence is based ... on the requirement in [Federal Rule of Civil Procedure] 52(a) that judges explain their reasoning." *Id.* at 776–77. Therefore, Illinois* rule that comparable damages awards should not be considered is not binding on "federal courts even in cases such as this where the rule of decision is given by Illinois law." *Id.* at 777 (citing *Jutzi–Johnson v. United States,* 263 F.3d 753, 759–60 (7th Cir. 2001). Accordingly, this Court reviews damages awards for wrongful death in cases similar to the one at hand. Before discussing the comparable awards, however, this Court addresses the Government's arguments concerning Solebo's alleged crimes and his life expectancy.

## A. Solebo's alleged crimes

■ 63. During closing arguments in the damages phase of the trial, the Government argued that the evidence against Solebo in his criminal case included post-arrest statements made by him in which he acknowledged that he had delivered heroin to a confidential informant and testimony from a confidential informant. (June 4, 2012 Tr. 49.) In light of this evidence, the Government believed that Solebo faced a sentencing range from five to ten years, which he would have served

in a federal prison that was substantially farther away from Chicago than the MCC. (June 4, 2012 Tr. 49–50.) The Government also believed that after completing his prison term, Solebo would have been removed to Nigeria. (June 4, 2012 Tr. 50.) Finally, the Government asserted that because Solebo was incarcerated at the time of his daughter's birth, he did not have a preexisting relationship with his daughter. (June 4, 2012 Tr. 52.) Therefore, the Government argued that any loss of society is limited by these circumstances. (June 4, 2012 Tr. 52.)

 64. While it is undisputed that Solebo was incarcerated at the time of his death, this Court finds it compelling that Solebo was in custody as a pre-trial detainee awaiting trial—he was not in custody as a result of being convicted of any crime—and he was therefore presumed innocent. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895). "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). This presumption is not to be taken lightly, and the Supreme Court has long held that "the presumption of innocence is evidence in favor of the accused, introduced by the law in his behalf." *Coffin*, 156 U.S. at 460, 15 S.Ct. 394. While the Government would like this Court to believe that Solebo would have been convicted with one hundred percent certainty, this Court declines the Government's invitation to ignore the uncontroverted fact that at the time of his death, Solebo had never been convicted of any

crimes and that he was presumed innocent as a matter of law at the time of his death.

65. By mere coincidence, this Court also presided over the trial and heard the Government's evidence in its less than successful criminal prosecution of Solebo's codefendant, Wasiu Mustapher, who was indicted on the same exact counts as Solebo. Specifically, the Government charged Mustapher with conspiracy to distribute and to possess heroin with intent to distribute (Count I), distribution of heroin (Count II), and possession with intent to distribute and distribution of heroin (Count III). (Def.'s Ex. 8, Indictment at 1–3, *United States v. Solebo and Mustapher*, No. 06 CR 61 (N.D.Ill. Feb. 23, 2006).) Mustapher entered a plea of not guilty to all counts, *United States v. Mustapher*, No. 06 CR 61–2, ECF No. 87 Min. Entry (Jan. 22, 2007) and proceeded to trial. The Government's case against him was heard by a jury in January 2007. *Mustapher*, No. 06 CR 61–2, ECF No. 87 Min. Entry (Jan. 22, 2007); *Mustapher*, No. 06 CR 61–2, ECF No. 92 Min. Entry (Jan. 24, 2007); *Mustapher*, No. 06 CR 61–2, ECF No. 97 Min. Entry (Jan. 26, 2007). At Mustapher's trial, a confidential informant recognized and identified Mustapher as the individual who supplied Solebo with heroin. (Stip. Ex., *United States v. Mustapher*, No. 06 CR 61–2, Excerpt of Trial Tr. 6–7, 19 (Jan. 22, 2007, J. Castillo); Stip. Ex., *United States v. Mustapher*, No. 06 CR 61–2, Excerpt of Trial Tr. 50 (Jan. 24, 2007, J. Castillo)). Nevertheless, the jury returned a split verdict of guilty on Count I, but not guilty on Counts II and III. *Mustapher*, No. 06 CR 61–2, ECF No. 97 Min. Entry (Jan. 26, 2007).

66. At the close of trial, Mustapher made an oral motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. *Id.* This Court entered the jury verdict and took Mustapher's oral

motion for a judgment of acquittal under advisement. *Id.* On February 5, 2007, Mustapher renewed his motion for a judgment of acquittal in writing. *Mustapher,* No. 06 CR 61–2, ECF No. 100 Min. Entry (Feb. 5, 2007). Two days later, Mustapher also moved for a mistrial on Count I. *Mustapher,* No. 06 CR 61–2, ECF No. 101 Min. Entry (Feb. 7, 2007). The Government filed its response to each of Mustapher's motions on February 28, 2007, *Mustapher,* No. 06 CR 61–2, ECF No. 104 Government's Resp. (Feb. 28, 2007); *Mustapher,* No. 06 CR 61–2, ECF No. 105 Government's Resp. (Feb. 28, 2007), and this Court then held a hearing on March 29, 2007, on Mustapher's motions, *Mustapher,* No. 06 CR 61–2, ECF No. 111 Min. Entry (Mar. 29, 2007). At the conclusion of the hearing, this Court granted Mustapher's motion for a judgment of acquittal, but stayed the effective date of its ruling until April 3, 2007, to allow the Government an opportunity to appeal. *Id.*

67. The Government elected not to pursue an appeal and on April 3, 2007, this Court entered a judgment of acquittal on Count I and dismissed Count I against Mustapher. *Mustapher,* No. 06 CR 61–2, ECF No. 114 Min. Entry (Apr. 3, 2007). In granting Mustapher's motion for a judgment of acquittal on Count I, this Court determined that the evidence the Government presented at his criminal trial was insufficient to sustain the jury's verdict finding Mustapher guilty of conspiring to distribute and to possess heroin with intent to distribute. *See* Fed.R. Crim.P. 29. In light of the acquittal on all counts of Solebo's co-defendant, there is no certainty that a jury would have found that Solebo was guilty beyond a reasonable doubt on the charges against him had he proceeded to trial.

68. Certainly, the evidence against Solebo was likely stronger than the evidence against Mustapher. Specifically, a confidential informant would have testified that he purchased heroin from Solebo on January 19, 2006, (Stip. Ex., *United States v. Mustapher,* No. 06 CR 61–2, Excerpt of Trial Tr. 74–75 (Jan. 22, 2007, J. Castillo); Damages Hr'g Stip. ¶ 3; Def.'s Ex. 18, Photo 6), and that he also orchestrated an undercover agent's sale of heroin from Solebo on January 25, 2006, (Stip. Ex., *United States v. Mustapher,* No. 06 CR 61–2, Excerpt of Trial Tr. 59–62 (Jan. 24, 2007, J. Castillo); Damages Hr'g Stip. ¶ 4; Def.'s Ex. 18, Photo 9). The confidential informant's testimony at Mustapher's trial was not without holes, however, as he testified under cross-examination that he began to cooperate with the Government in order to obtain a reduced sentence for a crime he had previously committed. (Stip. Ex., *United States v. Mustapher,* No. 06 CR 61–2, Excerpt of Trial Tr. 112–15 (Jan. 24, 2007, J. Castillo).) In fact, at Mustapher's trial, the confidential information agreed that he "had to provide somebody else [i.e., Solebo] to [the Government] or help [the Government] get somebody else who was involved in drug trafficking." (Stip. Ex., *United States v. Mustapher,* No. 06 CR 61–2, Excerpt of Trial Tr. 115–16 (Jan. 24, 2007, J. Castillo).) While this Court hesitates to speculate on what defenses Solebo would or could have brought and whether such defenses would have been successful, the jury's verdict in the case of Solebo's co-defendant suggests that something about the Government's investigation was less than conclusive and caused the jury to question the Government's prosecution against Solebo's co-defendant. Therefore, this Court cannot find that it was more probably true than not true that Solebo would have been convicted of the charges against him.

69. **Even if Solebo had been convicted, incarcerated for seven years, and subsequently** deported to Nigeria, as the

Government argued during closing arguments, (June 4, 2012 Tr. 50, 52), this Court notes that he would have been about thirty years old when he was released from prison and his daughter would have been about seven years old, which would have very likely left time for Solebo to lead a meaningful life with his wife and daughter. Whether that life was in the United States or in Nigeria—which Plaintiff testified that they had plans to move to (June 4, 2012 Tr. 36)—is not relevant to the loss of consortium and loss of society analyses, as damages for such losses are intended to compensate a widowed spouse and the next of kin for the loss of the decedent's companionship, advice, love, and affection, among other qualities; the relationships between Solebo and his wife and Solebo and his daughter would have continued to exist regardless of whether the family was in the United States or Nigeria.

## B. Solebo's life expectancy

70. This leads this Court to the question of precisely how long Solebo should have been expected to live despite the fact that he had, as this Court found, both an enlarged heart and seizure disorder. Both Dr. Holtzman and Dr. Curlin testified as to Solebo's life expectancy. Dr. Holtzman testified that Solebo's life expectancy as a result of his seizure disorder was approximately 48 years, meaning that Solebo would have lived for an additional 25 years. In making this estimate, however, Dr. Holtzman did not consider Solebo's enlarged heart and the effects his enlarged heart would have on his life expectancy. Dr. Curlin, on the other hand, testified that Solebo's life expectancy would be "significantly lower" than the average person his age because Solebo had an enlarged heart, was morbidly obese, and had a history of smoking. Despite his testimony, Dr. Curlin did not quantify Solebo's life expectancy. During closing arguments,

the Government conceded that it had not presented evidence of an actual figure but nonetheless argued that "five to ten years would be generous." (June 4, 2012 Tr. 59–60.)

71. In light of the fact that the Government did not offer any evidence of its own regarding Solebo's life expectancy, this Court is not willing to accept its assertion that Solebo had only a five to ten year life expectancy. This Court is also unwilling to accept Dr. Holtzman's testimony that Solebo had a 25 year life expectancy because Dr. Holtzman did not consider that Solebo had both seizure disorder and an enlarged heart when making this estimate. Instead, this Court finds that a reasonable life expectancy for Solebo is 17.5 years, meaning that Solebo should have expected to live until he was 40.5 years old. *See Kwasny v. United States*, No. 80 C 2198, 1986 WL 9184, at *13–*16 (N.D.Ill. Aug. 15, 1986) (Parson, J.) (finding that the decedent's life expectancy would have been 7.6 years after considering the evidence concerning the decedent's health and despite the fact that the mortality table evidence showed the decedent's life expectancy to be 15.2 years in an FTCA action where the plaintiff sought wrongful death and survivorship damages).

## C. Comparable cases involving minor children

72. The Government presented this Court with one comparable case, *Trunk v. United States*, No. 04 C 1545. There, Judge James Zagel awarded the decedent's five children varying amounts for the 29 years of the decedent's life expectancy because the decedent had unequal relationships with each of his children, four of whom were adults at the time of their father's death. (R. 124, Def.'s Resp. to Court's Order of July 3, 2012, *Trunk v. United States*, No. 04 C 1545, Excerpt of

Trial Tr. 7 (Oct. 3, 2006 Zagel, J.)) In addition, Judge Zagel described the decedent as a less than ideal father who when judged "even on the standard of the traditional flawed father ... had special flaws." (*Id.* at 7.) Judge Zagel awarded one of the decedent's daughters, who had "no functional relationship with her father for a very long period of time," $500 per year for a total award of $14,500.00. (*Id.* at 7.) Judge Zagel awarded $1,500.00 per year for a total award of $43,500.00 to another daughter who had a closer relationship with her father, but who "candidly admitted her relationship with her father was based on some instances of real contact and the rest of it was hope for the future." (*Id.* at 8.) Judge Zagel reasoned that in the case of the second daughter, "because she had started a relationship, because of the [decedent's grandchild], there was a significant possibility that it might continue or at least grow to some extent." (*Id.*) Judge Zagel next awarded one of the decedent's sons, who had a "decent but not extraordinary" relationship with the decedent $2,000.00 per year for a total award of $58,000.00. (*Id.*) Judge Zagel awarded another son, who "quite clearly [had] a relationship with his father" and whose relationship was of the type "that lasts over a period of time," $5,000.00 per year for a total award of $145,000.00. (*Id.* at 9.) Judge Zagel noted that this son "admired his father," "did many of the things that his father did," and Judge Zagel believed that "he would have sought advice from his father, ... [and] would have helped his father." (*Id.*) Finally, Judge Zagel awarded the child who was a minor at the time of the decedent's death and who "had not yet reached that point of adolescent rebellion," $3,000 for 22 years for a total award of $66,000.00. (*Id.*) Judge Zagel then noted that "[t]he more difficult question is, and obviously a more substantial question, is what the loss of the father, what signifi-

cance it had for [the minor child] while he was growing up." (*Id.*) Judge Zagel believed that this loss was "quite substantial" and awarded the youngest child $40,000.00 for seven years for an award of $280,000.00. (*Id.* at 10.) Thus, the total award for the "minor child" was $346,000.00. (*Id.* at 10.) On the basis of *Trunk*, the Government argued that the amounts of $500.00, $1,000.00, or $2,000.00 that Judge Zagel "provided for the children who had little relationship with their father [are] the right touchstone," (June 4, 2012 Tr. 60), and advocated for an award of $100,000.00 or less. (June 4, 2012 Tr. 62.) This Court rejects the Government's approach.

██ 73. The cases demonstrate a distinction—which is evident in *Trunk*—between the awards that minor children and adult children receive. *See, e.g., Barry v. Owens Corning*, 282 Ill.App.3d 199, 217 Ill.Dec. 823, 668 N.E.2d 8, 10 (1st Dist. 1996) (affirming jury awards of $500,000.00 to each adult child, $600,000.00 to the college-age child, and $750,000.00 to the minor child). Importantly in *Trunk*, the child who was eleven years old at the time of his father's death was awarded $40,000.00 per year for each remaining year of his father's life expectancy that the child would have remained a minor, and thereafter, the child was awarded $3,000.00 per year for each remaining year of his father's life expectancy that the child would have been an adult. Judge Zagel did not look at whether there was a preexisting relationship with the minor child, but instead inquired into the significance of the loss of the father on the minor child, which he determined was quite substantial despite the fact that the decedent was significantly flawed. Applying the same methodology here, Solebo's daughter—who was only six months old at the time of her father's death—would receive $40,000.00

for the remaining 17.5 years of Solebo's life expectancy for a total of $700,000.00.

74. A review of jury awards in comparable wrongful death cases reveals that juries have awarded minor children between approximately $40,000.00 and $90,000.00 per year when the life expectancy of the parent is known. For instance, in *Hart v. Almeida*, No.2007–L–006654, 2011 Jury Verdicts LEXIS 15999, at *1 (Ill. Cir. Ct. Cook Cnty. May 12, 2011), a Cook County jury awarded the decedent's daughter who was two years old at the time of her father's death and who did not live with her father, but who nonetheless had a close relationship with her father, $2,504,528.00 in wrongful death damages for loss of society. Family members testified that the daughter's life would never be the same after the loss of her father. The father died at the age of 35, but was expected to live until he was 63 years old, and therefore had a life expectancy of 28 years. Thus, the amount awarded per year for the father's remaining life expectancy was $89,447.43.

75. In *Holston v. Sisters of the Third Order of St. Francis*, 247 Ill.App.3d 985, 187 Ill.Dec. 743, 618 N.E.2d 334, 348 (1st Dist.1993), *aff'd by* 165 Ill.2d 150, 209 Ill. Dec. 12, 650 N.E.2d 985 (1995), an Illinois appellate court affirmed a Cook County jury award of $2,500,000.00 for loss of society to each minor son, ages eight and twelve, of the decedent mother. There, the mother died at the age of 29, but had a life expectancy of 50.6 years. *Id.*, 187 Ill.Dec. 743, 618 N.E.2d at 341. Thus, the amount awarded to the minor children for each year of the mother's remaining life expectancy was $49,407.11.

76. In *Barry*, 217 Ill.Dec. 823, 668 N.E.2d at 10, an Illinois appellate court affirmed a Cook County jury award of $750,000.00 to a minor child who was fifteen or sixteen years old at the time of her

father's death, *see* Pl.'s Br. at *8, *Barry v. Owens–Corning Fiberglas Corp.*, 668 N.E.2d 8, 10 (1st 1996) (No. 1–94–2193), 1995 WL 17168001. There, the father died at the age of 59 but had a life expectancy of 19.1 years. *Barry*, 217 Ill.Dec. 823, 668 N.E.2d at 13. Thus, the amount awarded to the minor child for each year of the father's remaining life expectancy was $39,267.02.

77. The cases demonstrate a trend towards awarding minor children who are younger at the time of a parent's death higher awards than minor children who are older or are teenagers at the time of a parent's death. As in *Hart*, Jadesola did not live with her father. Despite this, Solebo played a significant role in his daughter's life as he selected her name and met her within a week of her birth. In addition, Jadesola visited Solebo at the MCC at least once a week and sometimes twice a week; essentially, Jadesola visited Solebo on every available visiting day. As in *Trunk*, this Court asks about the significance that Solebo's death has had on Jadesola. It is evident that the loss is substantial. Plaintiff testified that Jadesola talks to her father in heaven each night when she says her prayers and that Jadesola asks questions about her father. As Jadesola ages, the enormity of her father's loss has become more palpable and presents itself when she asks her mother why her father cannot pick her up from school or join the family on holidays. Therefore, this Court finds that $90,000.00 for each year of Solebo's remaining life expectancy is an appropriate amount to award to Jadesola, for a total award of $1,575,000.00 in wrongful death damages for loss of society.

78. This amount falls within the range awarded to minor children in comparable wrongful death cases where the life expectancy of the parent is not known. For

instance, in *Arellano v. Cnty. of Cook,* No. 99–L–7279, 2002 Jury Verdicts LEXIS 58369, at *1 (Ill. Cir. Ct. Cook Cnty. June 13, 2002), a Cook County jury awarded $1,300,000.00 in wrongful death damages for loss of society to each of the decedent mother's three minor children, the youngest of whom was a newborn baby. Like Solebo, the mother was 23 years old at the time of her death. Similarly, in *Gleeson v. Stephani,* No. 02–L–14444, 2007 WL 3326695, at *1 (Ill.Cir.Ct. Cook Cnty. Aug. 28, 2007), a Cook County jury awarded $2,000,000.00 in wrongful death damages for loss of the decedent mother's society to each of her minor sons, the youngest of whom was four months old. In *Gleeson,* the mother was 26 years old at the time of her death. In *Hollister v. NW Assoc. for Women's Healthcare,* No. 05–L–8872, 2010 WL 4358538, at *1 (Ill.Cir.Ct. Cook Cnty. Sept. 22, 2010), a Cook County jury awarded $400,000.00 in wrongful death damages for loss of society to each minor son, the youngest of whom was less than two years old at the time of his mother's death. Notably, *Hollister* appears to be an outlier as compared to other jury awards. In *Williams v. City of Chi.,* No. 04–L–11193, 2010 WL 6466042 at *1 (Ill.Cir.Ct. Cook Cnty. Feb. 1, 2010), a Cook County jury awarded $1,000,000.00 in wrongful death damages for loss of society to each of the decedent's minor daughters. The mother in *Williams* was 24 years old when she died. And, in *Kasongo,* 523 F.Supp.2d at 809, an FTCA action seeking damages pursuant to the Illinois Wrongful Death Act, the Judge Rebecca Pallmeyer awarded each of the decedent's minor daughters, the youngest of whom was five years old at the time of the decedent mother's death, $1,000,000.00 for loss of society. Thus, damages awards to minor children in comparable wrongful death cases where the decedent parent's life expectancy is not ascertainable range from $400,000.00 to $2,000,000.00. When the outlier case of *Hollister* is excluded, the range of such awards is from $1,000,000.00 to $2,000,000.00. The award to Jadesola of $1,575,000.00 falls squarely within these ranges.

### D. Comparable cases for loss of consortium

79. Neither the Government nor Plaintiff presented this Court with comparable cases involving loss of consortium awards to a surviving spouse. Nonetheless, some of the cases involving minor children also involved a surviving spouse and are therefore instructive.

80. In *Arellano,* 2002 Jury Verdicts LEXIS 58369 at *1, a Cook County jury awarded the surviving husband $40,000.00 in wrongful death damages for loss of society. The jury verdict form does not contain any information about the relationship between the decedent and her surviving husband. In *Gleeson,* 2007 WL 3326695, at *1, a Cook County jury awarded $75,000.00 in wrongful death damages to the surviving husband for loss of society. Again, the jury verdict form does not contain any information about the relationship between the decedent and her surviving husband. In *Hollister,* 2010 WL 4358538, at *1, a Cook County jury awarded $500,000.00 in wrongful death damages for loss of society to the surviving husband. Again, the jury verdict form does not contain any information about the relationship between the decedent and her surviving husband.

81. In *Kasongo,* 523 F.Supp.2d at 809, Judge Pallmeyer awarded the surviving husband $500,000.00 for loss of society and consortium. There, the decedent and surviving spouse had been married for fourteen years at the time of the decedent's death, and they had three children aged five, seven, and ten. *Id.* The surviving

husband and the decedent had immigrated to the United States in July 2000, after fleeing the Democratic Republic of Congo due to civil wars in that region. *Id.* at 763–64. At trial, the surviving husband testified about his relationship with the decedent, explained that she was the foundation of the family's household, and described his loss as very great. *Id.* at 791.

82. More recently, in *Arpin v. United States,* No. 04–cv–128–DRH, 2009 WL 3816844, at *6 (S.D.Ill. Nov. 13, 2009), an FTCA case grounded on the Illinois Wrongful Death Act, Chief Judge David Herndon awarded the surviving spouse $4,000,000.00 in wrongful death damages for loss of consortium. There, the decedent's widow was described as the "traditional American housewife," and she did not drive or work outside of the home. *Id.* at *3. The decedent, on the other hand, was the family breadwinner. *Id.* As in *Kasongo,* the decedent in *Arpin* was said to have held the family together. *Id.* The decedent and his widow had been married 35 years. *Arpin v. United States,* No. 04–cv–128–DRH, 2006 WL 3314454, at *1 (S.D.Ill. Nov. 15, 2006). Overall, damages awards for a surviving spouse in comparable cases range from $40,000.00 to $4,000,000.00.

83. Undoubtedly, Plaintiff's loss of her husband is significant, but it cannot be said that her loss reaches the same level as the surviving husband's loss in *Kasongo* or the surviving wife's loss in *Arpin.* At the time of Solebo's death, Plaintiff and Solebo had known each other for about three-and-a-half years and had only been married for about a year-and-a-half. Indeed, they were married for only three-and-a-half months prior to Solebo's arrest. Thus, they celebrated their first year wedding anniversary while Solebo was incarcerated at the MCC. Furthermore, although Plaintiff testified that her relationship with So-

lebo between October 2005 and January 2006 was excellent and that they were both happy, the evidence in the record suggests that their relationship was a nascent one and that they were still in the process of getting to know each other. For instance, in November 2005, the couple had a quarrel that they were unable to resolve without involving the police. As a result of this incident, Plaintiff signed a criminal complaint stating that Solebo had physically hurt her. Although Plaintiff testified at trial that Solebo never struck her, this Court finds her testimony on this point less than credible. Nevertheless, it appears that the young couple remained a steady unit throughout Solebo's incarceration as Plaintiff visited him both at Kankakee and at the MCC on every visiting day she could. Thus, this Court finds that while Plaintiff should be compensated for her loss of consortium, a reasonable award is one that falls in the lower range of comparable cases. Accordingly, this Court awards Plaintiff $40,000.00 in wrongful death damages for her loss of consortium.

**E. Reductions for Solebo's contributory fault and the risk of a conviction**

84. The Wrongful Death Act limits the amount of recovery by the decedent's negligence. 740 Ill. Comp. Stat. 180/2. Under the Wrongful Death Act, "the plaintiff's recovery in actions for bodily injury or death is barred if the trier of fact finds that plaintiff's fault is more than 50% of the proximate cause of the injury. If the plaintiff's fault is not more than 50% of the proximate cause of the injury, recovery will not be barred but will be reduced in the proportion of the amount of fault attributable to the plaintiff." *Reiser v. United States,* 786 F.Supp. 1334, 1335–36 (1992) (citing *Fetzer v. Wood,* 211 Ill. App.3d 70, 155 Ill.Dec. 626, 569 N.E.2d 1237, 1240 (1991)); 740 Ill. Comp. Stat.

180/2. Here, this Court has determined that Solebo bore 33% of the fault for not taking his Dilantin as prescribed. Because Solebo did not bear more than 50% of the fault, recovery of damages under the Illinois Wrongful Death Act is not barred, but must be reduced. *See Reiser*, 786 F.Supp. at 1335–36. Accordingly, this Court reduces the awards to Plaintiff and Jadesola by 33% to account for Solebo's contributory fault.

85. Finally, this Court takes into account the fact that Solebo was a pre-trial detainee who was at risk of being convicted. To account for that risk, this Court reduces the total awards for loss of society and loss of consortium by an additional 10%, for a total reduction of 43%.

86. Therefore, this Court reduces the loss of society award to Jadesola by $677,250.00 and accordingly awards her a total of $897,750.00. Similarly, this Court reduces the loss of consortium award to Plaintiff by $17,200.00 and accordingly awards her a total of $22,800.00. Therefore, the total amount of wrongful death damages awarded is $920,550.00.

## CONCLUSION

As Judges Robert Dow and Rebecca Pallmeyer have both previously recognized, FTCA claims involving alleged medical negligence can be "exceedingly challenging," *Hardnick*, 2009 WL 1810106, at *15 (citing *Kasongo*, 523 F.Supp.2d at 812), especially because medicine "is not an exact science." *Id.* For that reason, and many others, this highly contested case presented a number of challenges. This Court is optimistic that some of the breakdowns in administering vital medication and providing adequate medical care to inmates that occurred at the MCC during Solebo's incarceration have now been remedied by improved medical procedures and oversight as a result of recent changes in the MCC leadership. Certainly, it is this Court's hope that the appropriate MCC officials will carefully study this opinion to ensure that these breakdowns do not reoccur in the future.

In this case, this Court finds on the basis of the evidence and expert testimony presented at trial that Plaintiff established by a preponderance of that evidence that the MCC personnel's negligence proximately caused Solebo's unfortunate and untimely death on May 1, 2007, and that the evidence supports this Court's reasonable damages award. Accordingly, this Court enters judgment in favor of Plaintiff and against Defendant on Plaintiff's FTCA action. This Court awards Plaintiff wrongful death damages in the amount of $920,550.00; $897,750.00 to Plaintiff's daughter for loss of society and $22,800.00 to Plaintiff for loss of consortium.